APPEAL,TYPE–D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:25–cv–00385–ABJ</u>
### *Internal Use Only*

DELLINGER v. BESSENT et al

Assigned to: Judge Amy Berman Jackson

Case in other court:   USCA, 25–05025

USCA, 25–05028

Cause: 28:1331 Fed. Question

Date Filed: 02/10/2025

Jury Demand: None

Nature of Suit: 890 Other Statutory Actions

Jurisdiction: U.S. Government Defendant

**<u>Plaintiff</u>**

| | | |
|---|---|---|
| **HAMPTON DELLINGER**<br>*in his personal capacity and in his official capacity as Special Counsel of the Office of Special Counsel* | represented by | **Amy Jeffress**<br>HECKER FINK LLP<br>1050 K St NW<br>Suite 1040<br>Washington, DC 20001<br>202–742–2655<br>Email: ajeffress@heckerfink.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Jackson Erpenbach**<br>HECKER FINK LLP<br>1050 K St NW<br>Suite 1040<br>Washington, DC 20001<br>202–796–1870<br>Email: jerpenbach@heckerfink.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Joshua Adam Matz**<br>HECKER FINK LLP<br>1050 K St NW<br>Suite 1040<br>Washington, DC 20001<br>929–294–2537<br>Fax: 212–564–0883<br>Email: jmatz@heckerfink.com<br>*ATTORNEY TO BE NOTICED* |

V.

**<u>Defendant</u>**

| | | |
|---|---|---|
| **SCOTT BESSENT**<br>*in his official capacity as Secretary of the Treasury* | represented by | **Madeline McMahon**<br>DOJ–CIV<br>1100 L Street NW<br>Washington, DC 20005 |

(202) 451–7722
Fax: (202) 616–8470
Email: madeline.m.mcmahon@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SERGIO GOR**                              represented by  **Madeline McMahon**
*in his official capacity as Director of the*                (See above for address)
*White House Presidential Personnel*                         *LEAD ATTORNEY*
*Office*                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**KAREN GORMAN**                            represented by  **Madeline McMahon**
*in her official capacity as Principal*                      (See above for address)
*Deputy Special Counsel, upon the*                           *LEAD ATTORNEY*
*purported removal of the Special Counsel,*                  *ATTORNEY TO BE NOTICED*
*the Acting Special Counsel of the Office*
*of Special Counsel*

**Defendant**

**KARL KAMMANN**                            represented by  **Madeline McMahon**
*in his official capacity as the Chief*                      (See above for address)
*Operating Officer of the Office of Special*                 *LEAD ATTORNEY*
*Counsel*                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**DONALD J. TRUMP**                         represented by  **Madeline McMahon**
*in his official capacity as President of the*               (See above for address)
*United States of America*                                   *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**RUSSELL VOUGHT**                          represented by  **Madeline McMahon**
*in his official capacity as Director of the*                (See above for address)
*Office of Management and Budget*                            *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Intervenor**

**MITCHELL WINE**
101 Newnata Cutoff
Mountain View, AR 72560
501–350–7663
*TERMINATED: 02/28/2025*

**Intervenor**

**ARKALGUD**                                represented by  **ARKALGUD LAKSHMINARASIMHA**
**LAKSHMINARASIMHA**                                         2602 6th Ave
*TERMINATED: 02/28/2025*                                     Apt 2

Canyon, TX 79015
PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 02/10/2025 | 1 | COMPLAINT against SCOTT BESSENT, SERGIO GOR, KAREN GORMAN, KARL KAMMANN, DONALD J. TRUMP, RUSSELL VOUGHT ( Filing fee $ 405 receipt number ADCDC−11468025) filed by HAMPTON DELLINGER. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons)(Matz, Joshua) (Entered: 02/10/2025) |
| 02/10/2025 | 2 | MOTION for Temporary Restraining Order *Request for Emergency Hearing* by HAMPTON DELLINGER. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Certificate of Compliance with Local Rule 65.1)(Matz, Joshua). Modified docket text on 2/10/2025 (znmw). (Entered: 02/10/2025) |
| 02/10/2025 | 3 | NOTICE of Appearance by Jackson Erpenbach on behalf of HAMPTON DELLINGER (Erpenbach, Jackson) (Entered: 02/10/2025) |
| 02/10/2025 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Kate L. Doniger, Filing fee $ 100, receipt number ADCDC−11468271. Fee Status: Fee Paid. by HAMPTON DELLINGER. (Attachments: # 1 Declaration of Kate L. Doniger, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Matz, Joshua) (Entered: 02/10/2025) |
| 02/10/2025 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Benjamin Stern, Filing fee $ 100, receipt number ADCDC−11468322. Fee Status: Fee Paid. by HAMPTON DELLINGER. (Attachments: # 1 Declaration of Benjamin Stern, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Matz, Joshua) (Entered: 02/10/2025) |
| 02/10/2025 | | Case Assigned to Judge Amy Berman Jackson. (zmtm) (Entered: 02/10/2025) |
| 02/10/2025 | | MINUTE ORDER granting 4 5 Motions for Leave of Kate L. Doniger and Benjamin Stern to Appear Pro Hac Vice only upon condition that the lawyers admitted, or at least one member of the lawyers' firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Amy Berman Jackson on 2/10/25. (DMK) (Entered: 02/10/2025) |
| 02/10/2025 | | NOTICE of Hearing: Motion Hearing set for 2/10/2025 at 4:30 PM in Courtroom 25A– In Person before Judge Amy Berman Jackson. Members of the public can access the hearing via toll free number 833−990−9400. Meeting ID 208322628. (zdrf) (Entered: 02/10/2025) |
| 02/10/2025 | | Minute Entry for proceedings held on 2/10/2025 before Judge Amy Berman Jackson re 2 MOTION for Temporary Restraining Order filed by HAMPTON DELLINGER. Motion arguments heard and taken under advisement. (Court Reporter Janice Dickman.) (zdrf) (Entered: 02/10/2025) |
| 02/10/2025 | | MINUTE ORDER. Pending before the Court is plaintiff's motion for a Temporary Restraining Order 2 . The Court received the motion shortly after it was docketed and assigned this morning, and it was occupied with another hearing for most of the day, so it set a scheduling conference for 4:30 p.m. At the hearing, counsel for the defendants represented that they did not receive the motion until the early afternoon and had not |

yet had an opportunity to file a response. Counsel also indicated that the defendants were unable to take a position as to whether they would be willing to freeze the firing until the Court resolved the legal issues. The Court heard some argument from both sides with respect to the factors it must consider in connection with the motion, and it appreciates the fact that the lawyers were both ready to address them orally, at least in part, this afternoon. But the Court has not yet had the benefit of a written submission by the defendants. Therefore, the defendants' opposition to the motion will be due by noon tomorrow, February 11, 2025. Give the Court's concerns about the potential irreparable harm occasioned by the challenged firing of the Special Counsel, a Presidential appointee confirmed by the Senate to serve a 5–year term who "may be removed by the President only for inefficiency, neglect of duty, or malfeasance," 5 U.S.C. § 1211(b), and given the significant statutory and constitutional issues involved, the Court will defer ruling on the motion until after it has received and considered the defendants' submission. In the interim, though, to preserve the status quo –– which the D.C. Circuit has described as "the regime in place" before the challenged action, Huisha–Huisha v. Mayorkas, 27 F.4th 718, 733–34 (D.C. Cir. 2022), or "the last uncontested status which preceded the pending controversy," id., quoting District 50, United Mine Workers of America v. International Union, United Mine Workers of America, 412 F.2d 165, 168 (D.C. Cir. 1969) –– the Court will issue a brief administrative stay. An administrative stay "buys the court time to deliberate": it "do[es] not typically reflect the court's consideration of the merits," but instead "reflects a first–blush judgment about the relative consequences" of the case. United States v. Texas, 144 S. Ct. 797, 798 (2024) (Barret, J., concurring). While administrative stays are more common in appellate courts, district courts have recognized their applicability in cases seeking emergency relief – including in this District. See National Council of Nonprofits v. Office of Management & Budget, No. 25–CV–239, 2025 WL 314433 (D.D.C. Jan. 28, 2025); Order, Texas v. Department of Homeland Security, No. 24–CV–306 (E.D. Tex. Aug. 26, 2024); Chef Time 1520 LLC v. Small Business Administration, No. 22–CV–3587 (D.D.C. Dec. 1, 2022). As these courts have recognized, the "[t]he authority for an administrative stay arises from the All Writs Act and a court's inherent authority to manage its docket." Order, Texas, No. 24–CV–306, at 2. Therefore, it is HEREBY ORDERED that from the time of this order through midnight on February 13, 2025, plaintiff Hampton Dellinger shall continue to serve as the Special Counsel of the Office of Special Counsel, the position he occupied at 7:22 p.m. on Friday, February 7, 2025 when he received an email from the President, and the defendants may not deny him access to the resources or materials of that office or recognize the authority of any other person as Special Counsel. This period may only be extended by further order of the Court. SO ORDERED. Signed by Judge Amy Berman Jackson on 2/10/2025. (lcabj1) (Entered: 02/10/2025)

| | | |
|---|---|---|
| 02/10/2025 | 6 | NOTICE of Appearance by Madeline McMahon on behalf of All Defendants (McMahon, Madeline) (Entered: 02/10/2025) |
| 02/10/2025 | 7 | NOTICE OF APPEAL TO DC CIRCUIT COURT by SCOTT BESSENT, SERGIO GOR, KAREN GORMAN, KARL KAMMANN, DONALD J. TRUMP, RUSSELL VOUGHT. Fee Status: No Fee Paid. Parties have been notified. (McMahon, Madeline) (Entered: 02/10/2025) |
| 02/11/2025 | 8 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 7 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 02/11/2025) |

| 02/11/2025 | 9 | TRANSCRIPT OF PROCEEDINGS before Judge Amy Berman Jackson held on February 10, 2025; Page Numbers: 1–29. Date of Issuance: February 11, 2025. Court Reporter: Janice Dickman, Telephone number: 202–354–3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/4/2025. Redacted Transcript Deadline set for 3/14/2025. Release of Transcript Restriction set for 5/12/2025.(Dickman, Janice) (Entered: 02/11/2025) |
| 02/11/2025 | 10 | MOTION to Stay *Court's Administrative Stay* by SCOTT BESSENT, SERGIO GOR, KAREN GORMAN, KARL KAMMANN, DONALD J. TRUMP, RUSSELL VOUGHT. (McMahon, Madeline) (Entered: 02/11/2025) |
| 02/11/2025 | 11 | RESPONSE re 2 MOTION for Temporary Restraining Order filed by SCOTT BESSENT, SERGIO GOR, KAREN GORMAN, KARL KAMMANN, DONALD J. TRUMP, RUSSELL VOUGHT. (McMahon, Madeline) (Entered: 02/11/2025) |
| 02/11/2025 |  | USCA Case Number 25–5025 for 7 Notice of Appeal to DC Circuit Court filed by KARL KAMMANN, RUSSELL VOUGHT, DONALD J. TRUMP, KAREN GORMAN, SERGIO GOR, SCOTT BESSENT. (zdp) (Entered: 02/11/2025) |
| 02/11/2025 | 12 | Memorandum in opposition to re 10 Motion to Stay filed by HAMPTON DELLINGER. (Matz, Joshua) (Entered: 02/11/2025) |
| 02/12/2025 | 13 | NOTICE *of the President's Designation of Acting Special Counsel* by SCOTT BESSENT, SERGIO GOR, KAREN GORMAN, KARL KAMMANN, DONALD J. TRUMP, RUSSELL VOUGHT (Hall, Christopher) (Entered: 02/12/2025) |
| 02/12/2025 | 14 | ORDER granting 2 plaintiff's motion for a temporary restraining order. It is HEREBY ORDERED that from the date of entry of this order until the Court rules on the request for a preliminary injunction, Hampton Dellinger shall continue to serve as the Special Counsel of the Office of the Special Counsel. Defendants may not deny him access to the resources or materials of that office or recognize the authority of any other person as Special Counsel. In light of this order, the administrative stay entered on February 10, 2025, Minute Order (Feb. 10, 2025), is hereby VACATED. Defendants' motion to stay the Court's administrative stay 10 is DENIED AS MOOT. The Court will hold a hearing on plaintiff's preliminary injunction on February 26, 2025 at 10:00 AM in Courtroom 25. The parties must confer and inform the Court by February 14 of their position on whether the Court should consolidate consideration of the request for preliminary injunction with consideration of the merits pursuant to Federal Rule of Civil Procedure 65(a)(2), and they must submit a proposed schedule for any additional submissions they believe are warranted. See Order for details. SO ORDERED. Signed |

| | | |
|---|---|---|
| | | by Judge Amy Berman Jackson on 2/12/2025. (lcabj1) (Entered: 02/12/2025) |
| 02/12/2025 | 15 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 14 Order on Motion for TRO,,,,,, Order on Motion to Stay,,,,,, Set/Reset Deadlines/Hearings,,,,, by SCOTT BESSENT, SERGIO GOR, KAREN GORMAN, KARL KAMMANN, DONALD J. TRUMP, RUSSELL VOUGHT. Fee Status: No Fee Paid. Parties have been notified. (McMahon, Madeline) (Entered: 02/12/2025) |
| 02/12/2025 | 16 | MOTION to Stay *Temporary Restraining Order Pending Appeal* by SCOTT BESSENT, SERGIO GOR, KAREN GORMAN, KARL KAMMANN, DONALD J. TRUMP, RUSSELL VOUGHT. (McMahon, Madeline) (Entered: 02/12/2025) |
| 02/13/2025 | 17 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 15 Notice of Appeal to DC Circuit Court,. (znmw) (Entered: 02/13/2025) |
| 02/13/2025 | | USCA Case Number 25–5028 for 15 Notice of Appeal to DC Circuit Court, filed by KARL KAMMANN, RUSSELL VOUGHT, DONALD J. TRUMP, KAREN GORMAN, SERGIO GOR, SCOTT BESSENT. (zdp) (Entered: 02/13/2025) |
| 02/13/2025 | 18 | MOTION to Intervene by MITCHELL WINE. (zdp) (Entered: 02/13/2025) |
| 02/13/2025 | 19 | ORDER denying 16 defendants' motion to stay. See Order for details. Signed by Judge Amy Berman Jackson on 2/13/2025. (lcabj1) (Entered: 02/13/2025) |
| 02/14/2025 | 20 | Joint STATUS REPORT by SCOTT BESSENT, SERGIO GOR, KAREN GORMAN, KARL KAMMANN, DONALD J. TRUMP, RUSSELL VOUGHT. (McMahon, Madeline) (Entered: 02/14/2025) |
| 02/15/2025 | | MINUTE ORDER. In light of the joint status report 20 , plaintiff's 10–page reply to the opposition to his motion for a temporary restraining order, now deemed to be a motion for a preliminary injunction, will be due on February 20, 2025. In the absence of opposition on the part of either party, it is hereby further ORDERED that the Court's consideration of the motion for preliminary injunction will be consolidated with consideration of the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). This means that additional submissions are necessary, even if just for procedural purposes. Defendants' motion for summary judgment is due on February 21, 2025. Plaintiff's opposition, and his cross–motion for summary judgment, if any, to be supported by a single, combined memorandum of points and authorities, will be due on February 24, 2025. Defendants' reply, combined with their opposition to plaintiff's cross–motion, if necessary, is due on February 25, 2025. Plaintiff's reply in support of his cross–motion, if necessary, is due on February 27, 2025. Rather than re–submitting identical briefs, the parties may state in their motions that they are incorporating or relying on previously filed memoranda in support of or in opposition to the temporary restraining order as the memoranda supporting or opposing the motions for summary judgment, but they are not required to do so. SO ORDERED. Signed by Judge Amy Berman Jackson on 2/15/2025. (lcabj1) (Entered: 02/15/2025) |
| 02/20/2025 | 21 | REPLY to opposition to motion re 2 Motion for TRO, filed by HAMPTON DELLINGER. (Matz, Joshua) (Entered: 02/20/2025) |
| 02/21/2025 | 22 | MOTION for Summary Judgment by SCOTT BESSENT, SERGIO GOR, KAREN GORMAN, KARL KAMMANN, DONALD J. TRUMP, RUSSELL VOUGHT. (Attachments: # 1 Text of Proposed Order, # 2 Statement of Facts)(McMahon, |

