IN THE

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### No. 25-5052

◆━◆

HAMPTON DELLINGER, IN HIS PERSONAL CAPACITY AND IN HIS OFFICIAL
CAPACITY AS SPECIAL COUNSEL OF THE OFFICE OF SPECIAL COUNSEL,

*Plaintiff-Appellee,*

—v.—

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE
TREASURY, ET AL., *Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## APPELLEE'S OPPOSITION TO APPELLANTS'
## EMERGENCY MOTION FOR A STAY PENDING APPEAL

JOSHUA MATZ, BAR NO. 61916
  *Counsel of Record*
AMY JEFFRESS, BAR NO. 44740
JACKSON ERPENBACH, BAR NO. 65902
BENJAMIN STERN, BAR NO. 65911
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(202) 742-2661
jmatz@heckerfink.com

KATE DONIGER, BAR NO. 65901
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor New
York, New York 10118
(212) 763-0883

*Counsel for Plaintiff-Appellee
Hampton Dellinger*

## CERTIFICATES TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

Plaintiff-Appellee is Hampton Dellinger, in his personal capacity and in his official capacity as Special Counsel of the Office of Special Counsel. Defendants-Appellants are Scott Bessent, in his official capacity as Secretary of the Treasury; Sergio Gor, in his official capacity as Director of the White House Presidential Personnel Office; Karen Gorman, in her official capacity as Principal Deputy Special Counsel and, upon the purported removal of the Special Counsel, the Acting Special Counsel of the Office of Special Counsel; Karl Kammann, in his official capacity as the Chief Operating Officer of the Office of Special Counsel; Donald J. Trump, in his official capacity as President of the United States of America; and Russell Vought, in his official capacity as Director of the Office of Management and Budget.

No amici curiae or intervenors participated before the district court.

### B. Rulings Under Review

The rulings under review are a Memorandum Opinion & Order and Order issued by the district court, the Honorable Amy Berman Jackson presiding, on March 1, 2025. ECF 32 (S.J. Op.), 33 (Judgment).

## C. Related Cases

This case has previously been before this Court as Nos. 25-5025 and 25-5028, and before the U.S. Supreme Court as 24A790. Counsel for Plaintiff-Appellee is not aware of any related cases.

DATED: March 5, 2025

/s/ Joshua A. Matz
Joshua A. Matz
*Counsel for Plaintiff-Appellee*
*Hampton Dellinger*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................2

ARGUMENT .........................................................................................6

   I.   The Government Is Not Likely to Prevail on the Merits................................6

     A.    The OSC's For-Cause Removal Protection is Constitutional ..................6

     B.    The District Court Properly Exercised Its Remedial Authority .............14

   II.    The Remaining Factors Strongly Cut Against Extraordinary Relief.........20

CONCLUSION ....................................................................................22

**INTRODUCTION**

After failing to convince the district court of its position, the government now asks this Court for emergency relief so that it can concededly violate a longstanding federal statute while its challenge to that statute unfolds on appeal. The Court should deny such relief. Following multiple rounds of briefing and an oral argument, the district court issued a thorough opinion upholding the Office of Special Counsel's (OSC) longstanding for-cause removal protection. It then granted well-recognized declaratory and injunctive relief with an ancient pedigree in Anglo-American law. These rulings were correct. In seeking to carry its burden to demonstrate otherwise, the government substantially misdescribes the powers and functions of OSC, manufacturing a threat to Article II prerogatives where none exists and misreading precedent along the way. In the same breath, the government advocates for novel restrictions on judicial remedial authority that defy centuries of historical practice and conflict with binding precedents from the Supreme Court and this Court.

It would be one thing for the government to press these points at the merits stage of this appeal. But it is quite another to assert that the unconstitutionality of a federal statute is so clear—and the unavailability of a remedy so unmistakable—that emergency interim relief is warranted. Especially given the government's extremely weak claim of irreparable injury, the Court should reserve these weighty issues for full deliberation and maintain stability and continuity at OSC in the interim.

