**ORAL ARGUMENT NOT YET SCHEDULED**

No. 25-5052

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

HAMPTON DELLINGER, IN HIS PERSONAL CAPACITY AND IN HIS OFFICIAL CAPACITY AS SPECIAL COUNSEL OF THE OFFICE OF SPECIAL COUNSEL,

*Plaintiff-Appellee,*

v.

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE TREASURY, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-cv-00385-ABJ
Before Amy Berman Jackson, J.

**BRIEF OF *AMICUS CURIAE* MEMBER OF THE MERIT SYSTEMS PROTECTION BOARD CATHY A. HARRIS IN OPPOSITION TO A STAY PENDING APPEAL, AND IN SUPPORT OF APPELLEE AND AFFIRMANCE**

MICHAEL J. KATOR
JEREMY D. WRIGHT
KERRIE D. RIGGS
KATOR, PARKS, WEISER &
WRIGHT, P.L.L.C.
1150 Connecticut Ave., NW
Suite 705
Washington, DC 20036
(202) 898-4800

LINDA M. CORREIA
CORREIA & PUTH, PLLC
1400 16th St., NW
Suite 450
Washington, D.C. 20036
(202) 602-6500

CARL RIZZI
LUCILLE E. BAEURLE
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5088

NEAL KUMAR KATYAL
    *Counsel of Record*
NATHANIEL A.G. ZELINSKY
EZRA P. LOUVIS
SAMANTHA K. ILAGAN
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

March 5, 2025

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

At the time of this filing, all parties, intervenors, and amici appearing before the district court and in this Court are listed in Appellants' emergency stay motion, except for *amicus curiae* Cathy A. Harris and *amicus curiae* the Separation of Powers Clinic.

References to the ruling at issue and related cases appear in the Appellants' stay motion.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE AND SUMMARY OF ARGUMENT.............1

ARGUMENT ........................................................................................................3

    I.      The Merit Systems Protection Board Falls Squarely Within The *Humphrey's Executor* Framework. ......................................................3

    II.     The Government's Remedies Arguments Are Wrong. ........................7

CONCLUSION ...................................................................................................12

APPENDIX

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

\* *Collins v. Yellen*,
  594 U.S. 220 (2021)..........................................................................................4, 5

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)..........................................................................................4, 5

*Fuller v. Trs. of the Acad. Sch. in Plainfield*,
  6 Conn. 532 (Conn. 1827) ...............................................................................9

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999)..........................................................................................10

\* *Harris v. Bessent*,
  No. 25-cv-00412, 2025 WL 679303 (D.D.C. Mar. 4, 2025)..............1, 5, 6, 8, 11

\* *Humphrey's Executor v. United States*,
  295 U.S. 602 (1935)..........................................................................2, 3, 4, 5

\* *Kalbfus v. Siddons*,
  42 App. D.C. 310 (D.C. Cir. 1914)..................................................................9, 11

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
  103 F.4th 748 (10th Cir. 2024) ........................................................................3

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
  No. 24-156 (2024)..............................................................................................4

*Macfarland v. U. S. ex rel Russell*,
  31 App. D.C. 321 (D.C. Cir. 1908)..................................................................9, 11

\* *Marbury v. Madison*,
  5 U.S. 137 (1803)...............................................................................2, 10, 11

*\*Authorities on which we principally rely are marked with asterisks.*

*Meta Platforms, Inc. v. FTC*,
   No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024)..............................3

*R. v. Mayor and Aldermen of Doncaster*,
   96 Eng. Rep. 795 (1752) ..................................................................9

*R. v. Mayor of London*,
   100 Eng. Rep. 96 (1787) ..................................................................9

*Sampson v. Murray*,
   415 U.S. 61 ..................................................................................8

* *Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020)....................................................................4, 5

* *Severino v. Biden*,
   71 F.4th 1038 (D.C. Cir. 2023) ......................................................8

* *Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ...................................................8, 10

*Truitt v. City of Philadelphia*,
   70 A. 757 (Pa. 1908) ......................................................................9

*United States v. Malmin*,
   272 F. 785 (3d Cir. 1921) ...............................................................9

*Vitarelli v. Seaton*,
   359 U.S. 535 (1959)........................................................................8

* *Wiener v. United States*,
   357 U.S. 349 (1958)..................................................................4, 5, 7

*Wise v. Withers*,
   7 U.S. 331 (1806) ........................................................................11

**Statutes**

5 U.S.C. § 1202(d) .............................................................................1

5 U.S.C. § 1212 ..................................................................................6

5 U.S.C. § 2302 ..................................................................................6

Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111 (1978) .....................6

**Other Authorities**

*About MSPB*,
  U.S. MERIT SYSTEMS PROTECTION BOARD,
  https://www.mspb.gov/about/about.htm (last visited Mar. 5, 2025)...................7

James L. High, *A Treatise on Extraordinary Remedies* 69–70 (2d ed.
  1884) ...............................................................................................9

* William Blackstone, *Vol. 3, Commentaries on the Laws of England*
  (1768)...............................................................................................9

Thomas Tapping, *The Law and Practice of the High Prerogative Writ
  of Mandamus* 240 (1853).....................................................................9

## INTEREST OF AMICUS CURIAE AND SUMMARY OF ARGUMENT[1]

*Amicus* Cathy A. Harris is a member of the Merit Systems Protection Board, who, under a longstanding law enacted by Congress, "may be removed" from that position "by the President *only* for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d) (emphasis added). But on February 10, 2025—three days after the President purported to terminate Hampton Dellinger by email—Harris received a similar email stating that Harris's "position on the Merit Systems Protection Board" was "terminated, effective immediately."

Harris immediately brought suit in the District Court. Judge Contreras granted Harris a temporary restraining order on February 18, 2025, and the parties agreed to consolidate the preliminary injunction hearing with trial on the merits. On March 4, 2024, Judge Contreras granted Harris's motion for judgment on the merits and entered a permanent injunction in her favor. *See Harris v. Bessent*, No. 25-cv-00412, 2025 WL 679303, at *1 (D.D.C. Mar. 4, 2025).[2] The government immediately appealed to this Court. *See Harris v. Bessent*, No. 25-5055 (D.C. Cir.).

---

[1] No counsel for a party authored this brief in whole or in part, no party or counsel for a party contributed money that was intended to fund preparing or submitting this brief, and no person other than amicus or her counsel contributed money that was intended to fund the preparation or submission of this brief. All parties have consented to the filing of this amicus brief.

[2] Judge Contreras's Memorandum Opinion is appended to this Brief.

Harris has an interest in this appeal because the government has presented similar arguments in both cases, and the government has similarly sought a stay of the judgment pending its appeal in *Harris v. Bessent*. Harris submits this *amicus* brief for two reasons. *First*, she respectfully alerts the Court to the government's appeal in *Harris v. Bessent* and underscores that *Harris* presents a different constitutional question than the one presented here. As Judge Contreras's opinion details, the multi-member Merit Systems Protection Board lies squarely within the framework of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and its progeny. The Board is a purely adjudicatory body balanced along partisan lines that does not exercise substantial executive power. Under binding and longstanding precedent, Congress may outline the circumstances in which the President may remove the members of this kind of multimember board.

*Second*, Harris urges the Court to conclusively reject the government's ahistorical argument that Article III courts are powerless to protect officials like her and Hampton Dellinger, and give effect to the removal statutes that Congress passed. As Judge Contreras's opinion in *Harris v. Bessent* detailed, not only do courts have the power to issue an injunction in this context, but Anglo-American courts have long also issued writs of mandamus in precisely this circumstance. The government's argument that Article III courts may not provide effective relief

conflicts with foundational authority, from Blackstone to *Marbury v. Madison*, 5 U.S. 137 (1803), as well as this Court's decisions.

## ARGUMENT

### I.     The Merit Systems Protection Board Falls Squarely Within The *Humphrey's Executor* Framework.

The merits issues presented in this case are distinct from those presented in *Harris v. Bessent*.  In this case, the government has argued that the Constitution prohibits Congress from restricting the President's power to remove Hampton Dellinger from his position as Special Counsel because Dellinger is the single head of an agency.  That argument, however, has no bearing on *Harris v. Bessent*, and *amicus* urges the Court in this case to avoid reaching the distinct constitutional question presented in *Harris*, which will be before this Court in short order.

The Merit Systems Protection Board—of which Harris is a member—is a purely adjudicatory, traditional multimember body that falls squarely within the *Humphrey's Executor* framework.  In the decisions on which the government relies, the Supreme Court has been careful to preserve *Humphrey's Executor*, as this Court and others have confirmed.  *See, e.g.*, *Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at *2 (D.C. Cir. Mar. 29, 2024); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 762 (10th Cir. 2024).  Under that settled precedent, Harris's case is straightforward.

3

Indeed, just last year, the Solicitor General told the Supreme Court that "[l]imits on the removal of the heads of multimember regulatory agencies have been a feature of our system of government for as long as such agencies have existed"; that "in the 90 years since *Humphrey's Executor*, Congress has repeatedly relied on the Court's decision"; and that there was "no sound reason to upset that understanding at this late date." U.S. Br. in Opp. at 7, *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, No. 24-156 (2024). That was true then, and it is true now.

**A.** From *Humphrey's Executor* onward, the Supreme Court has confirmed that Congress may afford a measure of removal protection to "multimember board[s] or commission[s]," *Seila Law LLC v. CFPB*, 591 U.S. 197, 207 (2020), which exercise "predominantly quasi judicial" functions, *Humphrey's Executor*, 295 U.S. at 624, and serve as "adjudicatory bod[ies]," *Wiener v. United States*, 357 U.S. 349, 356 (1958).

In two recent cases, the Supreme Court held that for-cause removal provisions for independent agencies led by a single director violated the separation of powers. *Seila Law*, 591 U.S. at 218; *Collins v. Yellen*, 594 U.S. 220 (2021). But in each case, the Court was careful to emphasize the novel and non-traditional structure of those independent agencies. *See Seila Law*, 591 U.S. at 207; *Collins*, 594 U.S. at 251; *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 496 (2010). Indeed, the Court went out of its way to contrast those novel agencies with

4

permissible multi-member bodies.[3]  As Judge Contreras explained in his decision, *Humphrey's Executor* "remains alive and well."  *Harris*, 2025 WL 679303, at *6.