| | | Madeline) (Entered: 02/21/2025) |
|---|---|---|
| 02/24/2025 | 23 | Cross MOTION for Summary Judgment , MOTION for Permanent Injunction by HAMPTON DELLINGER. (Attachments: # 1 Statement of Facts, # 2 Text of Proposed Order)(Matz, Joshua) (Entered: 02/24/2025) |
| 02/24/2025 | 24 | Memorandum in opposition to re 22 Motion for Summary Judgment filed by HAMPTON DELLINGER. (Attachments: # 1 Statement of Facts, # 2 Text of Proposed Order)(Matz, Joshua) (Entered: 02/24/2025) |
| 02/25/2025 | | NOTICE: As noted in the Court Order dated February 12, 2025, the parties shall appear in person for a preliminary injunction hearing on February 26, 2025 at 10:00 AM in Courtroom 25A. Members of the public can access the hearing via Toll Free Number 833–990–9400; Meeting ID 208322628. (zdrf) (Entered: 02/25/2025) |
| 02/25/2025 | 25 | REPLY to opposition to motion re 22 Motion for Summary Judgment *and Response in Opposition to Plaintiff's Cross–Motion for Summary Judgment* filed by SCOTT BESSENT, SERGIO GOR, KAREN GORMAN, KARL KAMMANN, DONALD J. TRUMP, RUSSELL VOUGHT. (McMahon, Madeline) (Entered: 02/25/2025) |
| 02/26/2025 | 26 | NOTICE of Appearance by Amy Jeffress on behalf of HAMPTON DELLINGER (Jeffress, Amy) (Entered: 02/26/2025) |
| 02/26/2025 | | Minute Entry for Preliminary Injunction proceedings held on 2/26/2025 before Judge Amy Berman Jackson. Arguments heard and taken under advisement. (Court Reporter Janice Dickman) (zdrf) (Entered: 02/26/2025) |
| 02/26/2025 | 27 | ORDER. It is hereby ORDERED that the temporary restraining order be extended for three days, through Saturday, March 1, 2025. See Order for details. SO ORDERED. Signed by Judge Amy Berman Jackson on 2/26/2025. (lcabj1) (Entered: 02/26/2025) |
| 02/27/2025 | 28 | TRANSCRIPT OF PROCEEDINGS before Judge Amy Berman Jackson held on February 26, 2025; Page Numbers: 1–66. Date of Issuance:February 27, 2025. Court Reporter: Janice Dickman, Telephone number: 202–354–3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/20/2025. Redacted Transcript Deadline set for 3/30/2025. Release of Transcript Restriction set for 5/28/2025.(Dickman, Janice) (Entered: 02/27/2025) |
| 02/27/2025 | 29 | REPLY to opposition to motion re 23 Motion for Summary Judgment, Motion for Permanent Injunction filed by HAMPTON DELLINGER. (Matz, Joshua) (Entered: 02/27/2025) |

| 02/28/2025 | 30 | MOTION to Intervene, MOTION for Joinder by ARKALGUD LAKSHMINARASIMHA. "Leave to File Granted." Signed by Judge Amy B. Jackson on 2/28/2025 (zdp) (Entered: 02/28/2025) |
| 02/28/2025 | 31 | LEAVE TO FILE DENIED– ARKALGUD LAKSHMINARASIMHA; Motion to Intervene and Motion for Joinder This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to File Denied, Multiple Filings as Duplicative".. Signed by Judge Amy Berman Jackson on 2/28/2025. (zdp) (Entered: 02/28/2025) |
| 02/28/2025 | | MINUTE ORDER denying 18 Motion to Intervene. Movant has not made a showing that he satisfies the requirements to intervene as of right under Fed. R. Civ. Proc. 24(a) because: (1) he is not given an unconditional right to intervene by any federal statute, and (2) he does not claim an interest relating to any property of transaction that is the subject of the action and is not so situated that disposing of the action may as a practical matter impair or impede his ability to protect that interest. Movant has also not shown that the Court should exercise its discretion to grant permissive intervention under Rule 24(b)(1), since: (A) he is not given a conditional right to intervene by any federal statute, and (B) he does not have a claim or defense that shares a common question of law or fact with the main action. The issue before the Court is whether the effort to terminate the Special Counsel's position without identifying a reason comports with the relevant statute, 5 U.S.C.§ 1211(b), and whether that statute is constitutional. Those are questions of law, not fact. The Court understands that the movant has an opinion, based on the handling of a matter in which he was involved, concerning the Special Counsel's performance of his duties, but given the issues to be resolved in this case, movant's personal experience and opinion do not bear on the resolution of the purely legal issues presented. SO ORDERED. Signed by Judge Amy Berman Jackson on 2/28/25. (DMK) (Entered: 02/28/2025) |
| 02/28/2025 | | MINUTE ORDER denying 30 Motion to Intervene and denying 30 Motion for Joinder. Movant has not made a showing that he satisfies the requirements to intervene as of right under Fed. R. Civ. Proc. 24(a) because: (1) he is not given an unconditional right to intervene by any federal statute, and (2) he does not claim an interest relating to any property of transaction that is the subject of the action and is not so situated that disposing of the action may as a practical matter impair or impede his ability to protect that interest. Movant has also not shown that the Court should exercise its discretion to grant permissive intervention under Rule 24(b)(1), since: (A) he is not given a conditional right to intervene by any federal statute, and (B) he does not have a claim or defense that shares a common question of law or fact with the main action. The issue before the Court is whether the effort to terminate the Special Counsel's position without identifying a reason comports with the relevant statute, 5 U.S.C.§ 1211(b), and whether that statute is constitutional. Those are questions of law, not fact, and movant's other matters do not bear on those questions. With respect to the motion for joinder, "[i]ntervention is used by a person who is outside the litigation and wishes to join it, while permissive joinder is initiated by a person who is already a party to the proceeding and wishes to bring in another party." 25 Fed. Proc., L. Ed. § 59:164; see Fed. R. Civ. Pro. 20. Because movant is not a party to this proceeding, joinder does not apply. For these reasons, the motion for intervention and the motion for joinder are hereby DENIED. Further, given that the movant has sent multiple, subsequent, duplicative filings to the court, which are insufficient for the same reasons, and that and that court staff have fielded multiple daily calls and emails from him, the Clerk of Court is direct not to accept any further filings from this movant. SO ORDERED. Signed by Judge Amy Berman Jackson on 2/28/25. (DMK) (Entered: 02/28/2025) |

| 03/01/2025 | 32 | MEMORANDUM OPINION. Signed by Judge Amy Berman Jackson on 3/1/2025. (lcabj1) (Entered: 03/01/2025) |
|---|---|---|
| 03/01/2025 | 33 | ORDER denying 22 defendants' motion for summary judgment and granting 23 plaintiff's cross−motion for summary judgment and granting declaratory and injunctive relief. See Order for details. SO ORDERED. Signed by Judge Amy Berman Jackson on 3/1/2025. (lcabj1) (Entered: 03/01/2025) |
| 03/01/2025 | 34 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 33 Order on Motion for Summary Judgment,,,, Order on Motion for Permanent Injunction, by SCOTT BESSENT, SERGIO GOR, KAREN GORMAN, KARL KAMMANN, DONALD J. TRUMP, RUSSELL VOUGHT. Fee Status: No Fee Paid. Parties have been notified. (McMahon, Madeline) (Entered: 03/01/2025) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HAMPTON DELLINGER,

*Plaintiff,*

*v.*

SCOTT BESSENT, *et al.,*

*Defendants.*

Civil Action No. 1:25-cv-00385-ABJ

## DEFENDANTS' NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's memorandum opinion and order granting Plaintiff's cross-motion for summary judgment and denying Defendants' motion for summary judgment. *See* ECF Nos. 32, 33.

Dated: March 1, 2025

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

CHRISTOPHER R. HALL
*Assistant Branch Director*

*/s/ Madeline M. McMahon*
MADELINE M. MCMAHON
(DC Bar No. 1720813)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 451-7722
Email: madeline.m.mcmahon@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                    )
**HAMPTON DELLINGER**     )
*in his personal capacity and*   )
*in his official capacity as*    )
*Special Counsel of the*      )
*Office of Special Counsel*,    )
                    )
          Plaintiff,   )
                    )   Civil Action No. 25-0385 (ABJ)
    v.                )
                    )
**SCOTT BESSENT**       )
*in his official capacity as*    )
*Secretary of the Treasury*, *et al.*, )
                    )
         Defendants.  )
_____)

## <u>ORDER</u>

Pursuant to Federal Rule of Civil Procedure 56 and 58 and for the reasons stated in the accompanying Memorandum Opinion [Dkt. # 32], it is hereby **ORDERED** that plaintiff's motion for summary judgment and motion for a permanent injunction [Dkt. # 23] is **GRANTED**, and the Court hereby enters judgment in favor of plaintiff on Count One. Defendants' motion for summary judgment [Dkt. # 22] is **DENIED**.

Furthermore, for the reasons set forth in the Memorandum Opinion:

It is **DECLARED** that plaintiff Hampton Dellinger is the Special Counsel of the Office of Special Counsel, having been appointed by the President and confirmed by the United States Senate on February 27, 2024.

It is further **DECLARED** that the February 7, 2025 email from the Assistant to the President, Director of Presidential Personnel Office, The White House, announcing plaintiff's termination was an unlawful, ultra vires act in violation of 5 U.S.C. §1211(b). Therefore, it is null and void, and plaintiff is and shall be the Special Counsel of the Office of Special Counsel for the remainder of his five-year term unless and until he is removed in accordance with 5 U.S.C. §1211(b).

It is further **DECLARED** that any recognition of an Acting Special Counsel in his place is unlawful.

In accordance with this declaratory judgment, it is hereby **ORDERED** that defendants Secretary Scott Bessent, Director Sergio Gor, Principal Deputy Special Counsel Karen Gorman, Chief Operating Officer Karl Kammann, and Director Russell Vought are **ENJOINED** as follows:

As of the date of this order, March 1, 2025, through the expiration of plaintiff's five-year term as Special Counsel, defendants Bessent, Gor, Gorman, Kammann, and Vought must recognize plaintiff's title and position as Special Counsel of the Office of Special Counsel; they must not obstruct or interfere with his performance of his duties; they must not deny him the authority, benefits, or resources of his office; they must not recognize any Acting Special Counsel in his place; and they must not treat him in any way as if he has been removed, or recognize any other person as Special Counsel or as the head of the Office of Special Counsel, unless and until he is removed from office in accordance with 5 U.S.C. §1211(b).

Given the entry of judgment, the Temporary Restraining Order issued on February 12, 2025 [Dkt. # 14] and extended on February 26 [Dkt. # 27] until today is hereby **VACATED.**

This is a final appealable order.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  March 1, 2025.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **HAMPTON DELLINGER** ) | |
| *in his personal capacity and* ) | |
| *in his official capacity as* ) | |
| *Special Counsel of the* ) | |
| *Office of Special Counsel,* ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 25-0385 (ABJ) |
| v. ) | |
| ) | |
| **SCOTT BESSENT** ) | |
| *in his official capacity as* ) | |
| *Secretary of the Treasury, et al.,* ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM OPINION

> On behalf of President Donald J. Trump, I am writing to inform you that your position as Special Counsel of the US Office of Special Counsel is terminated, effective immediately.  Thank you for your service[.]

Ex. A to Compl. [Dkt. # 1-1] ("Ex. A").

As of the close of the business day on February 7, 2025, plaintiff Hampton Dellinger was the Special Counsel of the Office of Special Counsel, having been appointed to a five-year term by the President of the United States and confirmed by the United States Senate.  In that position, he served as the head of the small independent agency tasked with shielding federal employees from prohibited personnel practices, including retaliation for whistleblowing, in the workplace.

At 7:22 p.m. that evening, he received the email message above from Sergio N. Gor, Assistant to the President, Director of Presidential Personnel Office, The White House, with no additional explanation or reasoning.

On Monday, February 10, 2025, plaintiff filed this action to assert his entitlement to the position of Special Counsel and prevent the defendants from interfering with or removing him from that role. *See* Compl. [Dkt. # 1]. He sued Scott Bessent, in his official capacity as Secretary of the Treasury; Sergio Gor, in his official capacity as Director of the White House Presidential Personnel Office; Karen Gorman, in her official capacity as Principal Deputy Special Counsel; Karl Kammann, in his official capacity as the Chief Operating Officer of the Office of Special Counsel; Donald J. Trump, in his official capacity as President of the United States; and Russell Vought, in his official capacity as Director of the Office of Management and Budget. *See* Compl. at 1.

At the same time, plaintiff moved for a temporary restraining order to enjoin the effort to terminate him. Pl.'s Mot. for a TRO [Dkt. # 2] ("Mot. for TRO"). The proceedings and rulings that followed will be set out in detail below. For purposes of this introduction, it is important to add that plaintiff later moved for a motion for preliminary injunction as well, and the Court scheduled a hearing. In the interim, with the parties' consent, the Court consolidated the motion for a preliminary injunction with consideration of the merits pursuant to Federal Rule of Civil Procedure 65(b). *See* Minute Order (Feb. 15, 2025).

On February 21, defendants moved for summary judgment in their favor. Defs.' Mot. for Summ. J. [Dkt. # 22] ("Defs.' Mot."). On February 24, plaintiff filed a combined opposition to defendants' motion, cross-motion for summary judgment on Count 1, and motion for permanent injunction. Pl.'s Cross-Mot. for Summ. J. and Permanent Inj. and Opp. to Defs.' Mot. [Dkt. # 23]

("Pl.'s Mot."). The motions are fully briefed,[1] and on February 26, the Court held a lengthy hearing on the consolidated motions. *See* Minute Entry (Feb. 26, 2025).

There is no dispute that the statute establishing the Office of Special Counsel provides that the Special Counsel may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office, and that the curt email from the White House informing the Special Counsel that he was terminated contained no reasons whatsoever. This is the basis for Count 1, which alleges that the termination was an unlawful, ultra vires action, and the basis for plaintiff's assertion that he is entitled to declaratory and injunctive relief. Compl. ¶¶ 37–41. The Court will grant plaintiff's motion and enter judgment in his favor.[2]

Defendants take the position that the statutory provision is unconstitutional and should be struck down rather than enforced. They insist that the President of the United States must have control over the head of this small federal agency, as he does over all administrative agencies, notwithstanding its narrow focus and its negligible impact on private actors or any sector of the economy. Plaintiff does not disagree with that. Congress did not disagree with that. It enshrined Presidential control in the statute by providing that he may remove the Special Counsel for the

---

1    On February 25, defendants filed a combined reply in support of their summary judgment motion and opposition to plaintiff's cross-motion. Defs.' Reply in Supp. of Defs.' Mot. and Resp. in Opp. to Pl.'s Mot. [Dkt. # 25] ("Defs.' Reply"). On February 27, plaintiff filed his combined reply in support of his cross-motion and opposition to the government's motion for summary judgment. *See* Reply in Supp. of Pl.'s Mot. and Opp. to Defs.' Mot. [Dkt. # 29] ("Pl.'s Reply").

2    Given that determination, the Court need not reach Count Two, Compl. ¶¶ 42–43, predicated on the Administrative Procedure Act, or Count Four predicated on the constitutional separation of powers and the Take Care Clause. Compl. ¶¶ 46–47. The other counts – Count Three for declaratory judgment, Count Five for writ of mandamus, and Count Six for injunctive relief – relate to the remedies sought. Compl. ¶¶ 44–45, 48–50, 51–52. The ruling also means that defendants' motion for summary judgment will be denied.

three relatively broad, but specified reasons.  Defendants maintain, though, that the Constitution demands that the President should have unfettered authority to fire him for no reason at all.

In short, the question presented in this case is whether it is an unconstitutional intrusion on the President's Article II powers to say that he may remove the Special Counsel for reasons related to his performance, but he cannot do it on a whim or out of personal animus.  It is an extremely narrow question with little or no precedential value given the sui generis nature of the Office of Special Counsel, and the fact that there is no longer any other agency with a single head, protected by similar restrictions, in the executive branch.

The Court finds that the statute is not unconstitutional.  And it finds that the elimination of the restrictions on plaintiff's removal would be fatal to the defining and essential feature of the Office of Special Counsel as it was conceived by Congress and signed into law by the President: its independence.  The Court concludes that they must stand.

A review of both the statutory provisions setting out the powers and functions of the Office of Special Counsel, and the history of the legislation establishing the Special Counsel's position and the terms of his tenure, reveals that his independence is inextricably intertwined with the performance of his duties.  The Special Counsel's job is to look into and expose unethical or unlawful practices directed at federal civil servants, and to help ensure that whistleblowers who disclose fraud, waste, and abuse on the part of government agencies can do so without suffering reprisals.  It would be ironic, to say the least, and inimical to the ends furthered by the statute if the Special Counsel himself could be chilled in his work by fear of arbitrary or partisan removal.

Moreover, striking down the removal provision in the statute is not necessary for any of the reasons that have animated the invalidation of similar restrictions in the past.  This Court's ruling that the attempt to terminate the Special Counsel was unlawful is entirely consistent with

the decisions reached and the legal framework set forth in the Supreme Court's most recent opinions on this subject: *Seila Law LLC v. Consumer Financial Protection Bureau* and *Collins v. Yellen*.

First, those cases do not require a finding that the removal protections on the Special Counsel are unconstitutional because they expressly acknowledge that the Office of Special Counsel is not at all comparable to the agencies they were addressing.

Second, and more importantly, this case does not present the affront to the President's Article II authority that those did. What troubled the Court in both *Seila Law* and *Collins* were restrictions on the President's ability to remove an official who wields significant executive authority. The Special Counsel simply does not. He cannot bring a case in court on behalf of the United States, impose a disciplinary sanction on behalf of the United States, demand payment on behalf of the United States, promulgate a regulation on behalf of the United States, or issue a decision on behalf of the United States. While he may perform some typically executive functions, such as conducting investigations, he has no power to enforce his own subpoenas or to overcome other agencies' objections to his requests for records. If an inquiry reveals wrongdoing, he cannot bring a complaint or call for corrective action himself; he must petition a multi-headed quasi-judicial agency, or the appropriate administrative agency under Presidential control itself, to do so. They are free to turn him down.