## BACKGROUND

The district court explained the history and jurisdiction of OSC, as well as the procedural history of this case, and we do not reprise those points here. *See* S.J. Op. 7-24. Instead, we focus on the government's contention that the Special Counsel is vested with executive authorities, including prosecutorial and investigative powers, that require direct presidential control through at-will removal. Gov't Br. 13-19. This contention starkly misdescribes the Special Counsel's office. Although OSC's for-cause removal limit is vital to its whistleblower-protection function, that limit poses no threat to Article II prerogatives for a simple reason: OSC generally lacks any power to render any decision on behalf of the Executive Branch (or otherwise to take final or coercive action on behalf of the government), and OSC's bounded authority does not unconstitutionally intrude on presidential terrain.

OSC's jurisdiction is tightly limited. Unlike the agencies at issue in *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020), and *Collins v. Yellen*, 594 U.S. 220 (2021), it lacks any power to regulate or penalize (either directly or indirectly) private activity. Instead, as an "ombudsman" and "watchdog" focused on the government, *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 162-63 (D.C. Cir. 1982), OSC has "only limited jurisdiction to enforce certain rules governing Federal Government employers and employees," *Seila Law*, 591 U.S. at 221.

And even as to federal employees, the Special Counsel does not impose any discipline or other adverse action or make binding decisions for the Executive Branch. Instead, OSC receives allegations of prohibited personnel practices (PPPs) and Hatch Act violations, assesses and investigates such complaints, and promotes a proper resolution. *See* 5 U.S.C. §§ 1212(a), 1216(c). While investigating these matters, OSC may in some cases issue subpoenas, but lacks authority to enforce its own subpoenas and must instead petition the MSPB (a separate Executive Branch agency) to seek enforcement of OSC subpoenas in court. 5 U.S.C. § 1212(b)(3)(A). Thus, "the Special Counsel's 'seemingly broad powers are greatly circumscribed in practice, [in part] by the Special Counsel's lack of authority to require either the Board or other agencies to do its bidding.'" *Am. Fed'n of Gov't Emps., AFL-CIO v. O'Connor (AFGE)*, 747 F.2d 748, 753 (D.C. Cir. 1984).

Similarly, even where OSC finds that an allegation was warranted, it can seek only to persuade others within the Executive Branch to address the situation. OSC first works with the relevant agency head to promote voluntary corrective action and relief for the PPP victim (or voluntary discipline in the case of a Hatch Act violation). But any recommended action by OSC in this process may be rejected: the Special Counsel has no power to bind any other agency. Absent voluntary settlement, OSC may petition the MSPB on the injured employee's behalf, 5 U.S.C. § 1214, or refer a complaint to the MSPB and ask that a perpetrator of a PPP or Hatch Act violation

be disciplined. *See id.* §§ 1215, 1216. An injured employee may also petition the MSPB directly (subject to certain procedural requirements). *Id.* § 1221. In all such circumstances, however, OSC exercises no authority over the MSPB. *Id.* § 1202(d). "[T]he MSPB is free to disagree with the Special Counsel and often does." *AFGE*, 747 F.2d at 753. The MSPB thus superintends the Special Counsel's authority to refer complaints—and it is the MSPB, not OSC, that makes binding decisions on these matters within the Executive Branch.

Beyond its human-resources investigative role, the Whistleblower Protection Act authorizes OSC to receive reports from employee-whistleblowers within agencies. *See* 5 U.S.C. § 1213(a). But even if a report appears credible, OSC cannot conduct its own investigation or otherwise take direct action. Instead, it may only review the investigation conducted by the whistleblower's agency and then report the investigation and OSC's own assessment of it to Congress and the President. *See id.* §§ 1212(a)(3), 1213(c)-(e). The Special Counsel must keep the identity of any whistleblower strictly confidential. *Id.* § 1213(h). And in a similarly advisory capacity, OSC reviews regulations issued by the Office of Personnel Management for any rule that would require committing a PPP. *See id.* § 1212(a)(4).