**B.**  As Judge Contreras also explained, *Humphrey's Executor* "dictates the outcome" of *Harris v. Bessent*.  *Id.*  The Merit Systems Protection Board is "a traditional independent agency headed by a multimember board or commission," which is "balanced along partisan lines."  *Id.* (quoting *Seila Law*, 591 U.S. at 207, 216).  Members serve "overlapping, staggered seven-year terms, meaning that the President will have the 'opportunity to shape [the Board's] leadership and thereby influence its activities.' "  *Id.* (quoting *Seila Law*, 591 U.S. at 225).  This is precisely the kind of board upheld in *Humphrey's Executor*.

The Merit Systems Protection Board is also the quintessential example of a purely "adjudicatory body."  *Wiener*, 357 U.S. at 356.  The Board's core function is to hear federal employee appeals of adverse actions, including those alleged to involve prohibited personnel practices and employment discrimination—for example, on the basis of race or political affiliation—and reprisal for

---

[3] *See Seila Law*, 591 U.S. at 207 ("Rather than create a traditional independent agency headed by a multimember board or commission . . . ."); *id*. at 216 ("*Humphrey's Executor* permitted Congress to give for-cause removal protections to a multimember body of experts."); *id*. at 218 (noting Congress may choose to provide "multimember expert agencies" for-cause protection); *id*. at 237 (noting that Congress could convert "the CFPB into a multimember agency"); *see also Collins*, 594 U.S. at 253 n.19 (contrasting the structure of the Federal Housing Finance Agency with "a multi-member Commission."); *Free Enter. Fund*, 561 U.S. at 501 ("The point is not to take issue with for-cause limitations in general.").

whistleblowing. *See* 5 U.S.C. § 2302. The Board does not launch investigations, fill up vague statutes, set reasonable prices, or police against unfair competition. Instead, like an Article III court, the Board adjudicates the discrete disputes brought before it. The Board's decisions, moreover, are subject to judicial review, meaning "federal courts" may always provide "the final say if the parties so desire." *Harris*, 2025 WL 679303, at *1.

Finally, the historical evolution of the Merit Systems Protection Board confirms that it is a purely adjudicatory body. The Board's precursor was the Civil Service Commission, established in 1883. In 1978, Congress passed the Civil Service Reform Act and split the Commission into multiple entities, including: (1) the Office of Personnel Management, to manage the Federal work force as a true organ of executive power; and (2) the Merit Systems Protection Board, which assumed the Civil Service Commission's adjudicatory authority. *See* Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111, 1122 (1978).

The Civil Service Reform Act also established the Office of Special Counsel, which investigates allegations of prohibited personnel practices, prosecutes violators of civil service rules and regulations, and enforces the Hatch Act. *See* 5 U.S.C. § 1212. The Special Counsel was originally established as an office within the Merit Systems Protection Board. But in 1989, Congress established the Special Counsel as an independent executive branch agency, and it "now functions independently as

6

a prosecutor of cases before the Board."[4]  If Congress cannot provide a purely "adjudicatory body" like Merit Systems Protection Board members for-cause removal protection, it is not clear that Congress may provide anyone that protection—even ordinary civil servants.  *Wiener*, 357 U.S. at 356.

In any event, the constitutionality of multimember boards like the Merit Systems Protection Board presents a delicate and distinct question from that presented here.  *Amicus* respectfully urges this Court not to reach it in this case.

## II.    The Government's Remedies Arguments Are Wrong.

In this appeal and in *Harris v. Bessent*, the government has advanced a breathtaking theory that Article III courts are powerless to prevent the executive from violating a for-cause removal statute, and that courts may only award aggrieved officials backpay.  Stay Mot. 21-22.  The government is simply wrong:  Binding precedent from this Court confirms that courts may enjoin the President's subordinates to enforce a for-cause removal statute.  Moreover, there is an extremely long history of Anglo-American courts providing writs of mandamus in precisely this circumstance.

This Court has repeatedly and recently recognized that courts may "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official."

---

[4] *About    MSPB*, U.S. MERIT SYSTEMS PROTECTION BOARD, https://www.mspb.gov/about/about.htm (last visited Mar. 5, 2025).

*Severino v. Biden*, 71 F.4th 1038, 1042-1043 (D.C. Cir. 2023) (quoting *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996)); *see also Sampson v. Murray*, 415 U.S. 61, 92 n.68 (explaining that courts may use their "injunctive power" to remedy an unlawful removal in the "extraordinary situation"); *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) (holding that wrongfully terminated official seeking declaratory judgment and an injunction was "entitled to the reinstatement which he seeks"). This Court could stop there and reject the government's stay application.

But "even if *Sampson*, *Swan*, and *Severino* did not make equitable relief available," Dellinger and Harris would be entitled to "writ[s] of mandamus." *Harris*, 2025 WL 679303, at *11. In *Harris*, Judge Contreras was clear that, "[t]o the extent that injunctive relief may be unavailable, the Court would grant mandamus relief in the alternative." *Id*. at *3.[5]

As Judge Contreras detailed, English courts "around the time of the founding recognized this power and exercised it regularly." *Id*. at *11.[6] Multiple common law treatises confirm this tradition. As Blackstone explained, "mandamus" is a "full and effectual remedy" "for refusal or admission where a person is intitled to an

---

[5] Dellinger's complaint also sought mandamus.

[6] *See also id*. (citing, inter alia, *R. v. Mayor of London*, 100 Eng. Rep. 96, 98 (1787) (recognizing power to issue mandamus restoring public official to office), *R. v. Mayor and Aldermen of Doncaster*, 96 Eng. Rep. 795 (1752) (mandamus to restore municipal official to office)).

office" and "for wrongful removal, where a person is legally possessed." *See* 3 W. Blackstone, Commentaries on the Laws of England *264-265.[7]  This Court confirmed as much in 1914:  The authority is "overwhelming" that " '[a] mandamus to restore' " lies where a person removable only for "causes specified" "is wrongfully dispossessed of [an] office." *Kalbfus v. Siddons*, 42 App. D.C. 310, 319 (D.C. Cir. 1914).[8]

That long history dispels the government's arguments and in fact confirms that courts have the power to issue injunctions.  In the context of a suit to "comply with removal restrictions," the remedies of mandamus and injunction are "essentially" the same.  *Swan*, 100 F.3d at 977 & n.1.  The government is therefore simply wrong to suggest (at 23) that this case involves "a type of relief that has never

---

[7] *See also, e.g.*, James L. High, *A Treatise on Extraordinary Remedies* 69–70 (2d ed. 1884) (recognizing that, where officers removable only " 'for due cause' " are illegally terminated, courts may "restore" that person "by mandamus . . . to an office to which he is justly entitled"); Thomas Tapping, *The Law and Practice of the High Prerogative Writ of Mandamus* 240 (1853) (mandamus "to restore" lies as a "remedy for a wrongful dispossession of an office or function which has temporal rights attached to it").

[8] *United States v. Malmin*, 272 F. 785, 790 (3d Cir. 1921) ("[M]andamus is an appropriate remedy to restore to office one lawfully in possession and unlawfully removed."); *Macfarland v. U. S. ex rel Russell*, 31 App. D.C. 321, 322 (D.C. Cir. 1908) (mandamus to compel re-enrollment of plaintiff as a police officer); *Truitt v. City of Philadelphia*, 70 A. 757, 761 (Pa. 1908) (mandamus "to reinstate" local superintendent after he was "illegally removed");  *Fuller v. Trs. of the Acad. Sch. in Plainfield*, 6 Conn. 532, 547 (Conn. 1827) (mandamus to "restore the plaintiff" as a trustee of public retirement board).

been available before." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc*., 527 U.S. 308, 322 (1999). Regardless, even if courts should formalistically label the order mandamus and not injunction, what matters is that courts *have* the power to issue relief and enforce the laws that Congress passed.

The government briefly acknowledges (at 21-22) the long history of courts issuing mandamus in this context but suggests that mandamus was limited to individuals removed from "non-executive offices," citing *Marbury v. Madison*. *Marbury v. Madison* says nothing of the sort, and the government does not point to any source that does. That fact alone means that government has not made the strong showing of success necessary to receive the extraordinary remedy of a stay pending appeal.

In fact, *Marbury* disproves the government's theory. William Marbury's commission as a justice of the peace was wrongfully withheld by then Secretary of State James Madison. As the Supreme Court, in an opinion also penned by Chief Justice Marshall, explained just a few years later, a justice of the peace's "powers" are "partly judicial, and *partly executive*." *Wise v. Withers*, 7 U.S. 331, 336 (1806) (emphasis added). Chief Justice Marshall nevertheless concluded that Marbury presented a "plain case for a mandamus." *Marbury*, 5 U.S. at 173. If that were not enough, yet more cases confirm that Anglo-American courts granted mandamus to executive officials. *See, e.g.*, *Kalbfus*, 42 App. D.C. at 314 (this Court granting

mandamus to assistant assessor); *Macfarland*, 31 App. D.C. at 322; (same to compel re-enrollment of plaintiff as a police officer); *Harris*, 2025 WL 679303, at *11 (collecting numerous English cases).

In any event, even if the government's suggestion held any merit, it would only confirm that mandamus is appropriate in *Harris v. Bessent* because Harris serves as a member of a purely adjudicatory body and is therefore akin to a judicial official.

\* \* \*

Our Anglo-American traditions matter.  The government's legal theory isn't rooted in those traditions.  It is pure make-believe.  This Court should reject it.

# CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Dated:  March 5, 2025                    Respectfully submitted,

                                         By: */s/ Neal Kumar Katyal*

MICHAEL J. KATOR                         NEAL KUMAR KATYAL
JEREMY D. WRIGHT                            *Counsel of Record*
KERRIE D. RIGGS                          NATHANIEL A.G. ZELINSKY
KATOR, PARKS, WEISER & WRIGHT,           EZRA P. LOUVIS
P.L.L.C.                                 SAMANTHA K. ILAGAN
1150 Connecticut Ave., NW                MILBANK LLP
Suite 705                                1850 K St., NW
Washington, DC 20036                     Suite 1100
(202) 898-4800                           Washington, DC 20006
                                         (202) 835-7505
LINDA M. CORREIA                         nkatyal@milbank.com
CORREIA & PUTH, PLLC
1400 16th St., NW                        CARL RIZZI
Suite 450                                LUCILLE E. BAEURLE
Washington, D.C. 20036                   MILBANK LLP
(202) 602-6500                           55 Hudson Yards
                                         New York, NY 10001
                                         (212) 530-5088


*Counsel for Amicus Curiae Cathy A. Harris*

## CERTIFICATE OF COMPLIANCE

I certify that this Brief complies with the type-volume limits set out in Federal Rule of Appellate Procedure 29 because it contains 2,581 words.  This Brief also complies with the requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced font.


Dated:  March 5, 2025

By: */s/ Neal Kumar Katyal*

NEAL KUMAR KATYAL
  *Counsel of Record*
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

*Counsel for Amicus Curiae Cathy A. Harris*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 5, 2025, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. All counsel in this case are registered CM/ECF users and will be served by the appellate CM/ECF.

Dated: March 5, 2025

By: */s/ Neal Kumar Katyal*

NEAL KUMAR KATYAL
   *Counsel of Record*
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

*Counsel for Amicus Curiae Cathy A. Harris*

# Appendix

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CATHY A. HARRIS, *in her personal capacity*          :
*and in her official capacity as Member of the*       :
*Merit Systems Protection Board*,                     :
                                                      :
  Plaintiff,                               :  Civil Action No.:  25-412 (RC)
                                                      :
  v.                                         :  Re Document No.:  22
                                                      :
SCOTT BESSENT, *in his official capacity as*         :
*Secretary of the Treasury*, *et al.*,               :
                                                      :
  Defendants.                               :

## MEMORANDUM OPINION

### GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff Cathy A. Harris was appointed to the Merit Systems Protection Board ("MSPB")

on June 1, 2022, for a term set to expire on March 1, 2028.  Federal law states that members of

the MSPB may be removed from office "only for inefficiency, neglect of duty, or malfeasance in

office."  On February 10, 2025, President Donald J. Trump informed Harris that her position on

the MSPB was "terminated, effective immediately" but provided no reason for Harris's

termination.  The following day, Harris filed this lawsuit against President Trump and several

other federal officials ("Defendants"), claiming that her termination violated federal law.  She

moved for a temporary restraining order enjoining Defendants from treating her as removed from

office, which this Court granted.  The parties consolidated preliminary injunction briefing with

the merits, and Harris moved for summary judgment.  The Court grants that motion, along with

declaratory judgment and a permanent injunction.

## II.  BACKGROUND

### A.  Statutory Background

Congress created the Merit Systems Protection Board as a component of the Civil Service Reform Act of 1978 ("CSRA"), which "establishes a framework for evaluating personnel actions taken against federal employees."  *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012); *see also* CSRA, Pub. L. No. 95-454, § 202, 92 Stat. 1111, 1121–25 (1978) (codified at 5 U.S.C. §§ 1201–05). Congress's Findings and Statement of Purpose indicate that "[i]t is the policy of the United States that . . . to provide the people of the United States with a competent, honest, and productive Federal work force[,] . . . Federal personnel management should be implemented consistent with merit system principles."  CSRA § 3, 92 Stat. at 1112.  Those merit system principles include, among others, "[r]ecruitment . . . from qualified individuals" where "selection and advancement [is] determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity."  *Id.* § 101, 92 Stat. at 1113 (codified at 5 U.S.C. § 2301).  Congress additionally instructed that "[e]mployees should be . . . protected against arbitrary action, personal favoritism, or coercion for partisan political purposes," as well as "against reprisal for the lawful disclosure of information which the employees reasonably believe evidences," among other things, violations of law, gross waste of funds, an abuse of authority, or substantial and specific dangers to public health or safety.  *Id.*, 92 Stat. at 1114 (codified at 5 U.S.C. § 2301).

The CSRA established the MSPB as "an independent agency consisting of three members" and "charged [it] with protecting the merit system principles and adjudicating conflicts between federal workers and their employing agencies."  *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 154 (D.C. Cir. 1982); *see also* CSRA § 101, 92 Stat. at 1114–17 (codified at 5

U.S.C. § 2302) (establishing prohibited personnel practices, such as employment discrimination, unlawful political activities, and any other violations of law within the federal civil service).  The Board's primary function is to review federal employee appeals of adverse actions "which [are] appealable to the Board under any law, rule, or regulation," including those related to removal or suspension for periods greater than fourteen days.  5 U.S.C. § 7701(a); *see also id.* § 1204(a)(1).  These adjudications consume approximately 95 percent of MSPB members' time.  *See* Pl.'s Statement of Undisputed Material Facts ¶ 54 ("SUMF"), ECF No. 22-2.  The Board may order federal agencies and employees to comply with its decisions, *see* 5 U.S.C. § 1204(a)(2), which are nonetheless subject to judicial review.  *See id.* § 7703.  The MSPB thus acts as a preliminary adjudicator of these employment disputes, with federal courts providing the final say if the parties so desire.

The MSPB carries out other limited tasks in pursuit of its mission.  It conducts studies "relating to the civil service" for the President and Congress, *see* 5 U.S.C. § 1204(a)(3), although this function takes up less than one percent of members' time, *see* SUMF ¶ 62.  The Board may also review "rules and regulations of the Office of Personnel Management," *see id.* § 1204(a)(4), on its own motion, following a complaint from the Special Counsel, or in response to a third party's petition, *see id.* § 1204(f)(1).  The MSPB may invalidate the rule or its implementation if it would require a federal employee to engage in prohibited personnel practices.  *See id.* § 1204(f)(2).[1]

Members of the MSPB are "appointed by the President, by and with the advice and consent of the Senate," and "not more than 2 of [the members] may be adherents of the same

---

[1] Harris explains that invalidation of an Office of Personnel Management rule under this mechanism "is an exceedingly rare occurrence" that has not happened during her tenure.  Harris Decl. ¶ 31, ECF No. 22-3.

political party." CSRA § 202 (codified at 5 U.S.C. § 1201). Members of the MSPB are appointed to seven-year terms that may be extended by up to one year if a successor has not yet been appointed. *Id.* (codified at 5 U.S.C. § 1202(a)–(c)). "Any member may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." *Id.* (codified at 5 U.S.C. § 1202(d)).

### B. Factual and Procedural Background

President Joseph R. Biden nominated Harris to be a member of the MSPB in January 2022. SUMF ¶ 1. The Senate confirmed her on May 25, 2022, and she was sworn in on June 1, 2022. *Id.* ¶ 2. Her term expires on March 1, 2028. *Id.* ¶ 3. The Senate later confirmed Harris as Chairman, and she was sworn in as Chairman on March 14, 2024. *Id.* ¶¶ 4–5.

Defendants do not dispute that Harris has been efficient and effective in her role at the MSPB. *See id.* ¶ 8. When the MSPB's quorum was restored in March 2022, the agency had a backlog of approximately 3,800 cases that had accrued since 2017, and officials estimated that it would take five or six years for the agency to catch up. *Id.* ¶¶ 12–14. By January 2025, however, the MSPB had cleared nearly 99 percent of its backlog. *Id.* ¶ 20. From June 1, 2022, to February 10, 2025, Harris participated in nearly 4,500 decisions. *Id.* ¶ 10.

On February 10, 2025, Harris received an email from Trent Morse, Deputy Assistant to the President and the Deputy Director of the White House Presidential Personnel Office, which stated in its entirety:

> On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately. Thank you for your service[.]

Ex. 4 to Pl.'s Mot. for Prelim. Inj. and J. on the Merits, ECF No. 22-4. The communication did not explain the basis for Harris's termination.

Harris filed this lawsuit on February 11, 2025, claiming that her firing was *ultra vires*,

unconstitutional, and a violation of the Administrative Procedure Act ("APA").  *See* Compl.

¶¶ 31–37, 40–41, ECF No. 1.  She seeks relief under the Declaratory Judgment Act, issuance of a

writ of mandamus, and equitable relief.  *See id.* ¶¶ 38–39, 42–46.  Harris additionally filed a

motion for a temporary restraining order, *see* Pl.'s Mot. for TRO, ECF No. 2, which Defendants

opposed, *see* Defs.' Opp'n to Mot. for TRO, ECF No. 6.  The Court held a hearing on the TRO

motion on February 13, 2025, and granted the motion on February 18, 2025.  *See* Min. Entry

dated Feb. 13, 2025; Order Granting Pl.'s Mot. for TRO, ECF No. 8; Mem. Op. Granting Pl.'s

Mot. for TRO ("Mem. Op."), ECF No. 9.  Defendants appealed that order to the D.C. Circuit,

and the appeal remains pending.  *See* Notice of Appeal, ECF No. 15.

On February 19, 2025, the parties filed a joint status report indicating that the Court's

consideration of the subsequent motion for preliminary injunction should be consolidated with

the merits of the case pursuant to Federal Rule of Civil Procedure 65(a)(2).  *See* Joint Status

Report, ECF No. 13.  On February 23, 2025, Harris filed a motion for a preliminary injunction

and judgment on the merits.  *See* Pl.'s Mot. for Prelim. Inj. and J. on the Merits ("Pl.'s Mot."),

ECF No. 22.  Defendants opposed the motion, *see* Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. and

J. on the Merits ("Defs.' Opp'n"), ECF No. 33, and Harris filed a reply, *see* Defs.' Reply, ECF

No. 38.  The parties appeared for a hearing before the Court on March 3, 2025.