The Special Counsel acts as an ombudsman, a clearinghouse for complaints and allegations, and after looking into them, he can encourage the parties to resolve the matter among themselves. But if that fails, he must direct them elsewhere. And along the way, while he is required to inform the President of certain findings, the statute also specifically directs him to report directly to Congress.

This is not significant executive authority. It is hardly executive authority at all.

Finally, the underlying assumption of *Seila Law* and *Collins* is that a President necessarily operates through his executive agencies as he performs his duty to take care that the laws are faithfully executed. Therefore, the President must be able to not only choose, but also remove, agency heads, because their jobs entail serving as an extension of his own executive authority. Plaintiff does not take issue with that proposition either. But he maintains that the Special Counsel is unique in that he cannot be characterized in that manner. The Office of Special Counsel is not assigned responsibilities that include furthering the administration's agenda; it is the Special Counsel's job to look into and shine light on a set of specific prohibited practices so that the other bodies, in the appropriate exercise of their constitutional authority, can take whatever action they deem to be appropriate. To do this as Congress intended that he should, he must remain entirely free of partisan or political influence, and that is why the statute survives scrutiny even under the most recent precedent.

In sum, it would be antithetical to the very existence of this particular government agency and position to vindicate the President's Article II power as it was described in *Humphrey's Executor*: a constitutional license to bully officials in the executive branch into doing his will.

For those reasons and the reasons stated below, plaintiff's cross-motion for summary judgment [Dkt. # 23] will be **GRANTED**, and defendants' motion for summary judgment [Dkt. # 22] will be **DENIED**.

## BACKGROUND

### A. Legislative History

The Special Counsel is the head of the Office of Special Counsel ("OSC"), 5 U.S.C. § 1211(a), an independent agency of the United States with a century-old origin and a history of fulfilling its statutory function spanning twelve presidential administrations.

The OSC was created within the context of the laws that first established the concept of a corps of federal civil servants and, over time, defined their rights and obligations. This began with the Pendleton Civil Service Act of 1883 ("Pendleton Act"), 22 Stat. 403 (1883),[3] which created a "classified" federal civil service and "required competitive examination for entry into that service." *Arnett v. Kennedy*, 416 U.S. 134, 149 (1974). For almost a century before the Pendleton Act, "federal employment was regarded as an item of patronage, which could be granted, withheld, or withdrawn for whatever reasons might appeal to the responsible executive hiring officer." *Id.* at 148. The resulting spoils system was "often . . . treated as a method of rewarding support at the polls," *Hampton v. Mow Sun Wong*, 426 U.S. 88, 107 (1976), and that gave rise to a federal workforce where employees were selected and advanced based on political or personal favoritism, rather than competence. S. Rep. No. 95-969, at 2–3 (1978).

---

3    The National Archives has transcribed the full text of the Pendleton Act, which can be found at *Pendleton Act (1883)*, Nat'l Archive (last reviewed Feb. 8, 2022), https://www.archives.gov/milestone-documents/pendleton-act#:~:text=Approved%20on%20January%2016%2C%201883%2C%20the%20Pendleton%20Act,passed%20the%20Pendleton%20Act%20in%20January%20of%201883.

Growing "sentiment for 'Civil Service reform'" in the wake of the Civil War and the subsequent assassination of President James A. Garfield,[4] *Arnett*, 416 U.S. at 148, led to the enactment of the Pendleton Act "to eliminate the abuses associated with the patronage system from much of the federal service. *Hampton*, 426 U.S. at 106. The Act replaced the patronage system with a "system of merit appointment, based on competitive examination." *Id.* at 107. As the Senate Report on the legislation described:

> The single, simple, fundamental, pivotal idea of the whole bill is, that whenever, hereafter, a new appointment or a promotion shall be made in the subordinate civil service in the departments or larger offices, such appointment or promotion shall be given to the man who is best fitted to discharge the duties of the position, and that such fitness shall be ascertained by open, fair, honest, impartial competitive examination. The impartiality of those examinations is to be secured by every possible safeguard. They are to be open to all who choose to present themselves. There will be tests of fitness of the applicant for the particular place to which he aspires.

*Nat'l Treasury Emps. Union v. Horner*, 654 F. Supp. 1159, 1161–62, quoting S. Rep. No. 576, at 13–14 (1882).

To "police patronage" in the new merit-based system, S. Rep. No. 95-969, at 4, the Pendleton Act created the United States Civil Service Commission ("Commission"), consisting of three commissioners appointed by the President. 22 Stat. 403. "The Commission's job was to screen, examine, and present a choice of applicants to fill jobs in the agencies." S. Rep. 95-969, at 4. The Commission also aided the President in "preparing suitable rules" for the federal civil service, which, as Congress directed, were to include: (1) "no person in the public service

---

4    According to the Supreme Court in *Arnett v. Kennedy*, 416 U.S. 134 (1974), the need for serious civil service reform was "brought to a head" when President Garfield was "accosted in Washington's Union Station and shot by a dissatisfied office seeker who believed that the President had been instrumental in refusing his request for appointment as United States Consul in Paris." 416 U.S. at 148.

is . . . under any obligations to contribute to any political fund, or to render any political service, and that he will not be removed or otherwise prejudiced for refusing to do so"; and (2) "no person in said service has any right to use his official authority or influence to coerce the political action of any person or body."  22 Stat. 403, § 2.

Despite the "enormous growth in federal employment" in the century following the Pendleton Act, in which the number of federal employees "increased from approximately 131,000 to almost 2.9 million," there was no "systematic . . . review or revision" of the civil service system again until 1978.  S. Rep. No. 95-969, at 1.  In the meantime, it had become clear that the Civil Service Commission did not "serve[] particularly well" as a management agency.  *Id.* at 5.  Although the Commission was not originally intended to be a "central personnel agency," over time, it had "assumed full [administrative] responsibility" over the vast majority of the federal workforce.  *Id.*  And because the Commission picked up "a variety of functions," several "conflicts inherent in [its] responsibilities" emerged, with the agency being required to "simultaneously serve as a management agent for a president elected through a partisan political process as well as the protection of the merit system from a partisan abuse."  *Id.*  As a result of the conflicting functions and the "expect[ation] to be all things to all parties – presidential counsellor, merit watchdog, employee protector, and agency advisory – the [C]ommission ha[d] become progressively less credible in all of its roles."  *Id.*

In an effort to remedy the situation, in June 1977, President Jimmy Carter assembled officials from the Civil Service Commission, the Office of Management and Budget, and other executive agencies to produce a report and set of recommendations for improving the federal personnel system.  *Id.* at 1–2.  On March 2, 1978, President Carter sent a letter to Congress with his proposal for "a comprehensive program to reform the Federal Civil Service system," intended

to "increase the government's efficiency" while "ensuring that employees and the public are protected against political abuse of the system." President Jimmy Carter, Federal Civil Service Message to Congress (Mar. 2, 1978) ("President Carter Letter").[5] Among other things, he proposed to replace the Civil Service Commission with two agencies: (1) the Office of Personnel Management, which would be the "center for personnel administration"; and (2) the Merit Protection Board, which would be "the adjudicatory arm of the new personnel system." *Id.* As part of the Merit Protection Board, President Carter proposed the creation of a "Special Counsel," who would "investigate and prosecute political abuses and merit system violations," and "safeguard the rights" of employees who "'blow the whistle' on violations of laws." *Id.* In his letter, President Carter emphasized the need for "independent and impartial protection" for federal employees. *Id.*

In response, Congress immediately began crafting the legislation that would massively reform the civil service system, the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C § 1101 *et seq.* As the Senate Report detailing the Act's history describes, Congress adopted President Carter's recommendation by "provid[ing] for an independent merit systems protection board and special counsel to adjudicate employee appeals and protect the merit system." S. Rep. No. 95-969, at 2. Both entities were intended to protect employees from "improper political influences or personal favoritism in the recruiting, hiring, promotion, or dismissal processes," and "to protect individuals who speak out about government wrongdoing from reprisals." *Id.* at 18. The Merit Systems Protection Board would act "as a quasi-judicial body, empowered to determine when

---

[5] The American Presidency Project hosted by the University of California, Santa Barbara, has transcribed the letter, which can be found at *Letter from Jimmy Carter, President of the United States, to Congress*, Am. Presidency Project (Mar. 2, 1978), https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-message-the-congress.

abuses or violations of law have occurred" and to "order corrective action" to "discipline employees who commit abuses." *Id.* at 24. As part of the MSPB, the Special Counsel would "receive and investigate allegations of prohibited personnel practices in violation of the merit system," with a "mandate to . . . prevent reprisals against government 'whistle blowers.'" *Id.*

The whistleblower mandate was particularly important to Congress:

> Protecting employees who disclose government illegality, waste, and corruption is a major step toward a more effective civil service. In the vast federal bureaucracy it is not difficult to conceal wrongdoing provided that no one summons the courage to disclose the truth. Whenever misdeeds take place in a federal agency, there are employees who know that it has occurred, and who are outraged by it. What is needed is a means to assure them that they will not suffer if they help uncover and correct administrative abuses. What is needed is a means to protect the Pentagon employee who discloses billions of dollars in cost overruns, the GSA employee who discloses widespread fraud, and the nuclear engineer who questions the safety of certain nuclear plants. These conscientious civil servants deserve statutory protection rather than bureaucratic harassment and intimidation.

*Id.* at 8.

Given their roles, Congress intended the MSPB and the Special Counsel to be "independent of any control or direction by the President." *Id.* at 24. But the legislators struggled to define the Special Counsel. The original draft of the CSRA set a seven-year term limit for the Special Counsel, *id.* at 29, the same term length as members of the MSPB. *Id.* at 28. Believing that a seven-year term "was too long," Congress later amended the term to a four-year term coterminous with the President, *id.*, which matched President Carter's proposed legislation. Reorganization Plan No. 2 of 1978, 43 Fed. Reg. 36037, 36039 (Aug. 15, 1978). But Congress noted the need for a for-cause removal restriction on the Special Counsel, explaining:

> Because the Special Counsel may be called upon to investigate prohibited personnel practices in the executive branch, and to bring disciplinary actions against executive branch officials, the Committee believed it is essential that the Special Counsel be independent of presidential direction and control. Accordingly, subsection (b) was added by the Committee to

11

> provide that the Special Counsel may be removed by the president only for
> inefficiency, neglect of duty, or malfeasance in office.

S. Rep. No. 95-969, at 29.

The debate did not stop there. Senators Charles Mathias (R-Md.) and Ted Stevens (R-Alaska) took issue with a shortened term, arguing:

> [The Special Counsel] would be responsible for investigating prohibited
> personnel practices and prosecuting those who commit such practices.
> Appointed by the President with the consent of the Senate to serve during
> the president's term, he would be, and would be perceived as being, a
> political appointee serving at the pleasure of the administration. How then
> would it be possible for the special counsel to initiate, thoroughly
> investigate, and then take actions which by their very nature could prove
> embarrassing to the administration? To be effective and to enjoy the
> confidence of the people, the Special Counsel must be insulated from overt
> and subtle influences of the president and his appointees.

*Id.* at 134. And, on the other side, there was objection to the for-cause removal restriction on the

Special Counsel's position. Commenting on a draft of the CSRA that included the seven-year

term, the Office of Legal Counsel ("OLC") issued an opinion that Congress could "not properly

limit" the President's power to remove the Special Counsel because his functions were "executive

in character." Mem. Op. for the Gen. Couns., Civ. Serv. Comm'n, 2 Op. O.L.C. 120, 120 (1978).

The OLC pointed in particular to the Special Counsel's "role in investigating and prosecuting

prohibited practices," equating the position to "that of a U.S. attorney or other Federal

prosecutors." *Id.* at 120.

Despite the OLC's opinion, the view of Senators Mathias and Stevens eventually carried

the day. The final version of the Civil Services Reform Act passed by Congress created the

"Special Counsel of the Merits Systems Protection Board" to serve a five-year term with removal

only for cause. Civil Services Reform Act of 1978, Pub. L. No. 95-454, § 1024, 92 Stat 1111,

1122. The CSRA gave the President power to appoint the Special Counsel, "by and with the advice

12

and consent of the Senate," and it required that the Special Counsel be an attorney. *Id.* President Carter signed the CSRA on October 13, 1978, praising Congress's "bipartisan efforts" to safeguard employees from "political intrusion" and assure "that whistleblowers will be heard" and "protected." President Jimmy Carter, Civil Service Reform Act of 1978 Statement on Signing S. 2640 Into Law (Oct. 13, 1978).[6]

The CSRA authorized the Special Counsel to "receive" and "investigate" allegations of a "prohibited personnel practice[s]," and it enabled federal employees to disclose "mismanagement," "gross waste of funds," "abuse of authority," dangers to public health or safety, and "violations of law" in confidence. Civil Services Reform Act § 1206. In both of his roles, the Special Counsel was tasked with collecting information and reporting it to another body. If he determined that there were "reasonable grounds" that a prohibited practice occurred, he was required to report that determination to the MSPB and he could "request" that the MSPB take corrective action. *Id.* And if he determined that there was "a substantial likelihood that the information disclose[d]" government wrongdoing, he could require the agency involved to investigate and write a report on the issue, for submission to Congress, the President, and in cases of criminal conduct, to the Attorney General. *Id.* The Special Counsel was also required to "submit an annual report to . . . Congress" on his activities, which would transmit "whatever recommendations for legislation or other action by Congress the Special Counsel may deem appropriate." *Id.*

---

6    The American Presidency Project has also transcribed this letter, which can be found at *Civil Service Reform Act of 1978 Statement on Signing S.2640 Into Law*, Am. Presidency Project (Oct. 13, 1978), https://www.presidency.ucsb.edu/documents/civil-service-reform-act-1978-statement-signing-s-2640-into-law.

Ten years after the enactment of the Civil Services Reform Act, however, it had "become clear" to Congress that the law "did not go far enough in its protection for whistleblowers." 135 Cong. Rec. 564 (1989) (statement of Sen. Carl Levin). In the first eight years of its existence, the Office of Special Counsel had "not taken any corrective action or disciplinary action in 99 percent of [its] whistleblower cases." 135 Cong. Rec. 5039 (1989) (statement of Rep. Steny Hoyer). A study conducted by the General Accounting Office found that out of the "over 400 whistleblower cases" filed with the OSC in a two-year period, only three "result[ed] . . . in the cancellation of transfers" for the whistleblower involved. *Id.* "[T]wo separate surveys in 1980 and 1983 found that . . . 70 percent of the [f]ederal employees with knowledge of fraud, waste, and abuse did not report it[,] and that the percentage of employees who did not report government wrongdoing because of fear of reprisal rose . . . from 20 percent in 1980 to 37 percent in 1983." 135 Cong. Rec. 564 (1989) (statement of Sen. Carl Levin). Congress noted that the OSC "had been little more than a rubber-stamp" for reprisals against whistleblowers, and that the CSRA "did little to encourage [f]ederal employees' confidence in their ability to reveal problems in their agencies." 135 Cong. Rec. 4518 (1989) (statement of Sen. Charles Grassley).

To "eliminate the inadequacy" of the whistleblower protections in the Civil Service Reform Act, Congress drafted the Whistleblower Protection Act of 1988, S.508, 100th Cong. (1988). 135 Cong. Rec. 5040 (1989) (statement of Rep. Steny Hoyer). The Act was meant to separate the Office of Special Counsel as an independent entity, and to clearly establish OSC's authority to "protect employees, especially whistleblowers, from prohibited personnel practices." S. 508, 100th Cong. § 2(b) (1988).

Although both houses of Congress unanimously passed the Whistleblower Protection Act in 1988 "with a clear understanding from the Office of Management and Budget" that President

14

Ronald Reagan's administration supported the bill, 135 Cong. Rec. 508 (1989) (statement of Sen. Carl Levin), President Reagan "pocket" vetoed the Act.[7]   Mem. of Disapproval for the Whistleblower Protection Act, 24 Weekly Comp. Pres. Doc. 1377 (Oct. 26, 1988) ("President Reagan Mem.").   According to one Senator, "[b]y the time the measure reached the desk of President Reagan, . . . the new Attorney General, Richard Thornburgh, had assumed his duties, and in . . . an appropriate exercise of his office, he indicated to President Reagan reservations he had with this legislation."  135 Cong. Rec. 4517 (1989) (statement of Sen. John Warner).