OSC is also vested with authority to "prescribe … regulations," but this authority is strictly limited to internal matters "necessary to perform the functions of the Special Counsel." *Id.* § 1212(e). The Special Counsel may separately issue

nonbinding advisory opinions concerning the Hatch Act, but he has no rulemaking authority in this sphere that compels compliance. *Id.* § 1212(f); *see also, e.g.*, *AFGE*, 747 F.2d at 752 ("[T]he advice the Special Counsel is permitted to give creates no law and binds neither the public nor any agency or officer of government.").

In these respects, the government's account of the Special Counsel's functions and authorities is quite significantly overstated. Across "almost every situation he encounters, the buck does *not* stop with him." S.J. Op. 48. Rather, "it is the Special Counsel's job to look into and shine light on a set of specific prohibited practices so that the other bodies"—who are themselves appointed by the President—"can take whatever action they deem to be appropriate." *Id.* at 6. For OSC to perform this crucial but limited function, a measure of independence from direct political control is vital. *See id.* at 54 ("The Special Counsel's independence ensures that he can fulfill his statutory duty to protect whistleblowers within the federal government, who must feel free to report fraud, waste, and abuse or unlawful political activity without fear of retaliation."). But that independence does not tread on any Article II prerogative, or otherwise unconstitutionally divert substantive presidential authorities, because the Special Counsel can at most "shine[] a light on wrongdoing," at which point "it is up to the administration to choose to do something about it." *Id.*

**ARGUMENT**

To obtain a stay, the government must demonstrate (1) "a strong showing that [it] is likely to succeed on the merits"; (2) that it "will be irreparably injured absent a stay"; (3) that the balance of equities favor a stay; and (4) that a stay is in the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The government fails that test.

## I.     The Government Is Not Likely to Prevail on the Merits

### A.     The OSC's For-Cause Removal Protection is Constitutional

**1.** The district court correctly concluded that OSC's limited jurisdiction, and its authority to recommend actions to other Executive Branch officials and agencies, does not intrude on any Article II prerogative requiring invalidation of its for-cause removal protection. The government's contrary view lacks merit.

For nearly a century, the Supreme Court has upheld for-cause removal rules where Congress deems such safeguards necessary to secure a modest measure of agency impartiality, expertise, and independence. *E.g.*, *Mistretta v. United States*, 488 U.S. 361, 410-11 & n.32 (1989); *Morrison v. Olson*, 487 U.S. 654, 687-93 (1988); *Wiener v. United States*, 357 U.S. 349, 355-56 (1958); *Humphrey's Executor v. United States*, 295 U.S. 602, 625-26, 629 (1935). Those rulings are the basis for an important part of the modern federal government. And their rationale is squarely applicable to OSC, as confirmed by Presidents Carter and George H.W. Bush (and legislative sponsors) in connection with creating OSC. *See* S.J. Op. 7-19.

In recent years, the Supreme Court has twice invalidated removal limits for principal officers leading single-headed agencies that exercise binding regulatory and enforcement authority affecting private actors. In *Seila Law*, the Supreme Court noted that for-cause removal limits for single-person agency leadership structures are a relatively recent phenomenon and warrant closer scrutiny. *See* 591 U.S. 220-22. But it did not stop there. Instead, it undertook a thorough study of the CFPB's structure, functions, funding, and authority—and concluded that applying for-cause removal protections to the Director of the CFPB raised grave concerns because of the Director's broad power to "issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties." *Id.* at 225. Ultimately, the Court held that the Director's authority to wield such power without accountability to the President through at-will removal infringed on Article II. *Id.* And this violation was magnified by the CFPB's unique funding structure, which ensured automatic funding through the Federal Reserve and defeated a crucial source of potential accountability to the President. *See id.* at 226.

Accordingly, the Court held that the President must be able to remove the CFPB Director at will, rather than only for cause. *See id.* at 234-38. In reaching this conclusion, however, the Court expressly distinguished OSC—emphasizing that OSC "exercises only limited jurisdiction to enforce certain rules governing Federal

Government employers and employees" and "does not bind private parties at all or wield regulatory authority comparable to the CFPB." *Id.* at 221.