### III.  LEGAL STANDARD

"Having granted consolidation under Rule 65(a)(2), the Court 'treats the parties' briefing

as cross-motions for summary judgment.'"  *Penkoski v. Bowser*, 486 F. Supp. 3d 219, 226

(D.D.C. 2020) (quoting *Trump v. Comm. on Oversight & Reform of the U.S. House of

Representatives*, 380 F. Supp. 3d 76, 90 (D.D.C. 2019)).  "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if

"the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And a fact is material if it "might affect the

outcome of the suit under the governing law." *Id.* at 248. On summary judgment, the Court

views all evidence "in the light most favorable to the nonmoving party and . . . must draw all

reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308

(D.C. Cir. 2011).

The principal purpose of summary judgment is to streamline litigation by disposing of

factually unsupported claims or defenses and determining whether there is a genuine need for

trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The movant bears the initial

burden of identifying portions of the record that demonstrate the absence of any genuine issue of

material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-

movant must point to specific facts in the record that reveal a genuine issue that is suitable for

trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must

"eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475

F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the

light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless,

conclusory assertions offered without any evidentiary support do not establish a genuine issue

for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV. ANALYSIS

The Court first considers the constitutionality of the MSPB's structure, concluding that

its members' for-cause removal protections are constitutional under *Humphrey's Executor*.

Federal law thus prevents the President from removing members of the MSPB without cause, and the President's attempt to terminate Harris was unlawful.  As such, Harris is entitled to summary judgment.  The Court next determines the remedies to which Harris may be entitled, granting her declaratory judgment and a permanent injunction.  To the extent that injunctive relief may be unavailable, the Court would grant mandamus relief in the alternative.

### A.  Constitutionality of the MSPB Members' Removal Protections

Harris claims that her termination was *ultra vires* in violation of statutory authority, violated the separation of powers, and was contrary to law under the APA.  *See* Compl. ¶¶ 31–37, 40–41.  She argues that this case falls squarely within the heartland of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and its progeny, and that the Board is a traditional multimember body that does not wield traditional executive power.  *See* Pl.'s Mot. at 11–20.  MSPB members' removal protections are therefore constitutional, according to Harris.  *See id.* at 11–12.  Defendants respond that the MSPB does not fall within *Humphrey's Executor*, and that the independent agency wields substantial executive power.  *See* Defs.' Opp'n at 5–13.  The Court concludes that MSPB members' removal protections are constitutional under *Humphrey's Executor* and must be upheld here.

In *Humphrey's Executor*, the Supreme Court upheld a statutory provision identical to the one at issue here restricting removal of Federal Trade Commission ("FTC") members.  *See Humphrey's Executor*, 295 U.S. at 619–20 (discussing 15 U.S.C. § 41); 5 U.S.C. § 1202(d).  The FTC comprises five members "appointed by the President[,] by and with the advice and consent of the Senate," and "[n]ot more than three of the commissioners shall be members of the same political party."  *Humphrey's Executor*, 295 U.S. at 619–20 (quoting 15 U.S.C. § 41).  "Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance

in office." *Id.* (quoting 15 U.S.C. § 41). In *Humphrey's Executor*, President Hoover had appointed William Humphrey as a member of the Federal Trade Commission, which carried a term of seven years. 295 U.S. at 612. Less than two years later, President Roosevelt terminated Humphrey over differences of political opinion, stating, "[e]ffective as of this date you are hereby removed from the office of Commissioner of the Federal Trade Commission." *Id.* at 619. Humphrey died several months later, but his estate sued to recover backpay on the basis that his removal was unlawful. *Id.* at 612.

The Supreme Court confirmed that President Roosevelt's termination of Humphrey was indeed unlawful. The Court observed that "[t]he statute fixes a term of office, in accordance with many precedents." *Id.* at 623. The Court further explained that the commission comprised a "nonpartisan" "body of experts" that was intended to "act with entire impartiality." *Id.* at 624. It was "charged with the enforcement of no policy except the policy of the law" and acted in a manner that was "predominantly quasi judicial and quasi legislative" rather than traditionally "political []or executive" in nature. *Id.* The Court differentiated FTC members from the postmaster in *Myers v. United States*, 272 U.S. 52 (1926) (evaluating statute stating that postmasters "shall hold their offices for four years unless sooner removed or suspended according to law"). "A postmaster is an executive officer restricted to the performance of executive functions" and is "charged with no duty at all related to either the legislative or judicial power." *Id.* at 627. The FTC, in contrast, "acts in part quasi legislatively and in part quasi judicially" rather than exercising traditional executive powers. *Id.* at 628. "We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of those just named," the Court concluded. *Id.* at 629.

Two decades later, the Court considered President Eisenhower's removal of a member of the War Claims Commission, whom President Truman had appointed and the Senate had confirmed. *See Wiener v. United States*, 357 U.S. 349, 350 (1958). Congress charged that commission with processing "claims for compensating internees, prisoners of war, and religious organizations . . . who suffered personal injury or property damage at the hands of the enemy in connection with World War II," and the commissioners' terms were limited by the short duration of the commission's existence. *Id.* The Court reasoned that Congress intended to "preclude[] the President from influencing the Commission in passing on a particular claim," which meant that the President naturally could not "hang . . . the Damocles' sword of removal" over the commissioners. *Id.* at 356. The Court reaffirmed that the President had "no such power" to "remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission." *Id.*[2]

In two more recent cases, however, the Supreme Court ruled that for-cause removal provisions applying to independent agencies with a single director violated the separation of powers. *See Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 218 (2020); *Collins v. Yellen*, 594 U.S. 220, 253 (2021). Neither of those cases undermines the

---

[2] The Court once again considered a multimember body in *Mistretta v. United States* when passing on the constitutionality of the United States Sentencing Commission, which formally resides in the Judiciary. 488 U.S. 361 (1989). The Sentencing Report Act of 1984 empowered the President to appoint commissioners to the Sentencing Commission, with members "subject to removal by the President 'only for neglect of duty or malfeasance in office or for other good cause shown.'" *Id.* at 368 (quoting 28 U.S.C. § 991(a)). When considering whether the Act affords the President undue influence over federal judges who served as commissioners, the Court recognized that "the President's removal power under the Act is limited." *Id.* at 410. "Such congressional limitation on the President's removal power, like the removal provisions upheld in *Morrison v. Olson*, 487 U.S. 654 (1988), and *Humphrey's Executor* . . . , is specifically crafted to prevent the President from exercising 'coercive influence' over independent agencies." *Id.* at 410–411.

constitutionality of for-cause removal provisions for multimember bodies of experts heading an independent agency. *See Seila Law*, 591 U.S. at 228 ("[W]e do not revisit *Humphrey's Executor* or any other precedent today.").

"Rather than create a traditional independent agency headed by a multimember board or commission, Congress elected to place the [Consumer Financial Protection Bureau ("CFPB")] under the leadership of a single Director." *Seila Law*, 591 U.S. at 207. In *Seila Law*, the Court observed that "[a]n agency with a structure like that of the CFPB is almost wholly unprecedented." *Id.* as 220; *see also id.* at 220–22 (searching for historical precedent to support the CFPB's structure). The Court further concluded that "[t]he CFPB's single-Director structure" contravenes the separation of powers "by vesting significant governmental power in the hands of a single individual accountable to no one," emphasizing that the director may act "*unilaterally*" and "[w]ith no colleagues to persuade." *Id.* at 224–25. Two other features of the CFPB undermined the constitutionality of the agency's structure. First, the director's five-year term meant that "some Presidents may not have any opportunity to shape [the agency's] leadership and thereby influence its activities." *Id.* at 225. Second, "[t]he CFPB's receipt of funds outside the appropriations process further aggravates the agency's threat to Presidential control." *Id.* at 226. For these reasons, the Court concluded that the CFPB's structure violated the separation of powers. *See id.* at 232.

None of the reasoning in *Seila Law* undermined the constitutionality of the traditional independent agency structure outlined in *Humphrey's Executor*. *See id.* at 218 (describing "exception[]" for "multimember expert agencies that do not wield substantial executive power"). Rather, the Court's reasoning reaffirmed the constitutionality of multimember boards with for-cause removal protections, as those agencies have a robust basis in this country's history, and

their members lack the power to act unilaterally.  *See* Pl.'s Mot. at 11 (emphasizing that Congress established the first such board in 1887).  The Court's rationale also relied on the CFPB's divergence from traditional agency structures when finding the for-cause removal protections unconstitutional.  *See, e.g.*, *Seila Law*, 591 U.S. at 205–07 (emphasizing facts showing drift from Elizabeth Warren's initial proposal for multimember board to Congress's enactment of single-headed agency).  The Court even opined that Congress could fix the problem by "for example, converting the CFPB into a multimember agency."  *Id.* at 237.

*Collins* then represented a "straightforward application" of the Court's "reasoning in *Seila Law*" to the Federal Housing Finance Agency ("FHFA").  594 U.S. at 251; *see also Seila Law*, 591 U.S. at 222 (noting doubt as to the constitutionality of the FHFA's structure).  Similarly to the CFPB, the FHFA was "an agency led by a single Director" that "lack[ed] a foundation in historical practice and clashe[d] with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control."  594 U.S. at 251.