In his Memorandum of Disapproval for the Whistleblower Protection Act, President Reagan noted his "serious constitutional" concern that the Act "insulate[d]" the Special Counsel from "presidential supervision" with for-cause removal, while at the same time granting him greater executive authority.  *See* President Reagan Mem.  In particular, the President pointed to the section of the Act that "authorize[d] the Special Counsel to obtain judicial review" of Merit Systems Protection Board decisions "to which the Special Counsel is a party."  *Id.*  Because that type of judicial review "would place two Executive branch agencies before a Federal court to resolve a dispute between them," President Reagan argued that the provision conflicted with his executive authority "to supervise and resolve disputes between his subordinates."  *Id.*  The President also took umbrage with the section of the law that would "prohibit" the Executive branch

_____

7      A "pocket veto" is a mechanism by which the President can prevent a bill from becoming law.  *See* U.S. Const. art. I, § 7, cl. 2.  When a bill passed by both houses of Congress reaches the President, if he does not sign it within ten days of its passage, it automatically becomes law.  *Id.*  But if Congress adjourns within that ten-day period and the President does not sign the bill, the law is automatically vetoed, and this is referred to as a "pocket veto."  *Id.*

from "review[ing] . . . [the] views of the [OSC] proposed to be transmitted in response to congressional committee requests." *Id*.[8]

After President Reagan's veto, Congress "regrouped, reexamined and renegotiated." 135 Cong. Rec. 5036 (1989) (statement of Rep. Frank Thornton). The Act's sponsors "work[ed] with Attorney General Thornburgh to remove the executive branch's misgivings about" the bill, 135 Cong. Rec. 4516 (1989) (statement of Sen. William Cohen), while retaining "the same strong protections" for whistleblowers. 135 Cong. Rec. 5036 (1989) (statement of Sen. Frank Thorton). To address the President's constitutional concern, Congress "agreed to make the changes requested by the administration to clip the Special Counsel's wings." 135 Cong. Rec. 5037 (1989) (statement of Rep. Pat Schroeder). Specifically, Congress agreed to "delete provisions . . . that would give the Special Counsel the authority to go to court to appeal MSPB decisions and enforce subpoenas," and to "drop the provision . . . that would authorize the Special Counsel to appeal MSPB decisions to the Federal circuit court." 135 Cong. Rec. 4509 (1989) (statement of Sen. Carl Levin). At the same time, the law, as originally envisioned, removed the OSC from its place within the MSPB, established it as an independent agency, and retained the for-cause removal protection for the Special Counsel. Whistleblower Protection Act of 1989, Pub. L. 101-12, 103 Stat. 16 (1989).

On March 3, 1989, Attorney General Thornburgh sent a letter to the sponsor of the Act, Senator Carl Levin (D-Mich.), confirming the administration's support of the revised bill and thanking him "for his efforts in working with us to forge a mutually acceptable resolution of our serious constitutional concerns." 135 Cong. Rec. 5033–34 (1989). Congress then passed the

---

8      The President's other "major objection" to the Whistleblower Act" was that it "essentially rig[ged] the [MSPB]'s process against agency personnel managers in favor of employees" by "substantially reduc[ing] the factual showing required of the employee and . . . substantially increas[ing] the burden on agencies." President Reagan Mem. at 1378.

revised Whistleblower Protection Act of 1989, 5 U.S.C. § 1211 *et seq.*, and President George H.W. Bush signed it into law on April 10, 1989.  Statement by President George Bush Upon Signing S.20, 25 Weekly Comp. Pres. Doc. 516 (Apr. 10, 1989) ("President Bush Statement").  President Bush noted the "substantial improvement" in the bill's "deletion of provisions that would have enabled the Special Counsel, an executive branch official, to oppose other executive branch agencies in court."  *Id.*  And he further stated, "I am pleased that the Administration was able to work in a spirit of cooperation and bipartisanship with both Houses of Congress to resolve our differences and enact this important legislation." *Id.*

Congress has reappropriated funds to the Office of Special Counsel every year since the passage of the Whistleblower Protection Act, *see, e.g.*, Further Consolidated Appropriations Act, Pub. L. 118-47, 138 Stat 460 (Mar. 23, 2024), and it has adjusted the Special Counsel's authority several times.

In 1994, at the previous "request of the Bush Administration," S. Rep. No. 1035-358, at 4 (1994), Congress passed an act reauthorizing both the Special Counsel and the Merits System Protection Board.  United States Office of Special Counsel, Merits System Protection Board: Authorization ("1994 Reauthorization Act"), Pub. L. No. 103-424, 108 Stat. 4361 (1994).  In addition to reauthorizing the Special Counsel for three years, the Act clarified "the rules governing OSC disclosure of information about whistleblowers," "requir[ed] OSC to provide appropriate information to whistleblowers whose cases have been closed," "[e]stablish[ed] a fixed time limit for OSC to take action on whistleblower cases," and "ensur[ed] that whistleblowers ha[d] access to relevant evidence in the event that they bring their own cases to the [MSPB]."  S. Rep. No. 103-358, at 2.  President Bill Clinton ended up signing the 1994 Reauthorization Act into law, with

only one noted concern regarding a provision of the law unrelated to the Special Counsel.[9] Statement by President William J. Clinton Upon Signing, 30 Weekly Comp. Pres. Doc. 2202 (Oct. 25, 1994) ("President Clinton Statement").

Almost two decades later, Congress passed the Whistleblower Protection Enhancement Act of 2012 ("WPEA"), Pub. L. 112-199, 126 Stat. 1465 (2012), to "strengthen the rights of and protections for federal whistleblowers so that they can more effectively help root out waste, fraud, and abuse in the federal government."  S. Rep. No. 112-155, at 1 (2012).  The act "provide[d] for certain authority for the Special Counsel," *id.*, specifically, its *amicus curiae* authority that Congress found "necessary to ensure the OSC's effectiveness."  *Id.* at 12–14.

As the Senate Report on the bill explained, when a federal employee brings allegations of a prohibited personnel practice to the Special Counsel, he "investigates . . . to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred."  *Id.* at 13.  If he makes a positive determination, he notifies the agency involved so that it can take corrective action, and if it refuses, he "is authorized to file a petition for corrective action with the MSPB."  *Id.*  But after the MSPB renders a decision, the Special Counsel's ability to "enforce and defend whistleblower laws in the context of that claim is limited," because he "does not have authority to ask the MSPB to reconsider its decision,"[10] and he cannot "seek review of an MSPB decision by the Federal Circuit."  *Id.*  Further, "[b]ecause the OSC lacks independent litigating

---

9    According to President Clinton's statement upon signing the Reauthorization Act, he had "been advised that one provision in this bill (section 9), which concerns the apparent authority of an arbitrator to discipline a Federal employee who was not a party to the original action, raises serious constitutional questions."  President Clinton Statement at 2022.

10    As the report explained, "In contrast, the Office of Personnel Management . . . , which typically is not a party to the case, can request that the MSPB reconsider its rulings."  S. Rep. No. 112-155, at 13.

authority," the Department of Justice represented the OSC in cases appealed to the Federal Circuit by the employee.  *Id.*  Therefore, Congress authorized the Special Counsel to "appear as amicus curiae in any" prohibited personnel practice case brought to the federal court by the aggrieved employee.  WPEA, Pub. L. No. 112-199, § 113, 126 Stat. 1465, 1472 (2012).  President Barack Obama signed the Whistleblower Protection Enhancement Act into law on November 27, 2012. Statement by Press Secretary on H.R. 2606, H.R. 4114, S. 743 and S. 1956, White House Off. of Commc'ns (Nov. 27, 2012).

Finally, in 2018, Congress reauthorized the Special Counsel in the omnibus National Defense Authorization Act, Pub. L. No. 115-91, 131 Stat. 1283 (2018).  That legislation clarified the type of information that federal agencies subject to an OSC investigation could or could not withhold from the agency.  *Id.*  And it established another reporting obligation on the OSC by requiring it to submit an annual report to Congress regarding the agency's activities.  *Id.*  President Donald Trump signed the National Defense Authorization Act into law, noting "the longstanding position of the executive branch that . . . insulation of a principal officer like the Special Counsel raises serious constitutional concerns."  Statement by President Donald J. Trump on H.R. 2810, White House Off. of Commc'ns (Dec. 12, 2017).

## B.  Statutory Background

As it is currently constituted, the Office of the Special Counsel is led by the Special Counsel, 5 U.S.C. § 1211(a), who is "appointed by the President, by and with the advice and consent of the Senate" to serve "for a term of 5 years."  *Id.* § 1211(b).  Congress requires that the Special Counsel must "be an attorney who, by demonstrated ability, background, training, or experience, is especially qualified to carry out the functions of the position."  *Id.*  And, by statute,

19

"[t]he Special Counsel may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." *Id.*

The Special Counsel and the OSC are authorized to operate in four primary ways. First, the agency acts as a confidential channel for federal employees to disclose "information" that the individual "reasonably believes evidences": (1) "a violation of any law, rule, or regulation"; (2) "gross mismanagement"; (3) "a gross waste of funds"; (4) "an abuse of authority"; or (5) a "substantial and specific danger to public health or safety." *Id.* § 1213(a)(1)(A)–(B). Without the individual's consent, the "identity of any individual who makes a disclosure . . . may not be disclosed by the Special Counsel" unless he determines that disclosure is necessary to avoid "imminent danger to public health and safety or imminent violation of any criminal law." *Id.* § 1213(h).

Upon receipt of a disclosure, the Special Counsel has forty-five days to determine whether there is a "substantial likelihood" that the information reveals a violation of law, gross mismanagement or waste of funds, abuse of authority, or danger to public health or safety. *Id.* § 1213(b). If the Special Counsel makes a positive determination, he must transmit the disclosed information to the appropriate agency head, and direct the agency head to investigate and submit a written report of their findings to the Special Counsel. *Id.* § 1213(c)(1). The Special Counsel then reviews the report, gives the whistleblower an opportunity to comment, and adds any of his own "comments or recommendations." *Id.* § 1213(e)(1), (3). The Special Counsel is then required to submits the agency's report, the whistleblower's comments, and his comments or recommendations "to the President and the congressional committees with jurisdiction over the agency." *Id.* § 1213(e)(3). And any case involving "evidence of a criminal violation" is referred to the Attorney General. *Id.* § 1213(f).

Second, the agency is authorized to "receive and investigate allegations of prohibited personnel practices." *Id.* § 1212(a)(2). Among other things, prohibited personnel practices include discrimination, coerced political activity, willful obstruction of an individual's right to compete for employment, and reprisal for whistleblowing. *Id.* § 2302(b)(1)–(14) (defining "prohibited personnel practice").

Within 240 days of receiving an allegation of a prohibited practice, the Special Counsel must determine whether "there are reasonable grounds to believe" that the practice has occurred, exists, or will occur. *See id.* § 1214(b)(2)(A)(i). He can also, "in the absence of an allegation, conduct an investigation" to determine whether there are reasonable grounds to believe a prohibited practice, "or a pattern of prohibited" practices, has occurred, exists, or will be taken. *Id.* § 1214(a)(5). In furtherance of his investigatory duty, the OSC may "issue subpoenas" and order "the taking of depositions" and "responses to written interrogatories." *Id.* § 1212(b)(2). If a party fails to obey a subpoena issued, "the Special Counsel may apply to the Merit Systems Protection Board to enforce [it] in court." *Id.* § 1212(b)(3)(A). The Special Counsel is authorized to "have timely access to all records, data, reports, audits, reviews, documents, papers, recommendations, or other material available to the applicable agency that relate to an investigation," *id.* § 1212(b)(5)(A)(i), but there are some exceptions. The Inspector General may withhold material "contain[ing] information derived from, or pertaining to intelligence activities," *id.* § 1212(b)(5)(B)(ii), and the Inspector or Attorney General may withhold material reasonably "expected to interfere with a criminal investigation or prosecution." *Id.* § 1212(b)(5)(B)(iii)(I)(aa).

If the Special Counsel determines that there are reasonable grounds, he reports that determination to the head of the agency involved, along with the MSPB and the OPM, so that it can remedy the action. *Id.* § 1214(b)(2)(B).

The OSC refers certain cases to its Alternative Dispute Resolution Unit, which may conduct voluntary mediation between the employing agency and the employee. *See Alternative Dispute Resolution Process*, Off. of Special Counsel, https://osc.gov/Services/Pages/ADR-OurProcess.aspx (last visited Feb. 22, 2024). A report by the MSPB in 2010 stated that "[t]ypically, OSC obtains corrective action through negotiation between the complainant and the agency." *See* Merit Sys. Prot. Bd., Whistleblower Protections for Federal Employees: A Report to the President and the Congress of the United States 43 (2010). But if the agency does not take corrective action, "after a reasonable period of time," the Special Counsel "may petition the Board for corrective action." 5 U.S.C. § 1214(b)(2)(C). When he petitions for corrective action, the MSPB provides an opportunity for him to submit "oral or written comments" on the matter. *Id.* § 1214(b)(3)(A). The Special Counsel may also request that the MSPB "order a stay of any personnel action for 45 days" if he "determines that there are reasonable grounds to believe that the personnel action" would be taken "as a result of a prohibited personnel practice." *Id.* § 1214(b)(1)(A)(i). And if the Special Counsel believes disciplinary action should be taken, he must prepare a written complaint to the MSPB. *Id.* § 1215(a)(1)(A).

The Special Counsel does not have independent authority to appeal or otherwise litigate a decision by the MSPB. If an employee exercises their right to appeal an MSPB decision to federal court, "[t]he Special Counsel is authorized to appear as amicus curiae . . . to present the views of the Special Counsel . . . and the impact court decisions would have on the enforcement of such provisions of law." *Id.* § 1212(h)(1).

Similarly, the Special Counsel is also empowered to "review rules and regulations" issued by the Office of Personnel Management, and he must "file a written complaint" with the MSPB if

he "finds that any such rule or regulation would, on its face or as implemented, require the commission of a prohibited personnel practice." *Id.* § 1212(a)(4).

Third, the Special Counsel has authority to investigate violations of the Hatch Act, 5 U.S.C. § 7321 *et seq.*, and the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301–35 *et seq.*, along with certain withholdings under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The Hatch Act regulates government employee participation in partisan political activities, generally prohibiting: the use of "official authority or influence for the purpose of interfering with or affecting the result of an election"; soliciting, accepting, or receiving political contributions from any person; running for election to a partisan political office; and engaging in partisan political activity on official duty time. 5 U.S.C. §§ 7323(a), 7324(a). The Special Counsel is responsible for investigating complaints of prohibited political activities under the Act, *id.* § 1216(a)(1), and if he believes that disciplinary action is warranted, he prepares a written complaint to the MSBP. *Id.* § 1215(a)(1).[11]

The OSC also has the authority to appear before the MSPB on behalf of a person who has been unable to resolve a complaint brought under the USERRA, which prohibits employment discrimination against members of the uniformed services and veterans "because of their service in the uniformed services." 38 U.S.C. §§ 4301(a)(3), 4311, 4324. This is the only instance in which the Special Counsel is permitted to appear on behalf of a party (not as a party himself) before the MSPB or the Federal Circuit, and in doing so, he would be serving as an advocate for the servicemember or veteran, not the OSC. *Id.* § 4324(a), (d).

---

11    Hatch Act violations carry only civil penalties, 5 U.S.C. § 7326, which are decided by the Merits System Protection Board.

The OSC additionally has authority to investigate and bring disciplinary complaints for "arbitrary and capricious withholding[s] of information" under FOIA, except for withholdings of "foreign intelligence or counterintelligence information . . . specifically prohibited by law or by Executive order."  5 U.S.C. § 1216(a)(3), (c).

Fourth, OSC is obliged by statute to make a series of reports to Congress.  In addition to the individual reports the agency must make to Congress concerning credible whistleblower violations, *id.* § 1213(e)(3)–(4), the OSC must submit an "annual" report to Congress on its "activities."  *Id.* § 1218.  The report must include, among other things, "the number, types, and disposition of allegations of prohibited personnel practices filed with the Special Counsel and the costs of resolving such allegations," "the number of investigations conducted," and "the number of stays and disciplinary actions negotiated with agencies."  *Id.* § 1218(1)–(13).  The agency must also submit a report to Congress each time the OSC resolves an allegation "by an agreement between an agency and an individual."  *Id.* § 1217(b)(1).  Further, "on the request of any committee or subcommittee," the Special Counsel or his designee "shall transmit to the Congress . . . by report, testimony, or otherwise, information and the Special Counsel's views on functions, responsibilities, or other matters relating to the Office."  *Id.* § 1217(a).  That information is also "transmitted concurrently to the President and any other appropriate agency in the executive branch."  *Id.*

### C.  Factual Background

On October 3, 2023, President Joe Biden nominated Hampton Dellinger to the position of Special Counsel.  *See* President Biden Announces Hampton Dellinger as Nominee for Special

Counsel, Office of the Special Counsel (Oct. 3, 2023).[12]  The Senate confirmed Dellinger on

February 27, 2024.  *See* Confirmation of Hampton Y. Dellinger, of North Carolina, to be Special

Counsel, Office of Special Counsel, for the Term of Five Year, 118th Cong. (2024).  And he was

sworn into office on March 6, 2024.  *See Hampton Dellinger Sworn in as*

*Special Counsel of OSC*, Office of Special Counsel (Mar. 6, 2024),

https://osc.gov/News/Pages/Press%20Release%20Template1.aspx.

### D.  Procedural History

Plaintiff filed his complaint and motion for a temporary restraining order on February 10.

*See* Compl.; Mot. for TRO.  The Court set what it intended to be a scheduling hearing for 4:30

p.m. the same day.  *See* Notice of Hr'g (Feb. 10, 2025).  At the hearing, counsel for defendants

represented that they were "not prepared to" take a position as to whether they would be willing

to maintain plaintiff's status until the Court resolved the legal dispute.  Tr. of Proceedings [Dkt.