Whereas *Seila Law* distinguished removal protections at OSC, it expressly cast into doubt such protections at the Federal Housing Finance Agency (FHFA)— which were ultimately stricken down one year later in *Collins*. In reaching this conclusion, *Collins* reasoned that asserted differences between the CFPB and FHFA regarding the "nature and breadth" of their authority were not dispositive of the constitutional analysis—adding that the FHFA was in some respects *more* powerful than the CFPB and that it had direct "regulatory and enforcement authority over two companies that dominate the secondary mortgage market and have the power to reshape the housing sector." 594 U.S. at 251, 253.

Taken together, these precedents support the constitutionality of OSC's for-cause removal limitation. *First*, and most fundamentally, *Seila Law* and *Collins* were animated by concern about the President's inability to remove officials sitting atop single-headed agencies "vested with significant executive power" that could "dictate and enforce policy for a vital segment of the economy affecting millions of Americans." *Seila Law*, 591 U.S. at 220, 225; *accord Collins*, 594 U.S. at 255. In that scenario, even "modest restrictions" on the President's removal authority may impede his ability to carry out his Article II duties. *Collins*, 594 U.S. at 256 (quoting

*Seila Law*, 591 U.S. at 228). As the Court recognized when it distinguished OSC in *Seila Law*, however, that same concern does not apply to OSC.

Simply put, the Special Counsel's ombudsman functions reflect marginal involvement with executive power—and are subject to an immediate, controlling check by a different Executive Branch actor appointed by the President. In that very real sense, the Special Counsel's whistleblower-protection activities do not threaten any Article II prerogative and do not constitute final action or decisionmaking by the Executive Branch. *See* S.J. Op. 5-6. The Special Counsel cannot file suit, impose discipline, promulgate regulations, enter stays, demand payment, or issue decisions or enter resolutions on behalf of the United States. While he can investigate certain HR matters, he cannot override any agency objections or even enforce his own subpoenas. When he finds wrongdoing, he cannot do anything other than petition another Executive Branch actor to do something about it. And while he can issue advisory guidance on certain matters, those opinions bind nobody. *See* S.J. Op. 48 ("[H]e does not wield significant executive power because he lacks real ability to exercise regulatory or enforcement authority or decision-making ….").

In all these respects, the Special Counsel is a unique actor whose extremely limited authorities do not intrude on any presidential prerogative. As an ombudsman and clearinghouse, his powers are to illuminate and persuade. Whereas *Seila Law* and *Collins* concerned agencies that made final decisions for the government—and

did so on issues with significant implications for private citizens—this case is nothing like that. Article II is not threatened by a slight measure of political independence for a nonpartisan official charged with confidentially receiving whistleblower reports and urging others in the Executive Branch to address them.

*Second*, and relatedly, OSC is more than just an extension of presidential will. *See, e.g.*, *Humphrey's Executor*, 295 U.S. at 628. Its sunshine-based authorities further a shared inter-branch commitment to Executive Branch compliance with congressionally imposed ethical and personnel requirements. *See* 5 U.S.C. § 1217; S.J. Op. 5. Indeed, OSC's structure reflects a carefully negotiated inter-branch resolution embraced by President George H.W. Bush—who expressly and quite specifically approved of OSC's for-cause removal protection in a public statement while signing the Whistleblower Protection Act. *See* S.J. Op. 17, 52.

*Third*, the function of independence at OSC is categorically different than it was for the agencies at issue in *Seila Law* and *Collins*. There, the case for agency independence rested on a substantive belief that economic regulation should be free of specific forms of presidential political control. *See Seila Law*, 591 U.S. at 207; *Collins*, 594 U.S. at 229-30. Here, in contrast, independence is warranted not to counterbalance the President's regulatory agenda, but rather to protect and assure whistleblowers, including those reluctant to disclose potential wrongdoing in their own agencies. If the official charged with protecting whistleblowers from retaliation

was himself vulnerable to retaliation for taking politically charged or inconvenient cases, then OSC's whistleblower protection purpose might fail when it is most needed. Thus, Congress rightly found—and two Presidents agreed—that the Special Counsel cannot protect whistleblowers if he is subject to removal without cause. Independence that exists for this purpose, and that remains subject to final decisions by other presidentially nominated agency officials, does not intrude on Article II.