*Humphrey's Executor* thus remains alive and well, and it dictates the outcome here.  The MSPB is "a traditional independent agency headed by a multimember board or commission," *Seila Law*, 591 U.S. at 207, and as such Congress may grant the Board's members for-cause removal protections.  The MSPB is "a multimember body of experts" that is "balanced along partisan lines."  *Seila Law*, 591 U.S. at 216; *see also Humphrey's Executor*, 295 U.S. at 624 (noting that the FTC is a "nonpartisan" "body of experts" that was intended to "act with entire impartiality").  The CSRA envisions that the Board "is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality."  *Humphrey's Executor*, 295 U.S. at 624.  The CSRA also "fixes a term of office."  *Id.* at 623.  The Board's members serve on overlapping, staggered seven-year terms, meaning that the President will have the "opportunity to shape [the

MSPB's] leadership and thereby influence its activities." [3]  *Seila Law*, 591 U.S. at 225.  The members' staggered terms permit them to "accumulate[] expertise" in the operation of federal agencies and federal employment law.  *Id.* at 218.  The MSPB's duties are "quasi judicial," *Humphrey's Executor*, 295 U.S. at 624, in that it conducts preliminary adjudications of federal employees' claims, which may then be appealed to Article III courts.  *See* 5 U.S.C. § 7703 (providing for review in the Federal Circuit); *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 423 (2017) (providing for review of mixed cases in district court).  The MSPB's rulemaking authority is limited to "regulations . . . necessary for the performance of its functions."  5 U.S.C. § 1204(h).  Congress further intended the agency to aid its legislative goals by regularly transmitting reports to Congress regarding the Board's functions.  *See* 5 U.S.C. §§ 1204(l), 1205. It is additionally evident that Congress hoped to "preclude[] the President from influencing the [Board] in passing on a particular claim." *Wiener*, 357 U.S. at 356.  The MSPB nonetheless remains politically accountable to both Congress and the President through the appropriations process in a manner inapplicable to independent agencies with their own funding sources, such as the CFPB and FHFA.  *See Selia Law*, 591 U.S. at 226; *Collins*, 594 U.S. at 231.

The MSPB also "do[es] not wield substantial executive power," *Seila Law*, 591 U.S. at 218, but rather spends nearly all of its time adjudicating "inward-facing personnel matters" involving federal employees, Pl.'s Mot. at 4.  The Board does not regulate the conduct of private parties, nor does it possess its own rulemaking authority except in furtherance of its judicial functions.  *See id.* at 12.  It cannot initiate its own personnel cases, but must instead "passively

---

[3] One MSPB member's term has now expired, and Harris's term expires on March 1, 2028.  *See* Pl.'s Mot. at 29 n.20; Pl.'s Reply at 13–14; SUMF ¶ 3.  President Trump will therefore have the opportunity to appoint at least two members to the MSPB during his term in office.

wait for them to be brought." *Id.* at 12; *see also* 5 U.S.C. § 1204 (defining the Board's powers and functions). Harris additionally points out that the MSPB *preserves* power within the executive branch by charging presidentially appointed Board members with mediation and initial adjudication of federal employment disputes, rather than shifting those decisions to Article III courts in the first instance. *See* Pl.'s Mot. at 14.

Several other features of the MSPB demonstrate its limited effects on the President's powers. The MSPB's jurisdiction is generally restricted to civil servants and does not include political appointees.[4] *See* 5 U.S.C. § 7511. Even among civil servants, members of the Senior Executive Service removed "for less than fully successful executive performance" are entitled only to an informal hearing before the Board. *See* 5 U.S.C. § 3592(a). Furthermore, the MSPB's decisions are generally not the final word. Federal employees may appeal the Board's decisions to Article III courts, *see* 5 U.S.C. § 7703(a), and the Director of the Office of Personnel Management may similarly seek review of any decision that he determines "will have a substantial impact on a civil service law, rule, regulation, or policy directive," *id.* § 7703(d)(1)–(2).

Finally, the MSPB's mission and purpose require independence. In enacting the CSRA, Congress exercised its power to regulate the civil service, defining certain prohibited personnel practices, to include discrimination, loyalty oaths, coercion to engage in political activity, and retaliation against whistleblowers. *See* 5 U.S.C. § 2302(b)(1)–(3), (8). Direct political control over the MSPB would have limited effect on the President's implementation of his policy agenda. It would instead neuter the CSRA's statutory scheme by allowing high-ranking

---

[4] Nor may the Board review the merits of determinations concerning an employee's eligibility to occupy a sensitive position that implicates national security. *See Kaplan v. Conyers*, 733 F.3d 1148, 1166 (Fed. Cir. 2013).

government officials to engage in prohibited practices and then pressure the MSPB into inaction.
The MSPB's independence is therefore structurally inseparable from the CSRA itself. These
duties dovetail with *United States v. Perkins*, in which the Supreme Court held that Congress
may "limit, restrict, and regulate the removal" of inferior officers. 116 U.S. 483, 485 (1886).
Denying independence to the Board would undermine these constitutionally sound limitations on
the removal of civil servants.

Defendants cannot argue that *Humphrey's Executor* has been overturned, so they instead
suggest that even if the MSPB is a traditional multimember agency, it wields "'substantial'
executive power" in a manner found significant in *Seila Law*. Defs.' Opp'n at 8 (quoting *Seila
Law*, 591 U.S. at 218). Yet the Supreme Court has clarified that it did not mean *Humphrey's
Executor* to exclude removal protections for any official exercising authority within the
executive branch. *See Morrison v. Olson*, 487 U.S. 654, 688–89 (1988); *see also Seila Law*, 591
U.S. at 216 (detailing "several organizational features that helped explain" the *Humphrey's
Executor* court's "characterization of the FTC as non-executive"). There is instead a "spectrum"
that runs from "'purely executive' officials who must be removable by the President at will if he
is to be able to accomplish his constitutional role" and those who serve "'quasi-legislative' or
'quasi-judicial'" roles, where the President's control is not "so central to the functioning of the
Executive Branch" as to require the President to be able to terminate the official at will.
*Morrison*, 487 U.S. at 690–91. As the Court explained above, the Board's duties—which
primarily include adjudication of employment claims—do not represent "substantial" executive
power and instead take on a quasi-judicial role. Furthermore, the MSPB's powers are no more
expansive than the FTC's functions upheld in *Humphrey's Executor*, which remains good law.

Several courts have deployed similar reasoning when rejecting challenges to the structures of traditional multimember agencies in the years since *Seila Law* and *Collins*. Last year, the Fifth Circuit upheld the structure of the Consumer Product Safety Commission ("CPSC"), concluding that the agency is "a prototypical 'traditional independent agency, run by a multimember board,'" is not directed by a single individual, and that the President may influence its activities through appointments or the appropriations process. *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 354–55 (5th Cir. 2024), cert. denied, 145 S. Ct. 414, 170 (2024). The Tenth Circuit turned away a comparable challenge to the agency, reasoning that *Humphrey's Executor* remains good law, that the CPSC is structured similarly to the FTC, and that limited civil and criminal enforcement powers do not undermine the constitutionality of its tenure protections. *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 762 (10th Cir. 2024), cert. denied, No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025). Courts have additionally found the FTC's structure constitutionally sound because the Supreme Court has not revisited *Humphrey's Executor*. *See Illumina, Inc. v. Fed. Trade Comm'n*, 88 F.4th 1036, 1047 (5th Cir. 2023); *Meta Platforms, Inc. v. Fed. Trade Comm'n*, 723 F. Supp. 3d 64, 87 (D.D.C. 2024). This Court, likewise, cannot reach a different outcome regarding the MSPB.

Because the MSPB falls within the scope of *Humphrey's Executor*, Congress has the power to specify that members of the MSPB may serve for a term of years, with the President empowered to remove those members only for inefficiency, neglect of duty, or malfeasance in office. The President thus lacks the power to remove Harris from office at will. Because the President did not indicate that he sought to remove Harris for inefficiency, neglect of duty, or

malfeasance in office, his attempt to terminate her was unlawful and exceeded the scope of his authority.[5]

## B.  Remedy

With the merits aside, the Court turns to the question of remedy.  Harris offers up three avenues for relief: declaratory judgment, a permanent injunction, and a writ of mandamus.  *See* Compl. ¶¶ 38–39, 42–44, 45–46; Pl.'s Mot. at 27–36.  The Court concludes that because any attempt to remove Harris is unlawful, she is entitled to declaratory judgment that she remains a properly appointed member of the MSPB.  The Court additionally determines that Harris has met her burden for the permanent injunction she seeks, and that a writ of mandamus would be appropriate if such injunctive relief were unavailable.

### 1.  Declaratory Judgment

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  It provides neither jurisdiction nor a cause of action, but rather a form of relief when the case is already properly before the Court.  *See C&E Servs., Inc. of Washington v. D.C. Water & Sewer Autho.*, 310 F.3d 197, 201 (D.C. Cir. 2002); *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 35 (D.D.C. 2016).  The Article III case-or-controversy requirement "is no less strict when a party is seeking a declaratory judgment than for any other

---

[5] The parties do not debate the cause of action through which this legal challenge must flow—whether it be the APA, an *ultra vires* claim, or a separation of powers claim.  These distinctions can be meaningful.  *See, e.g.*, *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 199–201 (D.D.C. 2024) (examining the compatibility of an APA and *ultra vires* claim).  The Court does not interpret this issue to be jurisdictional, however, and does not address an question the parties themselves declined to raise.

relief." *Fed. Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 963 (D.C. Cir. 1995) (citing *Altvater v. Freeman*, 319 U.S. 359, 363 (1943)). To establish that a matter is a "controversy" within the meaning of the Declaratory Judgment Act and Article III of the Constitution, a party "must 'show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Hoffman v. Dist. of Columbia*, 643 F. Supp. 2d 132, 140 (D.D.C. 2009) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

"[A] declaratory judgment always rests within the sound discretion of the court," *President v. Vance*, 627 F.2d 353, 365 n.76 (D.C. Cir. 1980) (citing *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494 (1942)), and "[t]here are no dispositive factors a district court should consider in determining whether it should entertain an action brought under the Declaratory Judgment Act." *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (quoting *POM Wonderful LLC v. FTC*, 894 F. Supp. 2d 40, 44 (D.D.C. 2012)). Several factors may be helpful to the Court's consideration of "the propriety of granting a declaratory judgment," however, such as "whether it would finally settle the controversy between the parties"; "whether other remedies are available or other proceedings pending"; and "the public importance of the question to be decided." *Hanes Corp. v. Millard*, 531 F.2d 585, 592 n.4 (D.C. Cir. 1976). The Court might also consider "1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Glenn*, 222 F. Supp. 3d at 36 (citing *President*, 627 F.2d at 365 n.76).