# 9] at 3 ("TRO Tr.").[13]  After hearing argument from both sides with respect to the applicable

factors, the Court issued a brief administrative stay so that it could consider the matter with the

benefit of defendants' written position.  *See* Minute Order (Feb. 10, 2025).  The administrative

stay ordered that plaintiff continue to serve as Special Counsel until midnight on February 13,

---

12    President Biden's statement can be found at *President Biden Announces Hampton Dellinger as Nominee for Special Counsel, Office of the Special Counsel*, THE WHITE HOUSE (October 3, 2023), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2023/10/03/president-biden-announces-hampton-dellinger-as-nominee-for-special-counsel-office-of-the-special-counsel/.

13    During the hearing, counsel for plaintiff also moved orally for the entry of a preliminary injunction and stated that "we would be content to allow the Court to treat our TRO memorandum of law as our opening brief in support of a preliminary injunction."  TRO Tr. at 20.

2025. *Id.* Defendants appealed the Court's administrative stay to the United States Court of Appeals for the District of Columbia. *See* Defs.' Notice of Appeal [Dkt. # 7].

The next day, February 11, defendants responded to plaintiff's motion for temporary restraining order, *see* Defs.' Opp. to Mot. for TRO [Dkt. # 11], and they moved to stay the Court's administrative stay. *See* Defs.' Mot. to Stay the Ct.'s Administrative Stay [Dkt. # 10] ("Defs.' Mot. to Stay"). Plaintiff responded to defendants' motion to stay on the same day. *See* Pl.'s Mem. in Opp. to Defs.' Mot. to Stay [Dkt. # 12].

In the early afternoon of February 12, 2025, defendants notified the Court "that in the afternoon on Tuesday, February 11, 2025, the President designated the Secretary of Veteran Affairs, Doug Collins, to serve as Acting Special Counsel," but that the Court's administrative stay made it "impossible for the office to be filled by the presidential designee." Defs.' Notice of the President's Designation of Acting Special Counsel [Dkt. # 13] ("Notice of Designation") at 1 (quotations omitted). The same day, the D.C. Circuit dismissed defendants' appeal of the Court's administrative stay for lack of jurisdiction. *See* Order, *Dellinger v. Bessent*, No. 25-5025 (D.C. Cir. Feb. 12, 2025).

Later that night, a day before the three-day administrative stay was set to expire, the Court granted plaintiff's motion for a temporary restraining order. *See* Order [Dkt. # 14] ("TRO Order"). It ordered that "until the Court rules on the entry of a preliminary injunction, plaintiff Hampton Dellinger shall continue to serve as the Special Counsel of the Office of Special Counsel." *Id.* at 26. The Court ordered that defendants must "not deny him access to the resources or materials of that office or recognize the authority of any other person as Special Counsel." *Id.* The order also vacated the administrative stay entered on February 10, 2025, and denied defendants' motion to stay the Court's administrative stay as moot. *Id.* The Court scheduled a hearing on plaintiff's

motion for a preliminary injunction on February 26, giving defendants time to oppose the motion and plaintiff time to reply. *Id.* at 27. The Court also directed the parties to inform the Court of their positions on whether consideration of the preliminary injunction should be consolidated with consideration of the merits under Federal Rule of Civil Procedure 65(a)(2). *Id.*

Defendants again appealed the Court's order to the D.C. Circuit, *see* Defs.' Notice of Appeal [Dkt. # 15], and they moved to stay the order pending their appeal. *See* Defs.' Mot. to Stay the Ct.'s TRO [Dkt. # 16]. On February 13, the Court denied defendants' motion to stay. *See* Order [Dkt. # 19]. It explained that the temporary restraining order preserved the status quo of the parties, *id.* at 1–2, which is defined as the "last uncontested status which preceded the pending controversy." *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969). The Court of Appeals dismissed defendants' second appeal for lack of jurisdiction on February 15. *See* Order, *Dellinger v. Bessent*, 25-5028 (D.C. Cir. Feb. 15, 2025).

On February 14, the parties filed a joint status report with their positions on consolidation with the merits. *See* Joint Status Report [Dkt. # 20]. Plaintiff "defer[red] to the Court's judgment" on consolidation, *id.* at 1, and defendants "request[ed] that the Court consolidate consideration of the request for preliminary injunction with consideration of the merits." *Id.* at 2. The parties also jointly proposed a schedule for additional briefing. *Id.* at 1–2. On February 15, the Court deemed plaintiff's motion for a temporary restraining order to be a motion for preliminary injunction, and it consolidated consideration of that motion with consideration of the merits under Federal Rule of Civil Procedure 65(a)(2). Minute Order (Feb. 15, 2025).

On February 20, plaintiff filed his reply to defendants' opposition to the motion for a temporary restraining order, which had already been granted. *See* Reply in Supp. of Mot. for TRO [Dkt. # 21]; *see* TRO Order.

On February 21, defendants moved for summary judgment, and as noted above, plaintiff opposed the motion and filed a cross-motion of his own. At the hearing on February 26, plaintiff clarified that he was seeking judgment in his favor on Count One of his complaint, which alleged ultra vires action in violation of 5 U.S.C. § 1211(b). Tr. of Proceedings [Dkt. # 28] ("Tr.") at 19–21. The Court heard extensive arguments on the merits and any available remedies, including the permanent injunction factors. *See* Tr. Shortly after the hearing, the Court issued an order extending the temporary restraining order for an additional three days under Rule 65(b)(2). *See* Order [Dkt. # 27] at 4–5. The order expires today and will be rendered moot with the ruling on the merits.

## STANDARD OF REVIEW

### A. Motion for Preliminary Injunction

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original); *see also Munaf v. Geren*, 553 U.S. 674, 89–90 (2008).

As the Supreme Court explained in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), when considering a motion for a preliminary injunction, the Court must consider whether the movant has met its burden of demonstrating that: (1) it "is likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) an injunction serves the public interest. *Id.*

For some time, the Court of Appeals adhered to a "sliding-scale" approach, where "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). However, in *Sherley*, the Court explained that because the Supreme Court's decision in *Winter* "seemed to treat the four factors as independent requirements," it had more recently "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Id.* at 393, quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring).

The Court of Appeals has not gone further to clarify whether the sliding scale approach is inconsistent with *Winter*, and the manner in which courts should weigh the four factors "remains an open question" in this Circuit. *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). *See also League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) ("Because appellants satisfy each of the four preliminary injunction factors, this case presents no occasion for the court to decide whether the 'sliding scale' approach remains valid after *Winter*."); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (reiterating that the Court has not yet decided the issue).

Whatever the status of the sliding scale might be, the D.C. Circuit has ruled that a failure to show a likelihood of success on the merits is sufficient to defeat a motion for a preliminary injunction. *See Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009); *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006). As another court in this district has observed, "absent a substantial indication of likely success on the merits, there would be no justification for the Court's intrusion into the ordinary processes of administration and judicial review." *Navistar, Inc. v. EPA*, Civil Action No. 11-cv-449 (RLW), 2011 WL

3743732, at *3 (D.D.C. Aug. 25, 2011) (alteration omitted), quoting *Hubbard v. United States*, 496 F. Supp. 2d 194, 198 (D.D.C. 2007).

And regardless of whether the sliding scale framework applies, it remains the law in this Circuit that a movant must demonstrate irreparable harm, which has "always" been a "basis of injunctive relief in the federal courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974), quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959). A failure to show irreparable harm is grounds for the Court to refuse to issue an injunction, "even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

Since the motion for preliminary relief has been consolidated with consideration of the merits, and since this opinion will address the merits, there is no need to assess plaintiff's likelihood of success. And the request for permanent injunctive relief, along with the ruling on the merits, has obviated the balancing factors supporting interim relief.

**B.    Motion for Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

30

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (alteration in original), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982). In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

**C.    Motion for Permanent Injunction**

Given the procedural posture of the case, the Court must apply the standard for the issuance of a permanent injunction.

A plaintiff seeking a permanent injunction must demonstrate that: (1) he has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by

a permanent injunction. *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 156–57 (2010),

quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

## ANALYSIS

### I.   The Court will grant summary judgment in favor of plaintiff on Count One.

#### A. The purported termination of the Special Counsel without cause violates 5 U.S.C. § 1211(b).

Count One of the complaint alleges that plaintiff's removal was ultra vires in violation of

5 U.S.C. § 1211(b).  Compl. ¶¶ 37–41.

As a "weapon in the arsenal for attacking federal administrative action," an ultra vires claim

requires the Court to determine whether defendants "plainly act[ed] in excess of [their] delegated

powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed.*

*Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022).  The statutory

mandate at issue is section 1211(b), which reads:

> The Special Counsel shall be appointed by the President, by and with the
> advice and consent of the Senate, for a term of 5 years . . . .  The Special
> Counsel shall be an attorney who, by demonstrated ability, background,
> training, or experience, is especially qualified to carry out the functions of
> the position . . . .  The Special Counsel may be removed by the President
> only for inefficiency, neglect of duty, or malfeasance in office.

5 U.S.C. § 1211(b).

There is no genuine dispute of fact that would preclude a finding that plaintiff's removal

was contrary to section 1211(b).  *See* Defs.' Statement of Undisputed Material Facts [Dkt. # 22-2]

("Defs.' SOF"); Pl.'s Statement of Material Facts Not in Genuine Dispute [Dkt. # 23-1] ("Pl.'s

SOF").  The parties agree that, in accordance with the statute, plaintiff was nominated by the

President and confirmed by the Senate to be Special Counsel.  Defs.' SOF ¶ 1; Pl.'s SOF ¶¶ 1–2.

The parties also agree that on February 7, plaintiff received an email from Sergio Gor, Assistant

to the President, Director of the White House Presidential Personnel Office, saying nothing more than his "position as Special Counsel of the US Office of Special Counsel is terminated, effectively immediately." Defs.' SOF ¶ 2; Pl.'s SOF ¶ 5; Ex. A. The email did not identify a reason, and it did not assert that plaintiff was being removed for "inefficiency, neglect of duty, or malfeasance in office." Nor have defendants asserted since then that he was terminated for one of those reasons or any other. Having been sworn into office on March 6, 2024, section 1211(b) required plaintiff to serve his five-year term until March 2029 unless the President removed him "for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1211(b). So, the undisputed facts show that the purported termination contravened section 1211(b), and therefore the Court finds that it was an ultra vires action.

**B. The statutory term of five years, protected by the removal for cause provision, is not unconstitutional.**

**1. Neither *Seila Law* or *Collins* compel the conclusion that section 1211(b) is unconstitutional.**

Defendants' only response to this reading of the plain text is that the statute is unconstitutional. Defs.' Mot. at 6–15. But no court has reached that conclusion. Instead, the Supreme Court made it a point to carve the OSC out of its pronouncements concerning the President's Article II prerogative to have unrestricted control over who should assist him in discharging his responsibilities.

In their motion for summary judgment, defendants paint with a broad brush:

> In the last five years, the Supreme Court has twice held that restrictions on the President's authority to remove principal officers who serve as the sole heads of executive agencies violate Article II—in those cases, the single heads of the Consumer Financial Protection Bureau and the Federal Housing Finance Agency. . . . Whatever the agency, for the President to discharge his constitutional duty to supervise those who exercise executive power on his behalf, the President can "remove the head of an agency with a single top officer" at will.

Defs.' Mot. at 1, citing *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020) and *Collins v. Yellen*, 594 U.S. 220, 256 (2021). [14]  But that is an oversimplified and inaccurate summary of the authority that guides the determination to be made, and the Supreme Court, in deciding the particular cases before it, did not announced a blanket rule that governs "whatever the agency."  To the contrary, in both *Seila Law* and *Collins,* the Court went into great detail about the individual agencies at issue, and the reasoning underlying those decisions does not apply to the case at hand.[15]

---

[14]    The Court addressed both *Seila Law* and *Collins* in its February 12 Temporary Restraining Order.  TRO Order at 9–15.

[15]    Defendants also cite *Trump v. United States*, 603 U.S. 593 (2024), for the proposition that "the President's power to remove executive officers of the United States whom he has appointed may not be regulated by Congress or reviewed by the courts." Defs.' Mot. at 7 (internal quotations omitted).  But this lifts a single phrase far out of the context of a case that has nothing to do with the questions raised here.  In *Trump,* the Court considered whether allegations in the indictment against Donald Trump concerning threats he allegedly made to replace the Acting Attorney General, during discussions with Justice Department officials after the 2020 election, implicated the use of his official authority such that he would be absolutely immune from prosecution for the alleged conduct.  *Id.* at 602–03, 617.  As part of that particular analysis, the Court observed:

> Investigative and prosecutorial decisionmaking is "the special province of the Executive Branch," *Heckler v. Chaney*, 470 U.S. 821, 832 (1985), and the Constitution vests the entirety of the executive power in the President, Art. II, § 1.  For that reason, Trump's threatened removal of the Acting Attorney General likewise implicates "conclusive and preclusive" Presidential authority.  As we have explained, the President's power to remove "executive officers of the United States whom he has appointed" may not be regulated by Congress or reviewed by the courts.  The President's "management of the Executive Branch" requires him to have "unrestricted power to remove the most important of his subordinates"— such as the Attorney General—"in their most important duties."

*Id.* at 620–21, citing *Myers*, 272 U.S. at 106, 176, and *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (internal citations omitted).  While the *Heckler* proposition is well-established, this discussion is inapposite here because it turned upon the enforcement of criminal laws, the "quintessentially executive function" over which the executive branch has "exclusive and absolute discretion."  That is not the situation here.  The Special Counsel's role is not analogous to (*continued on next page*)

In *Seila Law,* the question arose when a law firm resisting a civil investigative demand issued by the Consumer Finance Protection Bureau ("CFPB") challenged the legitimacy of the agency's structure.  591 U.S. at 208.  To address that contention, the Court began by reviewing its opinions on the President's power to remove executive branch officials.  It pointed to its decision in *Myers v. United States,* 272 U.S. 52 (1926), which held that Article II accords the President the "general administrative control of those executing the laws, including the power of appointment and removal of executive officers."  *Id.* at 163–64.  The *Seila Law* opinion also included the reminder that in *Free Enterprise Fund v. Public Company Accounting Oversight Board,* 561 U.S. 477 (2010), the Court reaffirmed that "as a general matter, the Constitution gives the President the authority to remove those who assist him in carrying out his duties." *Seila Law* 591 U.S. at 204, citing *Free Enter. Fund*, 561 U.S. at 513–14.

*Seila Law* also discussed the Court's later opinion in *Humphrey's Executor v. United States,* 295 U.S. 602 (1935), which let restrictions on removal of the members of the New Deal-era FTC, as it was constituted in 1935, stand.[16]  It emphasized that "[w]hile recognizing an exception for multi-member bodies with 'quasi-judicial' or 'quasi-legislative' functions, *Humphrey's Executor* reaffirmed the core holding of *Myers* that the President has 'unrestrictable power . . . to remove purely executive officers.'"  *Seila Law*, 591 U.S. at 217.  But it noted that the *Humphrey's Executor* court also "acknowledged that between purely executive officers on the one hand, and officers that

_____

that of the leaders of the United States Department of Justice, who are among "the most important" of the President's "subordinates."

16    The Court notes that this ruling does not depend upon the continuing vitality of *Humphrey's Executor.*  It is included here since it was part of the discussion in *Seila Law,* but it dealt with multi-member entities and not an organization with a single head like the OSC. *Humphrey's Executor*, 295 U.S. at 619.

closely resembled the FTC Commissioners on the other, there existed 'a field of doubt' that the Court left for 'future consideration.'" *Id.*, citing *Humphrey's Executor*, 295 U.S. at 632. And "[b]ecause the Court limited its holding to 'officers of the kind here under consideration,' . . . the contours of the *Humphrey's Executor* exception depend upon the characteristics of the agency before the Court." *Seila Law*, 591 U.S. at 215, quoting *Humphrey's Executor*, 295 U.S. at 632.

*Seila Law* also summarized the decision in *Morrison v. Olson,* 487 U.S. 654 (1988), concerning an "independent counsel," who was appointed under the now-expired Independent Counsel Reauthorization Act of 1994,[17] to investigate whether a particular high-ranking official had committed a crime. *Morrison*, 487 U.S. at 660. The quasi-legislative, quasi-judicial paradigm was not applicable, so the Court "viewed the ultimate question as whether a removal restriction is of 'such a nature that it impedes the President's ability to perform his constitutional duty.'" *Seila Law*, 591 U.S. at 217, quoting *Morrison*, 487 U.S. at 691. And while the independent counsel was specifically charged with performing law enforcement functions typically reserved to the executive branch – in particular, investigating and prosecuting crimes – the Court "concluded that the removal protections did not unduly interfere with the functioning of the Executive branch because 'the independent counsel was an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority.'" *Seila Law*, 591 U.S. at 217–18 (alterations omitted).

The *Seila Law* opinion characterized the two limited exceptions that had been recognized to date – "one for multimember expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority" – as

---

17      This Act expired on June 30, 1999.  *See* Final Rule, 64 Fed. Reg. 37,038, 37,041 (July 9, 1999).

"what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal powers." *Id.* at 218. It then explained why neither existing exception applied to the CFPB.

With respect to the first exception, *Seila Law* explained:

> [T]he CFPB Director is hardly a mere legislative or judicial aid. Instead of making reports and recommendations to Congress, as the 1935 FTC did, the Director possesses the authority to promulgate binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U.S. economy. And instead of submitting recommended dispositions to an Article III court, the Director may unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications. Finally, the Director's enforcement authority includes the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power not considered in *Humphrey's Executor.*

*Id*. at 218–19. The Court also highlighted the fact that the CFPB director "cannot be considered non-partisan . . . ." *Id.* at 218.