*Finally*, the presence of the for-cause removal limitation does not shield OSC from proper accountability. The Special Counsel is nominated by the President and confirmed by the Senate for a limited tenure. 5 U.S.C. § 1211(b). The President may remove him from office for "inefficiency, neglect of duty, or malfeasance in office." *Id*. And OSC remains accountable through its reporting obligations and the appropriations process—in contrast to the CFPB's and the FHFA's insulated funding schemes. *See Seila Law*, 591 U.S. at 225-26; *Collins*, 594 U.S. at 231.

**2.** The government raises three objections to this conclusion, none of which is meritorious. To start, the government claims that *Seila Law* and *Collins* require that all "sole agency heads" must be removable at will. Gov't Br. 12, 16. But this Court already concluded that those cases "do not hold that the President has unrestricted power to remove the Special Counsel." Order, No. 25-5028, at *14 (D.C. Cir. Feb 15, 2025), ECF 9. Moreover, much of the reasoning of *Seila Law* and *Collins* would have been superfluous if those cases created the bright-line rule that the government

advances—including their detailed analysis of the authorities of the agencies under review. And DOJ's OLC got things right the first time when it initially read *Collins* as not speaking directly to OSC's for-cause removal protection. *See* S.J. Op. 48 n.19.

Next, the government claims that OSC's "significant" executive functions require invalidation of the for-cause removal provision. Gov't Br. 14. As set forth above, the government's litigation-driven description of OSC's authorities and functions is severely overstated. Those errors are most plainly reflected in its effort to analogize the Special Counsel to U.S. Attorneys. *See* Gov't Br. 14-15. As the district court observed, the Special Counsel has no criminal enforcement power at all. S.J. Op. 24 n.15. In their cases, moreover, U.S. Attorneys proceed in federal court on behalf of the government and make crucial final decisions for the Executive Branch: they speak directly for Article II in serving subpoenas, indicting defendants, negotiating pleas, and making binding representations for the United States. The Special Counsel, in contrast, cannot do any of those things and lacks any coercive authority. In exercising his powers to investigate and prosecute—which rest at the heart of the government's brief—he cannot enforce his subpoenas in court (only the MSPB can do that), he cannot discipline anyone for unlawful conduct (again, that is reserved to the MSPB), and he cannot compel anyone to do anything (this authority is reserved for the agency heads with whom he interacts and, here too, the MSPB).

Given these jurisdictional limits, there is no credible basis to believe Article II powers will be diverted if the Special Counsel retains for-cause protection.

Finally, the government invokes an action OSC recently filed with the MSPB as evidence that the Special Counsel has hijacked Article II authority. Gov't Br. 1, 18.[1] But as explained above, it is entirely up to the MSPB how to act on that filing. While OSC's request for an initial stay pending consideration of its filing receives deference, *see* 5 U.S.C. § 1214(b)(1)(A)(ii), that deference does not apply later in the proceeding, *see id.* § 1214(b)(4)(A), and at all stages it is for the MSPB alone to decide whether and how to act on any filings from OSC. OSC does not make any decisions here that bind the Executive Branch or control the exercise of Article II power. That prerogative is reserved to the presidentially nominated and Senate-confirmed officials of the MSPB; OSC can bring its concerns to the MSPB and recommend action, but has no ability to decide anything or issue a stay—which only confirms that the Special Counsel's for-cause removal limit does not tread upon any of the Article II concerns that required at-will removal in *Seila Law* and *Collins*.[2]

---

[1] Consistent with his duties, on February 28, 2025, OSC filed another request for a stay of personnel actions with the MSPB concerning recent terminations of probationary employees at the U.S. Department of Agriculture, which is available here: https://osc.gov/Documents/PPP/Formal%20Stays/USDA%20Systemic%20Stay%20(redacted).pdf.

[2] As the Special Counsel explained below, a distinct basis for this conclusion is that he is an inferior rather than principal officer. *See* ECF 23, at 11-24, No. 25-cv-385.