First, the Court finds a "controversy" here within the meaning of the Declaratory Judgment Act. The parties place before the Court a "substantial controversy" over the

lawfulness of the President's effort to terminate Harris without cause, and whether she remains a member of the MSPB. *Hoffman*, 643 F. Supp. 2d at 140; *see also* Pl.'s Mot. at 11–26; Defs.' Opp'n at 5–13.  The parties have adverse legal interests, with Defendants arguing that the President has a power that Harris claims he does not. *See, e.g.*, Defs.' Opp'n at 5 (arguing that the President's removal power over principal officers is absolute).  This controversy is also "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Hoffman*, 643 F. Supp. 2d at 140.  The controversy here is not based, for instance, on "the occurrence of a future or contingent event," but has rather come to a head after the President attempted to terminate Harris. *C.F. Folks, Ltd. v. DC Jefferson Bldg., LLC*, 308 F. Supp. 3d 145, 150 (D.D.C. 2018).

The Court additionally finds that declaratory relief is appropriate here.  A declaratory "judgment will serve a useful purpose in clarifying the legal relations" between Harris and Defendants and abate ongoing "uncertainty, insecurity, and controversy" over her status as a member of the MSPB. *Glenn*, 222 F. Supp. 3d at 36.  The question is also one of significant "public importance," *Hanes Corp.*, 531 F.2d at 592 n.4, given that it concerns the structure and independence of a federal agency.  Although "other remedies" may be available, *id.*, declaratory judgment remains appropriate to clarify Harris's legal status, particularly given the complexity of injunctive relief in this area.  In addition, the Declaratory Judgment Act grants authority to enter declaratory judgment "whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

Defendants argue that the Court cannot issue declaratory judgment because it cannot enjoin the President. *See* Defs.' Mot. at 21–22 (citing *Samuels v. Mackell*, 401 U.S. 66, 70 (1971)).  First, the declaratory judgment here clarifies not just the President's legal relationship with MSPB members, but also subordinate officials' legal rights and duties.  Second, the

Supreme Court clarified in *Samuels* that it did "not mean to suggest that a declaratory judgment should never be issued in cases of this type if it has been concluded that injunctive relief would be improper." *Samuels*, 401 U.S. at 73. "There may be unusual circumstances in which an injunction might be withheld because, despite a plaintiff's strong claim for relief under the established standards, the injunctive remedy seemed particularly intrusive or offensive." *Id.* "[I]n such a situation, a declaratory judgment might be appropriate and might not be contrary to the basic equitable doctrines governing the availability of relief." *Id.* Courts withhold injunctive relief against the President precisely because it is considered "particularly intrusive or offensive," and declaratory judgment remains warranted here given Harris's "strong claim for relief under the established standards." *Id.* Defendants additionally cite no controlling authority for the notion that declaratory judgment may not clarify the legal relationship between the President and other parties. To the contrary, appellate courts have previously affirmed the issuance of declaratory relief involving the President. *See Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (considering declaratory judgment to be a less drastic remedy than a writ of mandamus); *see also Clinton v. City of New York*, 524 U.S. 417, 421 (1998) (affirming declaratory judgment that the President's actions under Line Item Veto Act were invalid).

For these reasons, the Court enters declaratory judgment in this case clarifying that Harris remains a member of the MSPB, and that she may not be removed from her position absent inefficiency, neglect of duty, or malfeasance in office.

### 2. Permanent Injunction

Harris additionally seeks a permanent injunction barring several officials—not including the President—from removing her or treating her as removed. *See* Compl. ¶¶ 45–46; Pl.'s Mot.

at 28–30; Pl.'s Proposed Order, ECF No. 22-1.  Defendants argue that Harris is not entitled to an injunction because the Court lacks the power to issue equitable relief "reinstating" an officer removed by the President.  Defs.' Opp'n at 14–18.  Defendants also contend that Harris has not suffered an irreparable injury and that the balance of the equities weigh in their favor.  *See id.* at 18–21.  The Court must therefore examine its power to issue equitable relief here before it considers whether to issue that relief.

### a. Availability of Injunctive Relief

Defendants argue that Harris's remedy must be limited to backpay, and that an injunction is inappropriate because that relief was not "traditionally accorded by courts of equity" to remedy an official's wrongful removal from office.  Defs.' Opp'n at 14 (quoting *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)).  Plaintiff responds that federal courts have long granted injunctive relief reinstating federal employees, and that mandamus should be available in the alternative.  *See* Pl.'s Reply at 10–19.

In *Grupo Mexicano*, the Supreme Court considered whether "a United States District Court has the power to issue a preliminary injunction preventing the [debtor] defendant from transferring assets in which no lien or equitable interest is claimed."  527 U.S. at 310.  The Court explained that "equity is flexible; but in the federal system, at least, that flexibility is confined within the broad boundaries of traditional equitable relief."  *Id.* at 322.  "[E]quity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73)."  *Id.* at 318 (quoting A. Dobie, Handbook of Federal Jurisdiction and Procedure 660 (1928)).  The Court concluded that because the Court of Chancery lacked "an equitable power to restrict a debtor's use of his unencumbered property

before judgment," a contemporary federal court lacks that power as well. *Id.* at 322; *see also id.* at 319–20. Defendants similarly reason that because the Court of Chancery did not issue injunctions returning public officials to their offices, this Court cannot either. *See* Defs.' Opp'n at 14–15. That contention stumbles, however, for at least two reasons.

The first is on-point Supreme Court guidance. In *Sampson v. Murray*, the Supreme Court considered whether a probationary employee at the General Services Administration could receive a temporary restraining order enjoining her dismissal during an administrative appeal to the Civil Service Commission. 415 U.S. 61, 62–63 (1974). The Court explained that a district court has "authority to grant interim injunctive relief to a discharged Government employee," *id.* at 63, but that the plaintiff before the Court did not make the elevated "showing of irreparable injury sufficient in kind and degree to override" the Government's usual autonomy over its internal affairs, *id.* at 84. Loss of wages and reputation could be remedied through further proceedings and was not enough to warrant injunctive relief for a federal employee, *see id.* at 91–92, but that relief may be appropriate "in the genuinely extraordinary situation," rather than "in the routine case." *Id.* at 92 n.68. The Court specifically addressed *White v. Berry*, in which the Supreme Court reasoned that "a court of equity has no jurisdiction over the appointment and removal of public officers." 171 U.S. 366, 377 (1898) (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)). The *Sampson* Court asserted that "[m]uch water has flowed over the dam since 1898," and that subsequent cases had recognized that federal courts are generally empowered to review the claims of discharged federal employees. *Sampson*, 415 U.S. 71–72 (citing *Service v. Dulles*, 354 U.S. 363 (1957)); *see also Kloeckner*, 568 U.S. at 44–46 (discussing remedies for federal employee under the CSRA, Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012)

(listing "reinstatement" as among "the kinds of relief that the CSRA empowers" courts to provide).  Harris's situation is additionally akin to that of the *Sampson* plaintiff because there is a federal standard to which Harris's hiring and firing must adhere, and one that the Court must enforce.  *Sampson* thus instructs that equitable relief is available to Harris if she can show that her termination represents a "genuinely extraordinary situation," rather than a "routine case." *Sampson*, 415 U.S. at 92 n.68.[6]  *Sampson* is not unique; the Supreme Court has repeatedly determined that plaintiff federal employees were entitled to reinstatement after termination violated their legal rights.  *See Service*, 354 U.S. at 388–89; *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959); *see also Miller v. Clinton*, 687 F.3d 1332, 1360 n.7 (D.C. Cir. 2012) (Kavanaugh, J., dissenting) (explaining that for a federal employee experiencing "unconstitutional discrimination, equitable relief could include an injunction prior to termination or reinstatement subsequent to termination").

The D.C. Circuit has also found injunctive relief against subordinate federal officials to be available to restore presidential appointees to their offices, although the Government did not raise the scope of historical equitable relief in those cases.  *See Swan v. Clinton*, 100 F.3d 973, 976–81 (D.C. Cir. 1996); *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023).[7]  In *Swan*, the six-year term of a member of the Board of the National Credit Union Administration ("NCUA") had expired, but he remained in office because the relevant statute allowed members to serve until their successors had qualified.  *Swan*, 100 F.3d at 975–76.  President Clinton

---

[6] There can additionally be no dispute that federal courts may grant injunctive relief "with respect to violations of federal law by federal officials."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)).

[7] Cases before other courts add further evidence that this power exists.  *See* Pl.'s Reply at 11–12 (collecting cases).

removed the board member, who then sued seeking declaratory judgment and an injunction ordering his reinstatement.  *See id.*  The court assessed the board member's standing to bring the case, focusing on whether his claims were judicially redressable.  *Id.* at 976–81.  The court was uncertain of its power to enjoin the President himself from removing the plaintiff from office, *see id.* at 977–78, but reasoned that it could instead "ensure the rule of law" by issuing "injunctive relief against subordinate officials" effectuating his reinstatement "*de facto* by" requiring his colleagues to treat him "as a member of the NCUA Board and allowing him to exercise the privileges of that office," *id.* at 978, 980.  This encompassed, for instance, "including [the plaintiff official] in Board meetings, giving him access to his former office, recording his votes as official votes of a Board member, allowing him to draw the salary of a Board member *etc.*"[8] *Id.* at 980.  The Circuit reprised this analysis in *Severino*, in which President Biden removed a member of the Administrative Conference of the United States Council, *see Severino*, 71 F.4th at 1041, and the plaintiff had standing because a court could "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment," *id.* at 1042–43 (quoting *Swan*, 100 F.3d at 980).[9]

Second, it is also clear that even if *Sampson*, *Swan*, and *Severino* did not make equitable relief available to Harris in a "genuinely extraordinary situation," she would nonetheless be entitled to a writ of mandamus—which is a remedy at law.  *See Kalbfus v. Siddons*, 42 App. D.C.

---

[8] The Circuit ultimately concluded that the board member's claim failed on the merits because, even assuming that NCUA board members had removal protections, holdover members would be entitled to no such protection.  *See Swan*, 100 F.3d at 983–88.