As for the comparison to *Morrison,* there was no question that the CFPB Director was not an inferior officer, and she could not be likened to an independent counsel, who, while empowered to carry out a core executive function, lacked policy making or administrative authority.

> [T]he Director has the sole responsibility to administer 19 separate consumer-protection statutes that cover everything from credit cards and car payments to mortgages and student loans. It is true that the independent counsel in *Morrison* was empowered to initiate criminal investigations and prosecutions, and in that respect wielded core executive power. But that power, while significant, was trained inward to high-ranking Governmental actors identified by others, and was confined to a specified matter in which the Department of Justice had a potential conflict of interest. By contrast, the CFPB Director has the authority to bring the coercive power of the state to bear on millions of private citizens and businesses, imposing even billion-dollar penalties through administrative adjudications and civil actions

37

*Id.* at 219–20.[18]

Since the constitutionality of the provision protecting the CFPB Director could not be decided by invoking either *Morrison* or *Humphrey's Executor,* the Supreme Court framed the question before it in *Seila Law* as whether to extend those precedents to the new sort of executive agency before it: "an independent agency led by a single Director and vested with significant executive power." *Id.* at 220.  Since to the Court, a lack of historical precedent for such an agency could be potential sign of constitutional problems, it then considered what precedent there was, and it pointed out that there were only four isolated examples, and they "shed little light" on what to do about the Director of the CFPB.  *Id.*

One of the four was the Office of Special Counsel.  *Id.* at 221.  And while the Court recited some of the historical background detailed above – that the first attempt to create such a position drew an objection from the Office of Legal Counsel under President Carter, and another prior version of the statute was vetoed on constitutional grounds by President Reagan – it went on to distinguish the OSC from the CFPB:

> [T]he OSC exercises only limited jurisdiction to enforce certain rules governing Federal Government employers and employees.  *See* 5 U.S.C. §1212.  It does not bind private parties at all or wield regulatory authority comparable to the CFPB.

---

[18]    Plaintiff argues that *Seila Law* does not control his case because he falls within the exception for inferior officers.  Pl's Mot. at 11–14; *see* Pl.'s Reply at 1–3.  The Court need not find that Dellinger is an inferior officer in order to distinguish *Seila Law,* and it is not persuaded that the characterization is accurate.  While the Supreme Court has not established a bright-line rule or clearly defined test to distinguish between principal and inferior officers, *see Edmond v. United States*, 520 U.S. 651, 661 (1997); *Morrison*, 487 U.S. at 671, it has  identified a set of factors to inform the determination:  (1) the existence (and identity) of a superior with removal power;  (2) the scope of the officer's duties;  (3) the scope of the officer's authority and jurisdiction; and (4) the nature of the officer's tenure.  *See Edmond*, 520 U.S. at 661–63.  And in light of the first factor, the fact that the President has the authority to remove the Special Counsel for cause appears to answer the question.  Moreover, he is a Presidential appointee who must be confirmed by the Senate under the Appointments Clause.  5 U.S.C. § 1211(b).

*Id.* at 221; *see also id.* at 222 (The OSC and two other single-headed agencies "do not involve regulatory or enforcement authority remotely comparable to that exercised by the CFBP.").

The only conclusion one can draw from this discussion is that this case is distinguishable from *Seila Law*.  It would be entirely inconsistent and illogical to read the Supreme Court's description of the OSC as "not remotely comparable" to the CFPB, and so distinct that a consideration of its statutory scheme does nothing to illuminate the constitutionality of the CFPB statute, and then maintain that the *Seila Law* decision invalidating the removal protections in that statute governs the OSC as well.

A close review of the statutory scheme at issue confirms that the OSC does not belong in the category of "an independent agency led by a single Director and vested with significant executive power."  *Id*. at 220.  Therefore, adherence to the principles and reasoning in *Seila Law* requires a different outcome in this case.

Plaintiff and defendants direct the Court to the same section of the statute, but while it contains some executive-sounding verbs, there is a striking absence of teeth and authority behind them.  The statute provides:

> The Office of Special Counsel shall . . . receive and investigate allegations of prohibited personnel practices, and, where appropriate . . . bring petitions for stays, and petitions for corrective action, . . . and file a complaint or make recommendations for disciplinary action.

5 U.S.C. § 1212(a)(2)(A), (B); *see id*. § 1214(b)(2)(B)–(C) (petition for corrective action); *id.* § 1215(a)(1)(A)–(C) (complaint for disciplinary action).  While the Special Counsel may "conduct an investigation" to determine whether there are reasonable grounds to believe a prohibited personnel practice has occurred, *id.* § 1214(a)(5), he may not demand corrective action, he must "petition" the Merit Systems Protection Board and ask it to order it.

> The Board shall order such corrective action as the Board considers
> appropriate, if the Board determines that the Special Counsel has
> demonstrated that a prohibited personnel practice . . . has occurred, exists,
> or is to be taken . . . . [T]he Board shall order such corrective action as the
> Board considers appropriate if the Special Counsel has demonstrated that a
> disclosure or protected activity . . . was a contributing factor in the
> personnel action which was taken or is to be taken against the individual.

*Id*. § 1214(b)(4)(A)–(B)(i). The authority rests with the Board, then, to do what it considers

appropriate. *See Am. Fed'n of Gov't Emps., AFL-CIO v. O'Connor,* 747 F. 2d 748, 753 (D.C. Cir

1984) ("[T]he MSPB is free to disagree with the Special Counsel and often does."). And if the

Special Counsel is recommending disciplinary action against "an employee in a confidential,

policy-making, policy-determining, or policy-advocating position appointed by the President, by

and with the advice of the Senate," the complaint must be presented to the President for appropriate

action, not the MSPB. 5 U.S.C. § 1215(b). Again, it's not up to the Special Counsel; the President

has the last word.

   While like the Director of the CFPB, the Special Counsel plays a role in enforcing a

number of separate statutory imperatives, the responsibility does not rest with him alone.

   The Special counsel may investigate allegations of violations of the Hatch Act as a more

typical law enforcement officer might do, *id.* § 1216(a), but if he finds that any of the enumerated

conduct has occurred, he is only authorized to "seek" corrective action in the same manner as if a

prohibited personnel practice was involved. *Id.* § 1216(c). The Special Counsel is authorized to

have access to the records of other agencies that are applicable to an inquiry he is conducting. *Id.*

§ 1212(b)(5)(A). But an Inspector General may withhold material if it contains information

pertaining to intelligence activities, and the Attorney General or an Inspector General may

withhold it if disclosure could interfere with an ongoing criminal investigation. *Id.*

§ 1212(b)(5)(B).

When it comes to whistleblower protections, while one may generally characterize the OSC's role as "enforcing" the rules against reprisals, the statute directs that the office shall "receive, review, and where appropriate, forward to the Attorney General or an agency head" disclosures of violations of criminal conduct, the gross waste of funds, abuse of authority, or danger to public health or safety. *Id*. § 1212(a)(3). He is a conduit. *See id*. § 1213(b), (c)(1)(A)–(B), (f)(1)–(2).

Even if his review of disclosures leads him to determine that there is a substantial likelihood that specifically identified forms of wrongdoing have occurred, his job is to "promptly transmit" the information to the appropriate agency head and write a report. *Id*. § 1213(b), (c)(1)(A)–(B).

The rest of the *Seila Law* opinion points to constitutional concerns with the configuration of the CFPB that do not translate easily to the OSC. It found that the CFPB's structure contravened the Framers' insistence on a strong executive, which has been embodied in Article II. But on what basis?

> The CFPB's single-Director structure contravenes this carefully calibrated system by vesting significant governmental power in the hands of a single individual accountable to no one. The Director is neither elected by the people nor meaningfully controlled (through the threat of removal) by someone who is . . . . Yet the director may *unilaterally,* without meaningful supervision, issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties. With no colleagues to persuade, and no boss to electorate looking over her shoulder, the Director may direct and enforce policy for a vital segment of the economy affecting millions of Americans.

*Seila Law*, 591 U.S. at 224–25 (emphasis in original). If those circumstances were important to the determination that the removal restrictions applicable to the CFPB Director were unconstitutional, it is telling that the Special Counsel cannot do much of anything *unilaterally.* He does not issue final regulations, oversee adjudications, initiate prosecutions, or determine what penalties to impose on private parties. He most certainly does not "direct and enforce policy for a

vital segment of the economy affecting millions of Americans;" he does not even "direct policy" affecting the civil servants within his purview.

If one adopts the approach utilized in *Seila Law* and applies the criteria that were persuasive in that case, it becomes clear that the Special Counsel falls well within the "field of doubt" *Humphrey's Executor* left for another day and outside the reach of *Seila Law*. While he concedes that he performs "some" executive functions, he cannot be described as a "purely executive officer." Nor does he "wield significant executive powers," and unlike any of the agency heads that have been the subject of Supreme Court consideration in the past, his role can hardly even be characterized as assisting the President in carrying out his duties.

The defendants repeat the mantra that he "investigates and prosecutes," but this effort to conjure up the image of a United States Attorney striding into court with the power to hold people accountable for their crimes is not an apt comparison. The Special Counsel has a much more restricted role. While he is authorized to investigate certain forms of wrongdoing, he lacks real prosecutorial authority: his charter is to ensure that the rules of the federal workplace are followed, but if an investigation reveals wrongdoing, he has to recommend that some other quasi-judicial or administrative agency do something about it. His tools are not grand juries or federal indictments; the proceedings he seeks to initiate are civil, and not even civil actions in an Article III court, but only complaints to be heard by an administrative agency, which can decline to pursue them. He can issue subpoenas to advance his investigation, but he cannot enforce them in court. He has to ask the MSPB to do that too. 5 U.S.C. § 1212(b)(3)(A), (B). He can review and recommend agency regulations, but he has no policymaking authority if his suggestions fall on deaf ears. *Id.* § 1212(a)(4). If he is concerned that any Office of Personnel Management rule would require the

commission of a prohibited personnel practice, he must file a complaint with the MSPB.  *Id.* § 1212(a)(4).

Defendants quote the Supreme Court's comment about the head of the CFPB: "[w]ith no colleagues to persuade, and no boss or electorate looking over her shoulder," the Director could "unilaterally" "dictate and enforce policy."  Defs.' Mot. at 8, quoting *Seila Law,* 591 U.S. at 225. But this selection from *Seila Law* demonstrates exactly why the cases are not analogous.  Unlike the head of the CFPB, the Special Counsel has no authority to "dictate" policy, and for the most part, he cannot enforce it unilaterally either.  He must refer matters to the MSPB or make recommendations to other agencies.  Moreover, since he stands alone, outside of the vast corps of officials who actually "assist [the President] in carrying out his duties," *Seila Law,* 591 U.S. at 204, citing *Free Enter. Fund,* 561 U.S. at 513–14, the restrictions on his removal do not conflict with the general principles announced in *Myers* and *Free Enterprise Fund.*

Although this Court does not consider plaintiff to be an inferior officer, the case is more akin to *Morrison,* in which the Court found that the removal protections did not unduly interfere with the functioning of the executive branch because, in part, the independent counsel had "limited jurisdiction and tenure and lacked policymaking or significant administrative authority."  *Seila Law*, 591 U.S. at 217, quoting *Morrison*, 487 U.S. at 691.  If, as in that case, one considers the question posed by the Supreme Court – "whether a removal restriction is of such a nature that it impedes the President's ability to perform his constitutional duty" – the answer is no.

For all of these reasons, it appears to the Court that the removal restriction comports with *Seila Law*.

The decision in *Collins v. Yellen* does not require the invalidation of section 1211(b) either.

*Collins* was an action brought by shareholders of the Federal National Mortgage

Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac")

against the Federal Housing Finance Agency ("FHFA").  594 U.S. at 235.  Like the CFPB, the

FHFA was established by Congress in the wake of the financial crisis in 2008, and it was authorized

to oversee Fannie Mae and Freddie Mac, and to serve as a conservator or receiver if necessary, as

both had suffered significant losses due to the collapse of the housing market.  *Id.* at 226.  The

shareholders challenged actions taken by the FHFA in its role as conservator and the

constitutionality of the agency's structure.  An amicus was appointed to present arguments on

behalf of the agency head.  *Id.* at 236.  The Court held that the shareholders' claim was barred by

Housing and Economic Recovery Act of 2008, 12 U.S.C. §4627(f), but it addressed the separation

of powers issue.

Defendants quote snippets from the ruling, but it is necessary to review the opinion as a

whole to understand what they mean.  Before reaching the merits, the Court detailed the wide-

ranging powers of the agency:

> The Agency is tasked with supervising nearly every aspect of the
> companies' management and operations. For example, the Agency must
> approve any new products that the companies would like to offer. § 4541(a).
> It may reject acquisitions and certain transfers of interests the companies
> seek to execute.  § 4513(a)(2)(A). It establishes criteria governing the
> companies' portfolio holdings. § 4624(a). It may order the companies to
> dispose of or acquire any asset. § 4624(c). It may impose caps on how much
> the companies compensate their executives and prohibit or limit golden
> parachute and indemnification payments.  § 4518. It may require the
> companies to submit regular reports on their condition or "any other
> relevant topics." § 4514(a)(2). And it must conduct one on-site examination
> of the companies each year and may, on any terms the Director deems
> appropriate, hire outside firms to perform additional reviews. §§ 4517(a)–
> (b), 4519.

*Id.* at 230.

> The statute empowers the Agency with broad investigative and enforcement
> authority to ensure compliance with these standards. Among other things,
> the Agency may hold hearings, §§ 4582, 4633; issue subpoenas,

44

§§ 4588(a)(3), 4641(a)(3); remove or suspend corporate officers, § 4636a; issue cease-and-desist orders, §§ 4581, 4632; bring civil actions in federal court, §§ 4584, 4635; and impose penalties ranging from $2,000 to $2 million per day, §§ 4514(c)(2), 4585, 4636(b).

*Id.*

The Recovery Act grants the FHFA expansive authority in its role as a conservator. As we have explained, the Agency is authorized to take control of a regulated entity's assets and operations, conduct business on its behalf, and transfer or sell any of its assets or liabilities. See §§ 4617(b)(2)(B)–(C), (G).

*Id.* at 238–39.

Once it addressed whether the shareholders had standing to raise the constitutional issues, *id.* at 242–43, and that the removal restrictions at issue applied to the Director, but not the Acting Director, *id.* at 250, the *Collins* opinion started with the proposition that the decision in *Seila Law* was "all but dispositive." *Id.*  The Court did not propose that it was necessary to revisit the analysis undertaken in the prior term; nor did it find it necessary to overturn any aspect of *Seila Law* or any of the authority upon which *Seila Law* was founded.  It stated that "[a] straightforward application of our reasoning in *Seila Law* dictates the result here." *Collins*, 594 U.S. at 251.

The opinion then considered each of the four arguments raised by the amicus in an effort to distinguish *Seila Law*, and it concluded that none of them was sufficient to call for a different result.  First, the Court rebuffed the contention that Congress should have greater flexibility to restrict the President's power to remove the FHFA director because the agency's authority is more limited than that of the CFPB.  *See Collins*, 594 U.S. at 251.  It stated that "the nature and breadth of the agency's authority is not dispositive," and it elaborated on what it meant:

The President's removal power serves vital purposes even when the officer subject to removal is not the head of one of the largest and most powerful agencies. The removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve

45

> the people effectively and in accordance with the policies that the people
> presumably elected the President to promote . . . . These purposes are
> implicated whenever an agency does important work, and nothing about the
> size or role of the FHFA convinces us that its Director should be treated
> differently from the Director of the CFPB.

*Id.* at 252; *see also id.* at 253 ("[W]hile the CFPB has direct regulatory and enforcement authority over purely private individuals and businesses, the FHFA has regulatory and enforcement authority over two companies that dominate the secondary mortgage market and have the power to reshape the housing sector . . . . FHFA actions with respect to those companies could have an immediate impact on millions of private individuals and the economy at large."). In short, the Court again applied the *Seila Law* principles to an agency that did in fact "wield significant executive power." The objective of these principles was to "ensure that the President's subordinates serve the people effectively and in accordance with the policies that the people presumably elected the President to promote." *Id*. at 252. But as it has just been explained, that is not the Special Counsel's job. He presents information to the President and can make recommendations to the President, but he is not tasked with carrying his executive agenda.

The Court further observed that "[c]ourts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry." *Id.* at 253.

Next, the amicus posited that when the agency was acting as a conservator, it was effectively assuming the status of a private party and not exercising executive power. *Id*. at 253–54. The court rejected that on the grounds that the agency does not always act as a conservator, and that even in that role, it is implementing a statutory scheme that accords it powers and responsibilities that ordinary conservators lack. *Id.* at 254. The Court did observe, though,

that interpreting a law passed by Congress in an effort to implement it is, by definition, the "'execution' of the law." *Id*., quoting *Bowsher v. Synar*, 478 U.S. 714, 733 (1986).