For all these reasons, the district court correctly entered judgment in favor of Special Counsel Dellinger, and the government fails to show error in that ruling.

## B. The District Court Properly Exercised Its Remedial Authority

The district court issued two remedies, a declaratory judgment and an order against the subordinate executive Defendants. Both remedies are appropriate.

**1.** Contrary to the government's position, neither remedy enjoins or compels the President to act. The declaratory judgment binds only subordinate Defendants responsible for implementing the President's termination—and in that circumstance, courts trust it is "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the [law] by the District Court, even though they would not be directly bound by such a determination." *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality op.); *see Utah v. Evans*, 536 U.S. 452, 463-64 (2002); *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998); *NTEU v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974).

A court may further remedy a President's unlawful action by enjoining subordinate officials responsible for implementation. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). This remedy "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back

---

The Special Counsel incorporates by reference that argumentation as a separate ground for concluding that his for-cause removal protection is constitutional.

to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

Under binding precedent, that historical practice authorizes relief to Special Counsel

Dellinger by enjoining the executive officials who may remove him, who control his

access to official authorities and resources, and who may attempt to replace him. *See*

*Severino v. Biden*, 71 F.4th 1038, 1042-43 (D.C. Cir. 2023); *Swan v. Clinton*, 100

F.3d 973, 979-80 (D.C. Cir. 1996); *id.* at 989 (Silberman, J., concurring).

**2.** The government also objects that courts categorically lack the authority to

reinstate unlawfully removed officials. This argument is flawed in several respects.

**a.** For starters, it trips out the gate because the district court did not order

reinstatement but rather declared that the purported termination notice was "null and

void" *ab initio* such that Mr. Dellinger "is and shall be the Special Counsel" without

ever having been removed from his five-year term. Judgment at 1; *see* S.J. Op. 59

n.25; *see also, e.g.*, *Kalbfus v. Siddons*, 42 App. D.C. 310, 321 (D.C. Cir. 1914)

(because removal was "illegal and void, the office never became vacant").

**b.** Regardless, the government is wrong to argue that courts lack the authority

to restore unlawfully removed officials to public office. *See* Laurence Tribe,

*American Constitutional Law* 706 n.20 (3d ed. 2000) (explaining that "an injunction

could issue to bar unlawful removal"). Indeed, the Supreme Court has *repeatedly*

approved court-ordered reinstatements to positions in the Executive Branch. *See,*

*e.g.*, *Webster v. Doe*, 486 U.S. 592, 604-05 (1988) (rejecting government's position

that courts lacked authority on remand to "order respondent's reinstatement," approvingly citing "traditional equitable principles"); *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959); *Service v. Dulles*, 354 U.S. 363, 370 (1957). And *Sampson v. Murray* clarified that courts may issue "injunctive relief" to reinstate executive employees where circumstances warrant it. 415 U.S. 61, 63, 92 n.68 (1974).

The government nevertheless asserts that reinstatement is inconsistent with "traditional principles of equity jurisdiction." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). But the government concedes that courts have long ordered unlawfully removed plaintiffs be restored to public office, whether by writ of mandamus or a *quo warranto* action. Gov't Br. 21-22. This is confirmed by the government's own cases. *See White v. Berry*, 171 U.S. 366, 377 (1898); *In re Sawyer*, 124 U.S. 200, 212-13, 216, 220 (1888). And it is rooted in centuries of practice. *See, e.g.*, Thomas Tapping, *The Law and Practice of the High Prerogative Writ of Mandamus as it Obtains Both in England and in Ireland* 221 (1853); Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 496 (1890); ECF 23, at 21-22, No. 25-cv-385 (discussing these authorities).