[9] Defendants argue that these cases are not on point because the courts there were considering the redressability of the plaintiffs' claims when evaluating their standing.  *See* Defs.' Opp'n at 16; *Swan*, 100 F.3d 976–81; *Severino*, 71 F.4th at 1042–43.  Yet the Circuit's reasoning is no mere dicta, as a federal court must determine that it has the power to grant effective relief before assuming jurisdiction over a case.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

310, 319–21 (D.C. Cir. 1914) (collecting cases); *see also* Pl.'s Reply at 15–16 (collecting

sources). To the extent that English equity courts declined to issue injunctions reinstating

officials to their positions, they likely did so because the King's Bench, a court of law, would

readily issue mandamus instead. *See Walkley v. City of Muscatine*, 73 U.S. 481, 483–84 (1867)

(explaining, relying on English cases, that "a court of equity is invoked" only where "a court of

law . . . is inadequate to afford the proper remedy"); *Parker v. Winnipiseogee Lake Cotton &

Woolen Co.*, 67 U.S. 545, 550–51 (1862) (similar). English courts around the time of the

founding recognized this power and exercised it regularly. *See, e.g.*, *R. v. Mayor of London*, 100

Eng. Rep. 96, 98 (1787) (recognizing power to issue mandamus reinstating public official);[10] *R.

v. Mayor and Aldermen of Doncaster* (1752), 96 Eng. Rep. 795 (restoring municipal official to

his office after removal by town council); *R. v. Mayor, Bailiffs, and Common Council of the

Town of Liverpool* (1759), 97 Eng. Rep. 533 (same);[11] *R. v. Mayor, Aldermen and Burgesses of

Doncaster* (1729), 92 Eng. Rep. 513 (same); 73 Eng. Rep. at 752 (discussing *Thompson v.

Edmonds*, in which the King's Bench restored a bailiff to his office because he "was removed"

by the mayor "without cause"); *R. v. Mayor, Aldermen, and Common Council of Gloucester*, 90

Eng. Rep. 1148 (restoring official to office of capital burgess). Numerous treatises further

confirm this practice. *See* 3 W. Blackstone, Commentaries *264–265 ("The writ of mandamus is

. . . a most full and effective remedy, in the first place, for refusal of admission where a person is

entitled to an office or place in any such [municipal] corporation; and, secondly, for wrongful

---

[10] During this case, respected trial lawyer Thomas Erskine explained that "[w]henever a person is improperly suspended or removed from an office, whether it concern public or private duties, if he has a certain term in it, and there are profits annexed to it, and the party has no other specific legal remedy, the Court will grant mandamus to restore him." 100 Eng. Rep. at 97.

[11] Here, Lord Mansfield explained that when officials respond to an action for mandamus, "the return must set out all the necessary facts, precisely; to shew that the person is removed in legal and proper manner, and for a legal cause." 97 Eng. Rep. at 537.

removal, when a person is legally possessed."); Thomas Tapping, *The Law and Practice of the High Prerogative Writ of Mandamus as it Obtains Both in England and in Ireland* 221 (1853) ("The writ of mandamus . . . has by a great number of cases held to be grantable . . . to restore him who has been wrongfully displaced, to any office, function, or franchise of a public nature . . . ."); *id.* at 224 (distinguishing an officer "at pleasure" who may be removed without cause).[12] Even the treatise cited in Defendants' opposition explains that a court sitting in equity would "not interfere by injunction" in such cases simply because it would instead "leave that question to be determined by a legal forum." 2 James L. High, *Treatise on the Law of Injunctions* § 1312 (2d ed. 1880); *see also* Defs.' Opp'n at 15. This was the state of the law at the time of the founding, as well as when Congress passed the All Writs Act as part of the Judiciary Act of 1789. *See Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 40 (1985). For this reason, the Supreme Court was careful in both *In re Sawyer* and *White v. Berry* to specify that mandamus was available "to determine the title to a public office" in "the courts of law." *In re Sawyer*, 124 U.S. at 212; *White*, 171 U.S. at 377.[13]

---

[12] Later treatises provide additional support for use of the writ of mandamus "for the purpose of restoring an individual to an office, where he has been illegally deprived of the possession thereof." Horace G. Wood, *A Treatise on the Legal Remedies of Mandamus and Prohibition, Habeas Corpus, Certiorari and Quo Warranto* 11 (1891). "When the title to the office is indisputable," proceedings for the writ of *quo warranto* would be "dilatory" and "a mandamus would be proper and should be awarded." *Id.* at 12 (quoting 7 How., 128); *see also* 1 Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* § 55 (1909) ("The jurisdiction to determine the title to a public office belongs only to courts of law and is exercised . . . by mandamus . . . and the mode of procedure established by the common law or by statute"); 2 Eugene McQuillin, *A Treatise on the Law of Municipal Corporations* § 582 (1911) (same).

[13] Defendants argue that Harris was effectively removed from office and seeks a court order returning her to it. *See* Defs.' Opp'n at 15. The D.C. Circuit has clarified that this is not the case, and that Harris was never in fact removed. *See Kalbfus*, 42 App. D.C. at 321 ("In the present case the removal of the relator having been illegal and void, the office never became vacant . . . .").

As the Court explains below, however, a writ of mandamus can issue under our contemporary jurisprudence only when "the party seeking issuance of the writ ha[s] no other adequate means to attain the relief he desires." *Kerr v. U. S. Dist. Ct. for N. Dist. of California*, 426 U.S. 394, 403 (1976) (citing *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)). Because the Court reads *Sampson*, *Swan*, and *Severino* to allow it to issue an injunction, it concludes that this injunction represents "adequate means" to provide Harris's requested relief, barring a mandamus remedy. *Kerr*, 426 U.S. at 403. This represents a curious reversal from norms before English courts, where reinstatement of officials through legal means was preferred over restoration through equitable means. *See Swan*, 100 F.3d at 976–81; *Severino*, 71 F.4th at 1042–43. Yet the broader point is that this Court may provide Harris *some* form of effective relief preventing her unlawful termination from the MSPB, whether it be through an injunction or a writ of mandamus. *See Swan*, 100 F.3d at 977 n.1 (explaining that a request for injunction and request for writ of mandamus can be "essentially" the same thing in some contexts).

Finally, Defendants argue that the Court cannot enjoin the President or enjoin others in a manner that restricts his Article II authority. *See* Defs.' Opp'n at 16. To be clear, Harris does not ask the Court to enjoin President Trump, *see, e.g.*, Pl.'s Proposed Order, and the Court does not do so.[14] Yet Defendants cite no authority for the proposition that a court lacks the power to enjoin the President's subordinates to restrain the President's violation of law. In fact, that is

---

[14] The availability of injunctive relief against the President may depend in part on whether compliance with 5 U.S.C. 1202(d) represents a ministerial rather than executive duty, a question the Supreme Court has "left open." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion); *see also State of Mississippi v. Johnson*, 71 U.S. 475, 498 (1866) (declining to decide whether a court may require the President "to perform a purely ministerial act," and defining a "ministerial duty" as "one in respect to which nothing is left to discretion); *McCray v. Biden*, 574 F. Supp. 3d 1, 9 (D.D.C. 2021) ("*Franklin*, however, did not absolutely slam the door shut on presidential injunctions."). Of course, the Court need not decide this question here.

precisely the remedy the Supreme Court affirmed in *Youngstown Sheet & Tube Co. v. Sawyer*,

343 U.S. 579, 584 (1952) (describing preliminary injunction restraining Secretary of Commerce

from following President Truman's orders and "continuing the seizure and possession of the

[steel] plant"). And in *Swan v. Clinton*, the D.C. Circuit concluded that a district court could

enjoin the President's subordinates in order to effectuate a federal official's reinstatement. *See*

100 F.3d at 979; *see also id.* (concluding that "injunctive relief against such officials could

substantially redress [the terminated official's] injury"); *see also Severino*, 71 F.4th at 1042–43.

Having assured itself that injunctive relief is available here, the Court proceeds to consider

whether a permanent injunction is warranted.[15]

### b. Factors for Permanent Injunction

An injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Yet "it goes without saying that federal courts

must vigilantly enforce federal law and must not hesitate in awarding necessary relief." *DL v.*

*District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) (quoting *Horne v. Flores*, 557 U.S.

433, 450 (2009)). A permanent injunction is a "forward-looking" remedy, *Gratz v. Bollinger*,

539 U.S. 244, 284 (2003), the "principal purpose" of which is to "deter future violations, and not

to punish the violator," *Sec. & Exch. Comm'n v. Savoy Indus., Inc.*, 587 F.2d 1149, 1169 (D.C.

Cir. 1978). "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a

court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). A

plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies

---

[15] Defendants additionally suggest that "when executive officers have challenged their removal by the President, they have traditionally sought back pay, not reinstatement." Defs.' Opp'n at 13. The Court fails to see how it might lack the power to issue injunctive relief here simply because the plaintiffs in *Wiener* and *Humphrey's Executor* decided to seek another remedy.

available at law, such as monetary damages, are inadequate to compensate for that injury; (3)

that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity

is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

*Id.* Where the federal government is the opposing party, the balance of equities and public

interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court "has

repeatedly held that the basis for injunctive relief in the federal courts has always been

irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456

U.S. 305, 312 (1982); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290,

297 (D.C. Cir. 2006) (same).

      For the same reasons the Court discussed in its previous opinion, Harris has established

that she has suffered irreparable harm and will likely suffer irreparable harm in the future absent

injunctive relief. *See* Mem. Op. at 11–19; *Standing Rock Sioux Tribe v. U.S. Army Corps of

Eng'rs*, 540 F. Supp. 3d. 45, 55 (D.D.C. May 21, 2021) ("While the irreparable-harm

requirement is recited in the past tense, it is clear that future harm may qualify." (citing

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010))). Congress intended the

MSPB and its members to carry out their limited duties with a degree of independence from the

President, guided primarily by his selection of members for the multimember board rather than

"the Damocles' sword of removal." *Wiener*, 357 U.S. at 356. As the Court reasoned in its

previous memorandum opinion, the MSPB's independence would evaporate if the President

could terminate its members without cause, even if a court could later order them reinstated. *See*

Mem. Op. at 16. Harris has undoubtedly experienced an injury to this independence in her

capacity as a member of the MSPB following the President's attempt to terminate her without

cause, and any future attempts would prove just as harmful to that autonomy.