Third, the amicus maintained that the structure of the agency did not offend Article II because the regulated entities were "[g]overnment-sponsored enterprises that have federal charters, serve public objectives, and receive special privileges like tax exemptions and certain borrowing rights." *Collins*, 594 U.S. at 255 (internal quotations omitted). The contention was that the concerns underlying the limitations on removal power were inapplicable when the regulated bodies were not purely private actors. *Id.* This, too, was found to be unpersuasive because "the President's removal power serves important purposes regardless of whether the agency in question affects ordinary Americans by directly regulating them or by taking actions that have a profound but indirect effect on their lives." *Id.*

The fourth argument was that the five-year tenure provided only "modest" protection, as the Director could be fired under the existing provisions for disobeying a lawful Presidential order. *Id.* at 255–56. The Court responded that even modest restrictions on the President's power are prohibited. *Id.* at 256. And it emphasized that, in its view, the President must be able to remove not only officers who disobey his commands and who are negligent or inefficient, but "those who exercise their discretion in a way that is not intelligent or wise, those who have different views of policy, and those who come from a competing political party who is dead set against the President's

agenda, and those in whom he has simply lost confidence." *Id.* at 256 (internal quotation marks and citations omitted).[19]

But the plaintiff is not relying on any of those contentions. His point is not that his agency is smaller or that his regulatory and enforcement authority is less important. He does not hang his hat on the fact that his term is "only" for five years. He does not deny that he has some executive responsibilities – after all, the *Seila Law* test is not whether the official exercises *any* executive power. His point is that at bottom, while he has some executive-like functions, and that carrying out his duties of course entails "executing" the statute that established the position, he does not wield significant executive power because he lacks real ability to exercise regulatory or enforcement authority or decision-making; in almost every situation he encounters, the buck does *not* stop with him. He is, primarily, an ombudsman who looks into complaints and

---

19      In a footnote in *Collins,* the Court addressed the warning by the amicus that a holding striking down the removal restrictions in the Recovery Act could affect other agencies as well, naming the Social Security Administration ("SSA") and the Office of Special Counsel, among others. 594 U.S. at 256, n. 21. The Court observed that those agencies were not before it and chose not to comment on the constitutionality of any similar provisions that applied to them. *Id.* After *Collins* was decided, the Office of Legal Counsel issued an opinion concluding that the decisions in *Seila Law* and *Collins* necessitated a finding that the protections against removing the SSA Commissioner were unconstitutional. Constitutionality of the Commissioner of Social Security's Tenure Protection, 45 Op. O.L.C. __, 1 (O.L.C. July 8, 2021). But the OLC included an explicit caveat that this vindication of the President's Article II powers by the President's own legal advisors did not necessarily extend to the Office of Special Counsel. *See id. at 10* n.3 ("This opinion does not address the validity of tenure protections conferred on the Special Counsel, whose removal restrictions implicate different considerations . . . ."). Like the Supreme Court in *Seila Law,* the opinion contrasted the SSA's impact on a large segment of the public, enormous budget, and exceptionally broad rulemaking authority with the OSC's ability to do no more than recommend regulatory changes. *Id.* at 15, citing *Seila Law,* 591 U.S. at 217–18 ("We emphasize the limited scope of our conclusion regarding the [SSA] Commissioner. It does not imply any similar determination with respect to the validity of tenure protections conferred on other executive officials – for example, the Special Counsel, another single member agency head whose removal restrictions implicate different considerations, such as the Special Counsel's primary investigative function and 'limited jurisdiction.'").

allegations – albeit with subpoena authority – and recommends that others, who do exercise executive or quasi-judicial authority, take action based on his findings. And the OSC does not either "affect ordinary Americans by directly regulating them *or* by taking actions that have a profound but indirect effect on their lives." *Collins*, 594 U.S. at 255 (emphasis added).

Plaintiff does not invite the Court to weigh the relative importance of various agencies' charters, as *Collins* said it shouldn't; the reason *Seila Law* is distinguishable is not because the agency is smaller or less important. It is because that, while the OSC is bound to implement the statutory directives imposed by Congress, it cannot fairly be likened to a typical administrative agency charged with implementing those directives in accordance with Presidential policy and priorities. The Special Counsel is supposed to withstand the winds of political change and help ensure that no government servant of either party becomes the subject of prohibited employment practices or faces reprisals for calling out wrongdoing – by holdovers from a previous administration or by officials of the new one.[20]

If *Seila Law* is to control a case involving the single head of an independent agency, as *Collins* said it should, it is essential to peek behind titles and labels and engage in this close

_____

20    Upholding the statutory restriction on removal in the absence of "inefficiency, neglect of duty, or malfeasance in office" does not give rise to the risk that a President could be stuck with a Special Counsel who is failing to fulfill the limited executive functions he does have. Nothing in plaintiff's pleadings challenges the President's "general removal power," or the "general rule that the President possesses 'the authority to remove those who assist him in carrying out his duties.'" *Seila Law*, 591 U.S. at 215, quoting *Free Enter. Fund*, 561 U.S. at 513–14. Similarly, the statute does not leave the President in the situation that troubled the Court in *Myers* when it concluded that the lack of the power to remove "would make it impossible for the President . . . to take care that the laws be faithfully executed." 272 U.S. at 164. Here, the statutory authority to remove the Special Counsel for cause enables him to fulfill that directive, while also preserving the requirement that the Special Counsel be insulated to some degree.

examination of the particular position involved.  And it is important to note that this official has a significant obligation that distinguishes him from the heads of the other agencies discussed: the responsibility to report his activities and findings not just to the President, but to Congress.

Finally, plaintiff fully recognizes that the removal provision he seeks to enforce could, as the Court in *Collins* warned, bar the President from dismissing him on purely political grounds. But, he maintains, that's as it should be.  The agency involved in *Collins* was qualitatively different from the Office of Special Counsel, which was specifically designed to serve a singular function for which independence from partisan political interference is necessary.  The Court agrees and finds that *Collins* does not require the invalidation of the statutory restrictions on removing the Special Counsel.

> **2. The history, purpose, and nature of the statute demonstrate that independence from political or partisan interference is fundamental to the Special Counsel.**

It is notable that while the Supreme Court struck down the removal restrictions in the *Seila Law* case, it found them to be severable from the rest of the Dodd-Frank Act and left it untouched. 591 U.S. at 234–35.  There was nothing about those provisions that affected the operations or structure of the CFPB, *id.* at 235, and their absence would not prevent the agency head from performing her duties.  Indeed, the Supreme Court had concluded that the opposite was true: the presence of the restrictions interfered with the Director's inherent obligation to perform those duties on behalf of the executive and the President's ability to oversee her.  *Id.* at 223–26.

The instant situation is entirely different.  Excising the provisions that protect the Special Counsel from dismissal for partisan or arbitrary reasons would cut straight to the heart of the

50

statutory scheme: the Special Counsel's independence. The term "independent agency" is not simply a label in this case; it is existential for the OSC.[21]

Consider how this all began. President Carter proposed, and Congress created, the Special Counsel to protect the merits-based civil service system from "improper political influences or personal favoritism," *see* President Carter Letter, and "to protect individuals who speak out about government wrongdoing from reprisals." S. Rep. No. 95-969, at 2. That merits-based system did not always exist. For nearly a century after the nation's founding, federal employment was plagued by a spoils system that permitted the President to treat a government job as an "item of patronage" to be rewarded to his partisan supporters only. *Arnett*, 416 U.S. at 148. Presidents across the political spectrum abused this power, until it resulted in the death of a sitting President, which spurred a movement for significant reform that would replace the patronage system entirely.

In that context, it becomes clear why Congress, throughout its creation and refinement of the position of Special Counsel, took pains to insulate him to some degree from the President. The legislature considered what the terms of the balance should be when it first created the position: "[b]ecause the Special Counsel may be called upon to investigate prohibited personnel practices in the executive branch, and to bring disciplinary actions against executive branch officials," Congress "believed it [was] essential that [he] be independent of presidential direction and control." S. Rep. No. 95-969, at 29. But Congress did not deprive the President of all control over the Special Counsel; it shortened the originally proposed seven-year term limit to five years, and

---

21    This is true notwithstanding the Supreme Court's observation in *Collins* that "describing an agency as independent would be an odd way to signify that its head is removable only for cause because even an agency head who is shielded that way would hardly be fully 'independent' of Presidential control." 594 U.S. at 249. The invocation of the term in this case is not mean to signify *that* the agency head is removable only for cause, but why.

51

it allowed the President to remove him for inefficiency, neglect of duty, or malfeasance in office. *See* Civil Services Reform Act of 1978, Pub. L. No. 95-454, 92 Stat 1111.

Later, when Congress sought to expand the Special Counsel's responsibilities in the Whistleblower Protection Act, it worked with the President to define the boundaries of his new authority. Defendants attempt to cherry-pick history, to the extent they are familiar with it, by highlighting certain constitutional objections to the Act voiced by the Office of Legal Counsel and President Reagan. Defs.' Mot. at 3. But not only do they neglect to mention that those objections were to *previous versions* of the Act, they omit the fact that the executive branch then worked closely with Congress to overcome the objections after considerable negotiation. The legislative history, as a whole, tells a different story than the impression created by defendants' isolated citations.

President Reagan and his Attorney General took particular issue with the fact that the first Whistleblower Protection Act passed by Congress authorized the Special Counsel to obtain judicial review of Merits Systems Protection Board decisions because that would pit two executive agencies against each other in federal court. *See* President Reagan Mem. But once the President vetoed the original bill, Congress worked with the Attorney General to "clip the Special Counsel's wings," 135 Cong. Rec. 5037 (1989) (statement of Rep. Pat Schroeder), by eliminating that authority altogether. 135 Cong. Rec. 4509 (1989) (statement of Sen. Carl Levin). After a process of negotiation, the same Attorney General, then serving under President George H. W. Bush, approved of the "mutually acceptable resolution of [the] serious constitutional concerns," 135 Cong. Rec. 5033–34 (1989), and President Bush then signed the reformed Whistleblower Protection Act into law. *See* President Bush Statement.

That history, and the specific role the Office of Special Counsel was designed to play, underlie and justify the presence of the removal restrictions in the statute.  As the Supreme Court has observed:

> Whenever called upon to judge the constitutionality of an Act of Congress . . . the Court accords "great weight to the decisions of Congress." The Congress is a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States.

*Rostker v. Goldberg*, 453 U.S. 57, 64 (1981), quoting *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 102 (1973).

The Special Counsel's statutory duties and powers are set out fully above, and it bears repeating that the terms of his  charter – the fact that he is authorized to investigate only certain forms of government wrongdoing, the lack of true prosecutorial authority, the remedies limited to making recommendations and complaints to other independent agencies with no right challenge their decisions, the absence of regulatory authority – were crafted by the executive and the legislature working together.  Those limitations are why the OSC cannot be accurately described as a "single-Director structure" that "vest[s] significant governmental power in the hands of a single individual accountable to no one."  *Seila Law*, 591 U.S. at 224.  It is also why the Special Counsel does not present the same constitutional threat as an official "[w]ith no colleagues to persuade," who "may dictate and enforce policy . . . affecting millions of Americans."  *Id.* at 225.

*Collins* focuses attention on the "vital purposes" that are "implicated" whenever the President's removal power is at issue.  *Collins*, 594 U.S. at 252.  As the Supreme Court has described it, this specific aspect of a President's Article II power is coercive and controlling.  *See Humphrey's Executor*, 295 U.S. at 630 (describing the removal power as a "coercive influence").  "[I]t is only the authority that can remove [executive] officials that they must fear and, in the performance of [their] functions, obey" the President.  *Seila Law*, 591 U.S. at 213–14 (citation and

53

quotations omitted).  The general power of removal permits a President to fire officers "who disobey his commands," "have different views of policy," or "who come from a competing political party who is dead set against [the President's agenda]." *Collins*, 594 U.S. at 256 (citations and quotations omitted)

Such coercive influence would run directly contrary to the Special Counsel's unique status and mission.  The Special Counsel's independence ensures that he can fulfill his statutory duty to protect whistleblowers within the federal government, who must feel free to report fraud, waste, and abuse or unlawful political activity without fear of retaliation.  It is his independence that qualifies him to watch over the time-tested structure that is supposed to bar executive officials from taking federal jobs from qualified individuals and handing them out to political allies – a system that Congress found intolerable over a century ago.  The position would be entirely ineffective if the Special Counsel were to be compelled to operate with the sword of at-will removal hanging over his head, or if a President, chagrined by whistleblower or merits system protections could undermine the OSC's independence by threatening to use it.

The Supreme Court imagined a scenario in which "an unlucky President" might get elected on a specific platform and "enter office only to find herself saddled with a holdover" agency head "who is dead set *against* that agenda." *Seila Law*, 591 U.S. at 225 (emphasis in original).  But that possibility does not give rise to concerns for the President in the rare situation presented here.  The Office of Special Counsel does not have duties that can be characterized as implementing an administration's agenda, and he cannot frustrate the President's policies; he cannot rewrite or reject regulations, and if he shines a light on wrongdoing, it is up to the administration to choose to do something about it.  The scenario is constitutionally tolerable because it would not be faithful to the statute as written, or the bipartisan goals it is supposed to

54

advance, if the Special Counsel himself is left to fear the very sort of reprisal his position is designed to prevent.

## II.    The Court will grant the plaintiff's request to impose equitable remedies in furtherance of its judgment.

Plaintiff asks the Court to declare that the February 7, 2025 termination was an unlawful, ultra vires act, and therefore it is null and void and that he is the Special Counsel of the Office of Special Counsel for the remainder of his five year term unless and until he is removed in accordance with 5 U.S.C. §1211(b).  Pl.'s Proposed Order [Dkt. # 23-2] at 2.  He also seeks an order directed to the subordinate executive branch officials named as defendants in this case that plaintiff must be recognized as the Special Counsel, that he must not be obstructed or denied the authorities, benefits, and resources of his office, and that they may not recognize an Acting Special Counsel instead.  *Id.*  These requests fall well within the Court's jurisdiction, and they will be granted in the order accompanying this opinion.

### A. The Court has the authority to issue a declaratory judgment and enjoin executive officials other than the President.

#### 1.  Declaratory judgment

28 U.S.C. §2201(a) provides:

> [I]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interest ed party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

The defendants challenge the Court's power to issue a declaratory judgment directed towards the President, on the grounds that it is at bottom an injunction, and therefore subject to the traditional limits on the Court's equitable authority to enjoin the President.  Defs.' Reply at 9–10. This seems to ignore the salutary and clarifying effects of the merger of law and equity with the

55

adoption of the Federal Rules of Civil procedure in 1938, and the fact that Congress established

the declaration as a legal remedy in the Declaratory Judgment Act.

## 2. Injunctive relief

Since the entry of the TRO, defendants have marshalled considerable authority to support

their position that the Court is not authorized to enjoin the President directly and order him to

reinstate the plaintiff. Plaintiff does not dispute this proposition.[22] Instead, he has made it very

clear in his submissions to date, *see e.g.*, Reply in Supp. of Mot. for TRO at 7; Pl.'s Mot. at 19;

Pl.'s Reply at 3, and at the hearing, that he is not seeking an order directing the President to do or

to stop doing anything. He asks the Court, once it has entered its declaratory judgment, to direct

the other defendants, executive branch officials, to refrain from interfering with his status and

activities as the Special Counsel. This is an order the Court has power to issue.

In *Youngstown Sheet & Tube Company v. Sawyer,* 343 U.S. 579 (1952), the Supreme Court

remedied the President's wrongful seizure of the nation's steel mills through an injunction to his

subordinates, and the case continues to be cited for the proposition that "courts have power to

compel subordinate executive officials to disobey illegal Presidential commands." *Soucie v.

David,* 448 F.2d 1067, 1072, n.12 (D.C. Cir. 1971).

The approach proposed by the plaintiff was discussed by the D.C. Circuit in *Swan v.

Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996). In *Swan,* a member of the Board of the National

Credit Union Administration had been removed by President Clinton, and he sought to have his

removal and replacement declared to be unlawful and to be reinstated. *Id*. at 974. Unlike in this

---

22    *See Severino v. Biden,* 71 F.4th 1038 (D.C. Cir. 2023) ("[E]njoining the President to make
a formal appointment" is "a constitutionally exceptional step," and "[a] court generally may not
enjoin the President in the performance of his official duties." *Id.* at 1042 (internal quotation marks
omitted), citing *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992).

case, the removal did not contravene the applicable statute since Swan's term had expired, and he was a holdover Board member when he was replaced. *See id*. at 975. In addressing its own subject matter jurisdiction to hear the case and decide that point, the Court considered the question of the redressability of plaintiff's injury, and the availability of an injunction as relief came up in that context.

> [I]njunctive relief against the President personally is an extraordinary measure not lightly to be undertaken. The reasons why courts should be hesitant to grant such relief are painfully obvious; the President, like Congress, is a coequal branch of government, and for the President to be ordered to perform particular executive acts at the behest of the Judiciary at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers.
>
> On the other side of the scale, of course, is the bedrock principle that our system of government is founded on the rule of law, and it is sometimes a necessary function of the judiciary to determine if the executive branch is abiding by the terms of legislative enactments. In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials.