The government's only response is that these were legal remedies with added "guardrails." Gov't Br. 22. But that gives away the game on *Grupo Mexicano*, which requires only that the "specific actions and the resulting practical consequences" be rooted in historical practice. *SEC v. Cavanagh*, 445 F.3d 105, 118 (2d Cir. 2006);

*accord Liu v. SEC*, 591 U.S. 71, 76 n.1 (2020) (directing courts to identify "parallels" in remedies historically awarded and not to "elevate form over substance"); S.J. Op. 59 n.25. Nor does the divide between law and equity constrain *Grupo Mexicano*'s historical inquiry now that "there is only one action … in which all claims may be joined and all remedies are available." *Ross v. Bernhard*, 396 U.S. 531, 539 (1970).[3]

**c.** The government's related arguments based on removed agency officials fare no better. There have been exceedingly few such cases because Presidents have only rarely attempted to terminate officials with for-cause removal safeguards. And while the removed officials in several of those cases sought backpay, that reflects case-specific considerations rather than the existence of any asserted "backpay-only" rule. *See* S.J. Op. 58-59. In both *Wiener* and *Parsons*, for example, the plaintiff *did* seek a court order to remain in office. *See* S.J. Op. 58 n.24; *Wiener v. United States*, 357 U.S. 349, 351 n.* (1958) (plaintiff's *quo warranto* suit for reinstatement became moot when the commission was dissolved). As for Messrs. Myers and Humphrey, reinstatement was simply impossible in light of their deaths pre-suit (Humphrey) and pre-judgment (Myers). *See Humphrey's Executor*, 295 U.S. at 612; *Myers v. United States*, 58 Ct. Cl. 199, 202-03 (1923), *aff'd*, 272 U.S. 52 (1926).

---

[3] The government errs again in attacking the declaratory judgment on these grounds: A declaratory judgment is "neither legal nor equitable" but instead may be premised on actions traditionally brought in courts of equity or law. *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 284 (1988); *contra* Gov't Br. 20.

In any event, the most relevant history here is not the history of cases where the relevant agency official died before obtaining relief, but rather the history of these statutory provisions and the equities they sought to establish. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 444-45 (2011); *Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944). Here, the district court issued its relief by reference to a well-known and widely repeated statutory provision that secures a measure of agency independence from political control. In creating such for-cause removal protections, Congress fundamentally undertook to safeguard covered officials against removal without cause. It follows from this statutory plan that officials removed without cause can seek a judicial order providing for their continuance in office. To hold otherwise would contravene nearly a century of precedent and practice, in which for-cause removal safeguards were treated as substantial protections for an official's ability to function in office without a showing of cause for removal (and in which they were not seen as cheap tokens readily traded for some backpay from the U.S. Treasury). Rather than infer that so many Presidents, legislators, courts, scholars, and agency officials misunderstood how for-cause removal restrictions work—namely, to keep covered officials in office unless they are properly terminated—the better inference is that equity permits courts to issue remedies necessary to uphold the statutory plan.

**3.** In all events, the order below can be affirmed on yet another ground, namely that it constitutes a proper exercise of *quo warranto* or mandamus authority. *See* S.J. Op. 59 n.25; *Murr v. Wisconsin*, 582 U.S. 383, 404 (2017).

As to *quo warranto*, the government objects that Special Counsel Dellinger must satisfy "procedural requirements" to request leave from "the Attorney General, U.S. Attorney, or court." Gov't Br. 22. But the district court has given leave. S.J. Op. 59 n.25; *see* D.C. Code § 16-3503. And requiring a prior request to the U.S. Attorney General would be futile. *See Honig v. Doe*, 484 U.S. 305, 326-27 (1988).

Special Counsel Dellinger is similarly entitled to relief in mandamus. Compl. ¶¶ 49-50 (pleading mandamus); *compare* S.J. Op. 31 (permanent injunction factors), *with Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004) (mandamus factors). The government responds that mandamus relief must be "clear," Gov't Br. 22, but if the Special Counsel's for-cause removal protections are constitutional, then it would be ministerial rather than discretionary to simply retain Mr. Dellinger in office. *Mississippi v. Johnson*, 71 U.S. 475, 498-99 (1866); *see also Swan*, 100 F.3d at 977; *Stern v. S. Chester Tube Co.*, 390 U.S. 606, 609-10 (1968) (confirming a court "order" to compel action may be affirmed either as mandamus or injunction).