Harris additionally suffers irreparable harm because she has been "depriv[ed] of [her] statutory right to function" as a member of the MSPB, and any further attempts to separate her from her position will exacerbate this injury. *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983). The termination email Harris received resulted in the inability to pursue her "statutory mission" to protect employees from prohibited personnel practices, such that "the loss of the ability to do what Congress specifically directed [her] to do cannot be remediated with anything other than equitable relief." *Dellinger v. Bessent*, No. 25-cv-0385, 2025 WL 471022, at *11 (D.D.C. Feb. 12, 2025). In addition, unlike most other federal employees, Harris was duly appointed by the President and confirmed by the Senate to a position carrying a term of years with specific reasons for her removal.

The Court finds that this harm represents a "genuinely extraordinary situation" meriting injunctive relief related to a federal employee's discharge. *Sampson*, 415 U.S. at 92 n.68; *see also* Mem. Op. at 12–13 (discussing *Sampson*). The clear federal statute granting Harris for-cause removal protections, coupled with longstanding precedent upholding the constitutionality of analogous provisions, overcomes the "latitude" traditionally afforded the Government "in the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83. The plaintiff in *Sampson*, who failed to meet this standard, sought an injunction temporarily enjoining her dismissal during an administrative appeal. *See id.* at 63. Yet the parties point to no administrative pathway here through which Harris could seek reinstatement following improper termination. Furthermore, whereas the *Sampson* plaintiff was a probational employee, *see id.* at 62, Harris is a member of the board of an independent agency, was appointed by the President and confirmed by the Senate, and enjoys tenure protections to preserve her independence.

For similar reasons, it is also apparent that "remedies available at law, such as monetary damages, are inadequate to compensate for" Harris's injuries. *eBay Inc.*, 547 U.S. at 391. Defendants argue that loss of salary generally does not represent irreparable harm. *See* Defs.' Opp'n at 19. As the Court has explained, however, this is not a standard employment action that can be remedied through back pay and later reinstatement, and Harris's claims do not revolve around her salary. *See* Mem. Op. at 15.

Defendants additionally cite *Raines v. Byrd*, 521 U.S. 811 (1997), for the notion that "a loss of political power" does not represent injury. Defs.' Mot. at 15. *Raines* is a case about legislators' standing to sue over legislation they perceive to cede power to the Executive Branch, and the case has minimal application to the irreparable injury analysis here. *See* 521 U.S. at 820–21. Harris is not a member of Congress, nor is standing at issue. The Supreme Court reasoned in *Raines* that any injury would be far too diffuse to support the legislators' standing, as it was spread across both Houses of Congress, and the legislators did not claim injury arising from "something to which they *personally* are entitled." *Id.* at 821. If anything, *Raines* supports Harris's claim to injury based on exclusion from her office: she has "been singled out for specially unfavorable treatment as opposed to other Members," and has lost something to which she is "personally" entitled. *Id.*

Finally, injunctive relief in this case is in the public interest, and the balance of the equities tips in Harris's favor. Given that federal law limits the conditions under which Harris's tenure may be terminated, Supreme Court precedent supports the constitutionality of those conditions, and Defendants do not argue that those conditions were met here, the Court finds that it is in the public interest to issue injunctive relief. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and

operations.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  So too is there substantial public interest in the for-cause removal protections Congress has given to certain members of independent agencies.  Furthermore, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required."  *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Defendants suggest that the public interest weighs against injunctive relief here because "[s]uch a remedy would undermine the accountability of the Executive Branch instilled by the Constitution," and the President "cannot be compelled to retain the services of a principal officer."  Defs.' Opp'n at 20–21.  This argument largely relies on Defendants' success on the merits, and the Court has already determined that the President lacks the power to remove Harris at will.  Defendants additionally argue that "the public interest is better served by an MSPB member who holds the President's confidence."  *Id.* at 21.  Yet Defendants decline to explain exactly how the public interest would be better served by removing Harris from her position. They do not dispute any of Harris's factual assertions, including her efforts to consider, deliberate, and vote on 35 cases per week to clear the MSPB's backlog of nearly 3,800 cases. *See* SUMF ¶¶ 12–28.  This effort was successful, as by early this year the inherited cases had all but disappeared.  *See id.* ¶ 20.  Recall that many of these cases involve allegations that federal agencies engaged in prohibited personnel practices, such as targeting of federal employees based on political affiliation; retaliation against whistleblowers reporting violations of law, waste, fraud and abuse; discrimination; and USERRA violations, among others.  *See* Pl.'s Mot. at 4–5 (collecting cases).  Defendants make no effort to enlighten the Court as to how Harris's handling

of these cases might differ from the President's preferred approach, let alone in a manner that might tilt the public interest factor in their favor. Defendants additionally overlook the fact that if Harris or her colleagues were ever to become inefficient, neglect their duty, or engage in malfeasance in office, the President would be empowered to remove them for cause. *See* 5 U.S.C. § 1202(d). The Court thus finds nothing in Defendants' arguments that might support a public interest against injunctive relief here.

The Court additionally notes that in opposing injunctive relief in its entirety, Defendants have declined to engage with the scope of Harris's proposed relief. *See generally* Proposed Order; Defs.' Opp'n. The Court will nonetheless tailor its declaratory and injunctive relief to meet Harris's entitlement under the law.[16]

### 3. Writ of Mandamus

Harris requests that the Court issue a writ of mandamus if no other relief is available. *See* Pl.'s Mot. at 34–35. Defendants argue that the President has no clear nondiscretionary duty here, as his selection of "who should lead an Executive Branch agency is certainly not a mere ministerial task." Defs.' Mot. at 22.

"The preemptory common-law writs are among the most potent weapons in the judicial arsenal." *Will v. United States*, 389 U.S. 90, 107 (1967). A district court has "original jurisdiction of any action in the nature of mandamus" only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy

---

[16] Although injunctive relief is merited, the Court narrows Harris's request slightly. Harris seeks a permanent injunction prohibiting several Defendants from removing her or treating her as removed. *See* Proposed Order. Yet § 1202(d) permits the President to remove her for inefficiency, neglect of duty, or malfeasance in office. The Court nonetheless notes the undisputed record demonstrating that Harris and her colleagues have carried out their duties to decide cases in addition to clearing a significant backlog.

available to [the] plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022)

(quoting *Muthana v. Pompeo*, 985 F.3d 893, 910 (D.C. Cir. 2021)). "[M]andamus jurisdiction

under § 1361 merges with the merits." *Muthana*, 985 F.3d at 910 (quoting *Lovitky v. Trump*, 949

F.3d 753, 759 (D.C. Cir. 2020)). "[E]ven if the plaintiff overcomes all these hurdles, whether

mandamus relief should issue is discretionary." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir.

2005).

The Court finds the first two requirements for mandamus relief to be satisfied.  A court

"can analyze the clear right to relief and clear duty to act requirements for mandamus

'concurrently.'" *Illinois v. Ferriero*, 60 F.4th 704, 715 (D.C. Cir. 2023) (quoting *Lovitky*, 949

F.3d at 760).  "[T]o meet the 'clear duty to act' standard, '[t]he law must not only authorize the

demanded action, but require it; the duty must be clear and indisputable.'" *Ferriero*, 60 F.4th at

715 (quoting *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931).  Based on the

Court's holding that federal law precludes the President's power to remove Harris at will, the

Court finds a duty here that is clear and indisputable, and under binding Supreme Court

precedent there is no "room for an honest difference of opinion" on the part of federal officials.

*Reichelderfer v. Johnson*, 72 F.2d 552, 554 (D.C. Cir. 1934).  In other words, the statute does not

provide room for executive discretion—the President has no menu of options to pick from when

he categorically may not remove Harris without cause.  In making this determination, the Court

additionally looks to the voluminous precedent demonstrating that courts of law issued

mandamus relief in similar situations at the time Congress passed the All Writs Act in 1789 and

over the ensuing centuries.

As the Court previewed earlier, however, it appears at present that Harris has a separate,

"adequate remedy" available in the form of a permanent injunction.  *In re Nat'l Nurses United*,

47 F.4th at 752 n.4. The Court thus determines that her request for mandamus relief fails on that basis alone. Were equitable injunctive relief unavailable here, however, the Court would not hesitate to "vigilantly enforce federal law" and "award[] necessary relief" through a writ of mandamus as an alternative remedy at law. *DL*, 860 F.3d at 726.

## V. CONCLUSION

For the foregoing reasons, Plaintiff Cathy A. Harris's motion for summary judgment is **GRANTED**; and it is

**DECLARED** that Plaintiff Cathy A. Harris remains a member of the Merit Systems Protection Board, having been confirmed by the Senate on May 25, 2022, and sworn in on June 1, 2022, and that she may be removed by the President prior to the expiration of her term in office only for inefficiency, neglect of duty, or malfeasance in office pursuant to 5 U.S.C. § 1202; and it is

**FURTHER ORDERED** that Plaintiff Cathy A. Harris shall continue to serve as a member of the Merit Systems Protection Board until her term expires pursuant to 5 U.S.C. § 1202, unless she is earlier removed for inefficiency, neglect of duty, or malfeasance in office under that statute. Defendants Secretary Scott Bessent, Deputy Director Trent Morse, Director Sergio Gor, Acting Chairman Henry Kerner, and Director Russell Vought are **ENJOINED** from removing Harris from her office without cause or in any way treating her as having been removed without cause, denying or obstructing Harris's access to any of the benefits or resources of her office, placing a replacement in Harris's position, or otherwise recognizing any other person as a member of the Merit Systems Protection Board in Harris's position; and it is

**FURTHER ORDERED** that the Court's Temporary Restraining Order is **VACATED**.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 4, 2025                         RUDOLPH CONTRERAS
                                              United States District Judge