*Id.* at 978 (internal citations and quotation marks omitted). The Court decided that in Swan's situation, the remedy could come in the form of an injunction directed towards the executive director of the Board. *Id.* at 980. In his concurring opinion, Judge Lawrence Silberman chided the majority for its lengthy consideration of its authority to direct the President to rehire someone in a case in which the firing at issue was not unlawful in the first place. *See id.* at 989–91 (Silberman, J., concurring). But he agreed that if the Court had found that the plaintiff should remain in the position, the better course would be to simply order the other executive branch officials to recognize his status. *Id.* at 988–89. The Circuit later repeated that a court can "enjoin

'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*'" to redress the official's injury. *Severino*, 71 F.4th at 1042–43, quoting *Swan,* 100 F. 3d. at 980.[23]

Finally, to support their argument that plaintiff is not entitled to injunctive relief, defendants point to a line of cases in which federal officials removed from their positions pursued suits for back pay. *See* Defs.' Mot. at 16. While it is true that the plaintiffs in *Shurtleff v. United States*, 189 U.S. 311 (1903), *Myers*, 272 U.S. 52, *Humphrey's Executor*, 295 U.S. 602, and *Wiener v. United States*, 357 U.S. 349 (1958), were seeking to recover monetary compensation, none of those cases stands for or even purported to address the proposition that no the other remedy was available.[24] The issue in *Shurtleff* was whether the President could remove an officer "for any other causes other than those mentioned" in a for-cause removal restriction. 189 U.S. at 314. *Myers* addressed whether the President could remove a postmaster without the consent of the

---

23      Plaintiff also suggests that a writ of mandamus might be available to order the other government officials to perform a purely ministerial act, citing *Severino v. Biden*, 71 F.4th 1038. *See* Tr. at 25. During the redressability analysis in that case, the Court again reviewed what might be possible, and it observed that *Franklin v. Massachusetts*, 505 U.S. at 788, "left open a narrow potential exception for injunctions that require the President to perform a 'purely "ministerial" duty' over which he has no discretion." As in *Swan,* the Court chose not to tackle the question of whether, under its precedent, an injunction to reinstate an official could qualify as "ministerial." *Id*. While there is no need to address the question with respect to the President since plaintiff is not asking that he be joined, the Court has similar qualms about whether acquiescing in Dellinger's status and refraining from interfering with the performance of his duties for five years could be classified as "ministerial," so it will leave the question of mandamus for another day.

24      Defendants also point to *Parsons v. United States*, 167 U.S. 324 (1897), describing it as a suit for "salary and fees," Defs.' Mot. at 16, but that description does not tell the whole story. In that case, when President Grover Cleveland attempted to remove the United States Attorney for the Northern and Middle District of Alabama without cause, the U.S. Attorney "respectfully decline[d] to surrender the office." *Id.* at 325. The individual President Cleveland had named as successor then sued the U.S. Attorney to require him to "turn over . . . all the books and papers and other property appertaining to the office." *Id.* at 326. After the successor won in the lower court, the deposed U.S. Attorney filed a petition for a writ mandamus in the Supreme Court to vacate the order, and that petition also sought the recovery of "salary and fees." *Id.*

Senate. 272 U.S. at 107–08, 109. Reinstatement was not an issue since Myers was deceased. *See id*. at 106. *Humphrey's Executor* determined whether for-cause removal protection for the Commissioners of the Federal Trade Commission violated the President's removal power, and as in Myers, the case was being pursued after his death. 295 U.S. at 618–19. And *Weiner* "present[ed] a variant of the constitutional issue" in *Humphrey's*, addressing whether the President could remove a member of the quasi-judicial War Claims Commission. *Weiner*, 357 U.S. at 350–51. Reinstatement was not an issue because Congress abolished the Commission before the case was resolved. *See id*. at 350.

So the Court finds it proper to enjoin defendants Bessent, Gor, Gorman, Kamman, and Vought, ordering them to recognize plaintiff Dellinger's authority as Special Counsel unless and until he is removed in accordance with 5 U.S.C. § 1211(b). [25]

---

25    Defendants cite *White v. Berry*, 171 U.S. 366 (1898), Defs.' Mot. at 1, in which the U.S. Collector of Internal Revenue removed an official who had been appointed to a position by the Secretary of the Treasury, because he was a Democrat and the Collector wanted to replace him with a republican. *Id.* at 366–67. The lower court held that the removal violated the Pendleton Civil Service Act and that it had the authority to "to restrain the appointing power from removing" the plaintiff because it was unlawful. *Id.* at 376. The Supreme Court found it to be "well settled that a court of equity has no jurisdiction over the appointment and removal of public officers," *id.* at 377, and it vacated the order. But it confirmed that "[t]he jurisdiction to determine the title to a public office belongs exclusively to the courts of law." *Id.* This reaffirms the Court's power to issue declaratory relief, but it does not bear on the requested injunction since plaintiff is not requesting an order that anyone be removed or reinstated. *White v. Berry* is relevant in that the Supreme Court plainly recognized that the power to remove or replace officials had regularly been exercised by courts throughout the country's history, albeit in a manner that honored the then-existing separation between courts of law and courts of equity: "either by certiorari, error, or appeal, or by mandamus, prohibition, quo warranto, or information in the nature of a writ of quo warranto, according to the circumstances of the case, and the mode of procedure established by common law or by statute." *Id.* In short, there are many parallels to remedies that have been awarded in the past. Plaintiff has cited a line of authorities in which the quo warranto procedure was utilized to resolve disputes over title to an office, *see* Reply in Supp. of Mot. for TRO at 7, and Pl.'s Reply at 4, n.3, and the Court agrees that his prayer for relief is sufficiently broad to encompass a request for this or another form of legal relief if recharacterizing it is necessary, especially since the Court is not ordering that anyone be appointed or removed.

### B.  The permanent injunction factors support the issuance of an injunction.

A plaintiff seeking a permanent injunction must demonstrate that:  (1) he has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.  *Monsanto Co.*, 561 U.S. at 156–57, quoting *eBay Inc.*, 547 U.S. at 391. "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court. *eBay*, 547 U.S. at 391.  "The purpose of an injunction is to prevent future violations" where there is "cognizable danger of recurrent violation." *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1363–64 (D.C. Cir. 2023), quoting, *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).  But "[i]f a less drastic remedy" is "sufficient to redress" the injury, the "extraordinary relief of an injunction" is not warranted.  *Monsanto Co.*, 561 U.S. at 165–66.

### 1.  Irreparable Harm and Inadequate Remedy at Law

Plaintiff reminds the Court that his motion for a temporary relief argued that removal would cause him irreparable harm by depriving him of his "statutory right to function in his office," which could not be remedied by a post-judgment award of damages.  Pl.'s Mot. at 27–28.  It is now the stage where judgment is being awarded, so the option of deferring injunctive relief because the problem can be remedied later is no longer available, and the Court did not find that adequate at the outset of the lawsuit anyway.  *See* TRO Order at 20–21.  Because at this point in the proceedings, there is substantial overlap between the claimed irreparable injury and the lack of an adequate remedy at law, the Court will consider these two factors together, as other courts in this

district have done.  *See, e.g.*, *Ridgley v. Lew*, 55 F. Supp. 3d 89, 98 (D.D.C. 2014); *Kymber Consulting Grp., LLC. v. Cato*, No. 22-1042 (JMC), 2022 WL 7488185, at *3 (D.D.C. 2022).

As the Court of Appeals has explained, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough" to prove irreparable harm.  *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam), quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958).[26]

Plaintiff has made a sufficient showing of irreparable harm that cannot be remediated through a damages award.  As the Court has explained, unless he is removed for inefficiency, neglect of duty, or malfeasance, plaintiff has a statutory duty to fulfill:  to "protect employees, former employees, and applicants for employment from prohibited personnel practices." 5 U.S.C. § 1212(a)(1).  The purported removal without cause renders him unable to fulfill that duty, a loss that can never be restored, and therefore it gives rise to irreparable harm.  And as plaintiff predicted, the harm he feared was impending was not mere speculation; defendants compounded the problem when they notified the Court, the President has already "designated the Secretary of Veteran Affairs, Doug Collins, to serve as Acting Special Counsel," during the pendency of the Court's proceedings.  Notice of Designation at 1.

Defendants' contentions with respect to this factor are unpersuasive.  They tend to repeat the arguments they made against the TRO, characterizing plaintiff's injury as a loss of "employment and salary" and then asserting that it is not irreparable because "[a] court can generally repair an injury to an individual from loss of employment by awarding post judgment

---

26    Defendants cite *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) for their argument that plaintiff does not meet the "high standard for irreparable injury." Defs.' Mot. at 20 (quotations omitted).  But that case addresses the test for interim relief, not whether an injunction would be appropriate after litigation concludes.  *Id.* at 293.

relief such as backpay." Defs.' Mot. at 20; Defs.' Reply at 12. Plaintiff has never even brought

up the subject of his salary.

Defendants rely on *Sampson v. Murray*, 415 U.S. 61, 83 (1974), as they did at the TRO

stage. Defs.' Mot. at 20. The Court addressed *Sampson* in its order granting the TRO. *See* TRO

Order at 17–24. *Sampson* involved a probationary employee who sought to enjoin the General

Services Administration from discharging her, arguing that the discharge would cause irreparable

harm by depriving her of income and causing "her to suffer the embarrassment of being wrongfully

discharged." 415 U.S. at 62–63, 66. The allegations themselves differentiate that case from this

one. *Sampson* also acknowledged that its analysis was "dealing" with a particular class of

employee – a "probationary" one. *Id.* at 80–81. And while it rejected injunctive relief in her

situation, it made it clear it was not shutting the door entirely:

> [C]ases may arise in which the circumstances surrounding an employee's
> discharge, together with the resultant effect on the employee, may so far
> depart from the normal situation that irreparable injury might be found.
> Such extraordinary cases are hard to define in advance of their occurrence
> . . . . [W]e do not wish to be understood as foreclosing relief in the
> genuinely extraordinary situation. Use of the court's injunctive power,
> however, when discharge of probationary employees is an issue, should be
> reserved for that situation rather than employed in the routine case.

*Id.* at 92 n.68.

This is not a routine case dealing with a terminated probationary employee. Plaintiff

Dellinger was appointed to serve a statutory term of five years, which he was doing until his

sudden, unexplained removal. Ex. A. And he is not claiming the same irreparable injury as the

*Sampson* plaintiff, nor could his claimed injury – deprivation of his statutory right to function – be

compared to the loss of income or embarrassment involved in the typical employment action, for

which there are remedies that do not involve equitable relief. As the Court stated in the temporary

restraining order:

> This case falls outside of the typical paradigm since the OSC is an independent agency and the White House is not plaintiff's employer. In short, plaintiff's injury stems directly from "extraordinary" circumstances as *Sampson* requires; namely, that for the first time, a President has removed the Special Counsel from his statutorily prescribed term without any cause or explanation.

TRO Order at 19.

Defendants now point to *Raines v. Byrd*, 521 U.S. 811 (1997), as well, and they argue that "loss of political power" is not a cognizable harm. Defs.' Mot. at 20. But *Raines* is not on point. In *Raines*, six members of Congress sued the Secretary of the Treasury and the Office of Management and Budget to challenge the constitutionality of the Line-Item Veto Act, which authorized the President to "'cancel' certain spending and tax benefits measures after he . . . signed them into law." *Id.* at 814. The plaintiffs had voted against the Act, *id.*, and, for standing purposes, alleged that the law injured them by: (1) altering the legal and practical effect of all votes they may cast on bills with vetoable items; (2) divesting them of their constitutional role in the repeal of legislation; and (3) altering the constitutional balance of powers between the legislative and executive branches. *Id.* at 816. The Court held that none of these injuries were sufficient for standing because the fact that they had "simply lost" the vote on the Line-Item Veto Act did not implicate the invasion of legally protected interest to give rise to the necessary injury-in-fact. *Id.* at 827–29.

Plaintiff Dellinger is not a member of Congress, this case does not involve a single vote, no one has challenged plaintiff's standing, and he does not assert a reduction of his "political power." Plaintiff was injured by the deprivation of his statutory right to function at all when the President attempted to remove him without cause.

Defendants also assert that the dissent in *Barnes v. Kline*, 759 F.2d 21 (D.C. Cir. 1984), *vacated on other grounds*, 479 U.S. 361 (1987), supports the argument that public officials do not

have a "separate private right" to their office.  Defs.' Mot. at 20, citing *Barnes*, 759 F.2d at 50

(Bork, J., dissenting).  As the reliance on a dissent tends to signal, *Barnes* does not support their

position.  In that case, thirty-three members of Congress sued two executive officials to challenge

the constitutionality of the President's "pocket veto" power, which President Reagan had exercised

to veto the International Security and Development Co-operation Act.  *Id.* at 23–24.  The D.C.

Circuit held that the plaintiffs "clearly ha[d] standing to litigate" the case, over the dissent by Judge

Bork cited by defendants.  *Id.* at 29.  So, that case does not provide much support either, and the

principle it is cited to advance is undermined by defendants' simultaneous insistence that plaintiff

is not entitled to an injunction because he could sue for backpay damages.  *See* Defs.' Mot. at 16–

17 (citing five previous Supreme Court cases in which removed officers were allowed to bring suit

over their removal).

      The Court finds that plaintiff has demonstrated both that he would suffer irreparable harm

in the absence of injunctive relief and that he lacks an adequate remedy at law.

### 2.  Balance of the Equities and Public Interest

      The next set of factors are whether the balance of hardships between the plaintiff and

defendant warrants an equitable remedy, and whether the injunction serves the public interest.

*Monsanto Co.*, 561 U.S. at 157.  As they did at the TRO stage, both parties advance the arguments

concerning these factors together.  *See* Defs.' Mot. at 21–23; Pl.'s Mot. at 28–29.  Because the

Court finds that they are intertwined, and the Supreme Court has instructed that "assessing the

harm to the opposing party and weighing the public interest . . . merge when the [g]overnment is

the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), the Court will consider them

together.

The Department of Justice wrings its hands over the harm that could flow from what it calls a "special exception for the Special Counsel" to the President's Article II power, Defs.' Mot. at 8, asserting that this inflicts harm on the President by depriving him of "control over an entire executive department." Defs' Reply at 12. But plaintiff is not seeking to be excepted from binding case authorities; his position is that the OSC was not covered by them in the first place. *See* Tr. at 4–5. Moreover, the instant decision is extremely narrow and sui generis, and it does not result in the diminution of the President's powers; this is the only single-headed agency left for the courts to consider, and it is unlike any of them. Thus, recognizing the unique nature of the OSC will be no threat to the Framers' decision, made manifest in Article II, to make "a single President responsible for the actions of the Executive Branch." *Seila Law*, 591 U.S. at 224, citing *Free Enter. Fund*, 561 U.S. at 477.

On the other side of the equation, one cannot deny the proposition that the Special Counsel's singular role, and preserving his independence in carrying it out, advance the public interest. That was the genesis of the Whistleblower Protection Act and the particular provisions at issue. The protection the OSC offers to enable whistleblowers to come forward with information about wrongdoing without fear of reprisal is critical to ensuring that those instances of wrongdoing are corrected, to the benefit of both the government and the public at large. Both houses of Congress have consistently emphasized the need for robust support for whistleblowers; for example, on July 30, 2023, the Senate passed a resolution introduced by Senator Chuck Grassley (R-Iowa) designating the date as "National Whistleblower Day." S. Res. 793, 118th Cong. (July 31, 2023). The resolution was a reminder that:

> [W]histleblowers risk their careers, jobs, and reputations by reporting waste, fraud, and abuse to the proper authorities . . . . [I]n providing the proper authorities with lawful disclosures, whistleblowers save the taxpayers of the United States billions of dollars each year and serve the

public interest by ensuring that the United States remains an ethical and safe
place[.]

*Id.* at 2.  The benefits of a duly appointed Special Counsel, operating free of partisan pressure far

outweigh any harms identified by the defendants.

The Court is therefore skeptical of defendants' assertion that "the public would be better

served by the appointment of a principal officer who holds the President's confidence."  Defs.'

Mot. at 22.  There has been no indication here that plaintiff has been acting in a partisan or biased

manner; to the contrary, for example, his recent finding vindicating complaints by IRS agents that

were retaliated against for raising concerns about the treatment of Hunter Biden during President

Biden's administration spurred Senators Charles Grassley and Ron Johnson to implore President

Trump to protect those individuals.   Letter from Senator Charles E. Grassley, Chairman

Committee on the Judiciary, and Ron Johnson, Chairman, Permanent Subcommittee on

Investigations to President Donald J. Trump (Feb. 6, 2025), http://www.grassley.senate.gov/

imo/media/doc/grassley_johnson_to_trump_-_irs_whistleblower_retaliation.pdf.   That happened

just one day before plaintiff's purported termination.  And the suggestion that the public is

necessarily better served by the President's choice runs contrary to the Court's earlier findings

about the critical importance of independence in this particular position.  Moreover, it is enough

to satisfy the final two factors when considering a permanent injunction to find that an injunction

to preserve the status quo of plaintiff's position does not harm the public, and therefore, the

potential that a President may have qualms that fall far short of the statutory reasons for dismissal

does not counsel against relief.

## CONCLUSION

For all of the reasons set forth above, the Court will enter judgment in favor of plaintiff on

Count One, and it will award the declaratory and injunctive relief set forth in the accompanying

order.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 1, 2025