Accordingly, the government is not likely to succeed on its claim that the district court's remedies were impermissible. *See Harris v. Bessent*, No. 25-cv-412, 2025 WL 679303, at *8-14 (D.D.C. Mar. 4, 2025) (issuing similar relief).

## II.    The Remaining Factors Strongly Cut Against Extraordinary Relief

**A.** To demonstrate irreparable harm, the government cites damage "to the Executive Branch, to the separation of powers, and to our democratic system." Gov't Br. 25. That claim is foreclosed by precedent denying stays pending appeal based on similar asserted injuries. *See Texas v. United States*, 787 F.3d 733, 767-68 (5th Cir. 2018); *State v. Biden*, 10 F.4th 538, 559-60 (5th Cir. 2021); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018). The government also contends that the Special Counsel's recent filing at the MSPB concerning probationary employees constitutes irreparable harm. Gov't Br. 9-10, 25. But any asserted harm there was caused by the MSPB, not OSC—and, in any event, it is not irreparable injury for OSC to file an administrative action with an Executive Branch agency that independently adjudicates compliance with statutory law.

**B.** In contrast, granting a stay would irreparably injure Special Counsel Dellinger because he will be deprived of the statutory right to function in his office. *See* S.J. Op. 61; *see also, e.g.*, *Harris*, 2025 WL 679303, at *12-14; *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983). The government retorts that loss of employment is not irreparable harm, Gov't Br. 26, but this is no "routine" suit for a salary and instead involves "'extraordinary' circumstances": "[F]or the first time, a President has removed the Special Counsel from his statutorily prescribed term without any cause or explanation." S.J. Op. 62-63 (citation omitted).

**C.** The government nowhere explains how a stay pending appeal would serve the public interest. To be clear, it would not. The public has a substantial and nonpartisan interest in protecting federal whistleblowers from discrimination and retaliation. S.J. Op. 65-66. That independence has never been more important given the historic, rapid upheaval currently occurring within federal employment. And as Congress and two Presidents concluded, a Special Counsel protected from removal without cause is of "critical importance" to these public interests. *See* S.J. Op. 66.[4]

On the other hand, it would severely undermine the public interest to enter a stay, which could well result in continued conflict and uncertainty over OSC's leadership. At this vital juncture, OSC needs continuity and stability. Allowing an Acting Special Counsel to take charge during the pendency of litigation—a move that may prove only temporary depending on the ultimate outcome—risks sowing confusion. Especially considering the well-reasoned opinion below, the many flaws in the government's position here, and the public importance of a robust and properly functioning OSC, the more prudent course is to deny a stay pending appeal and to allow the issues here to be resolved after appropriate briefing and oral argument.[5]

---

[4] Special Counsel Dellinger has at all times carried out his statutory role free from partisan influence and bias. S.J. Op. 66.

[5] In that event, this Court (while denying a stay) might expedite this appeal.

## CONCLUSION

The emergency motion for a stay pending appeal should be denied.

Respectfully submitted,

/s/ Joshua A. Matz

Kate L. Doniger, Bar No. 65901
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
kdoniger@heckerfink.com

Joshua A. Matz, Bar No. 61916
Amy Jeffress, Bar No. 44740
Jackson Erpenbach, Bar No. 65902
Benjamin Stern, Bar No. 65911
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@heckerfink.com
ajeffress@heckerfink.com
jerpenbach@heckerfink.com
bstern@heckerfink.com

*Attorneys for Plaintiff-Appellee*
*Hampton Dellinger*

DATED: March 5, 2025

**CERTIFICATE OF COMPLIANCE**

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,156/5,200 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirement of Fed. R. App. P. 32(a)(6) because this document has been prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced typeface.

DATED: March 5, 2025

/s/ Joshua A. Matz
Joshua A. Matz
*Counsel for Plaintiff-Appellee*
*Hampton Dellinger*

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2025, I electronically filed the foregoing response brief with the Clerk for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.


DATED: March 5, 2025

/s/ Joshua A. Matz
Joshua A. Matz
*Counsel for Plaintiff-Appellee*
*Hampton Dellinger*